**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JONATHAN FERRIER** | **CIVIL ACTION NO. 25-2286 c/w 26-1694** |
| **v.** | **Ref.: 26-1694** |
| **CP MARINE SERVICES, LLC and TEN MILE EXCHANGE, LLC** | **JUDGE JAY C. ZAINEY** |
| | **MAGISTRATE JUDGE KAREN WELLS ROBY** |

**MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR LEAVE TO FILE THIRD PARTY COMPLAINT</u>**

MAY IT PLEASE THE COURT:

Claimants, CP Marine Services, LLC ("CP Marine"), and Ten Mile Exchange, LLC ("Ten Mile"), (collectively "CP Marine/Ten Mile"), who, pursuant to Rule 14 of the Federal Rules of Civil Procedure, respectfully move this Honorable Court for leave to file the attached Third Party Complaint against Natalie Jean Marine, LLC ("Natalie Jean"), a subsequent employer of Jonathan Ferrier, the plaintiff in the consolidated action 25-2286, because recent discovery conducted on August 7, 2026, has revealed a potential claim against Natalie Jean for tort indemnity, contribution, and/or equitable subrogation, concerning payment of maintenance and cure obligations to or on behalf of Mr. Ferrier that have been, or could be, satisfied by CP Marine/Ten Mile.

Pursuant to LR 7.6, CP Marine/Ten Mile have sought the consent of all interested parties, including Ferrier who has not yet made a claim herein. T&M consents to the relief herein, whereas, Ferrier's position is not yet known, although it is anticipated that he opposes this relief.

## I. RELEVANT FACTS

On April 5, 2025, Jonathan Ferrier sustained a lower leg fracture while unmooring the M/V DOUGLAS as part of his employment thereon. Ferrier underwent two surgeries, had a good

recovery, never reported any problems or negative symptoms during physical therapy[1], and was released to work full duty by his surgeon, Dr. Barton Wax, on August 4, 2025. *See, Jefferson Orthopedic August 4, 2025 Records, Ex. "A".*

Plaintiff returned to employment with CP Marine, but his employment was subsequently terminated.

Thereafter, Plaintiff sought employment with one of his former employers, Natalie Jean Marine, LLC ("Natalie Jean Marine"), on or about September 30, 2025. Natalie Jean Marine had Mr. Ferrier evaluated by a medical professional on September 30, 2025, at which time Ferrier was asked, in connection with the Physical Exam, among other things:

"Have you ever had, or do you now have any of the following conditions:

| **QUESTION** | **ANSWER** |
|---|---|
| Broken Bones: | Yes, 2025 |
| Knee Trouble: | No |
| Dislocate Joints: | No |
| Foot Trouble: | No |
| Swelling of Ankles: | No |
| Any Other Medical Problems: | No |

Ferrier was also asked, and answered the following questions:

Have you ever been a patient in a hospital?
ANSWER: Yes
Have you ever had any surgical operation or been advised to do so?
ANSWER: Yes, Leg Surgery.
Do you have any condition which may require a special work assignment or job accommodation?
ANSWER: No.
Have you ever had an injury or operation to a knee or shoulder?
ANSWER: No.
Have you ever had any job which required heavy physical labor? List year.
ANSWER: Yes, 2020 – 2025.

*See, Ochsner Occupational Health – Westbank, Ex. "B"*

[1] The deposition transcript of Freed Eitmann, PT, is not yet available as it was recently conducted this week.

After considering the history reported by Ferrier, the physical exam, and using his medical training, experience, and application of the sciences, the examining medical provider, Ben Leblanc, NP, concluded in the USCG Physical Form CG-719K that Ferrier, "…has the strength, agility, and flexibility to perform all of the items listed in the physical ability table", which included:

**Section VIII: Demonstration of Physical Ability – To be completed by the Medical Practitioner**

**LISTS OF TASKS CONSIDERED NECESSARY FOR PERFORMING ORDINARY AND EMERGENCY RESPONSE SHIPBOARD FUNCTIONS**

| Shipboard Tasks, Function, Event, or Condition | Related Physical Ability | The Examiner Should Be Satisfied That The Applicant: |
|---|---|---|
| Routine movement on slippery, uneven, and unstable surfaces | Maintain balance (equilibrium) | Has no disturbance in sense of balance |
| Routine access between levels | Climb up and down vertical ladders and stairways | Is able, without assistance, to climb up and down vertical ladders and stairways |
| Routine movement between spaces and compartments | Step over high doorsills and coamings, and move through restricted accesses | Is able, without assistance, to step over a doorsill or coaming of 24 inches (600 millimeters) in height. Able to move through a restricted opening of 24 x 24 inches |
| Open and close watertight doors, hand cranking systems, open/close valve | Manipulate mechanical devices using manual and digital dexterity, and strength | Is able, without assistance, to open and close watertight doors that may weigh up to 55 pounds (25 kilograms); should be able to move hands/arms to open and close valve wheels in vertical and horizontal directions; rotate wrists to turn handles; able to reach above shoulder height |
| Handle ship's stores | Lift, pull, push, carry a load | Is able, without assistance, to lift at least a 40 pound (18.1 kilograms) load off the ground, and to carry, push, or pull the same load |
| General vessel maintenance | Crouch (lowering height by bending knees); kneel (placing knees on ground); stoop (lowering height by bending at the waist); use hand tools such as spanners, valve wrenches, hammers, screwdrivers, pliers | Is able, without assistance, to grasp, lift, and manipulate various common shipboard tools |
| Emergency response procedures including escape from smoke-filled spaces | Crawl (ability to move body using hands and knees); feel (ability to handle or touch to examine or determine differences in texture and temperature) | Is able, without assistance, to crouch, kneel, and crawl, and to distinguish differences in texture and temperature by feel |
| Stand a routine watch | Stand a routine watch | Is able, without assistance, to intermittently stand on feet for up to four hours with minimal rest periods |
| React to visual alarms and instructions, emergency response procedures | Distinguish an object or shape at a certain distance | Fulfills the eyesight standards for the merchant mariner credential |

| | | |
|---|---|---|
| React to audible alarms and instructions, emergency response procedures | Hear a specified decibel (dB) sound at a specified frequency | Fulfills the hearing standards for the merchant mariner credential |
| Make verbal reports or call attention to suspicious or emergency conditions | Describe immediate surroundings and activities, and pronounce words clearly | Is capable of normal conversation |
| Participate in fire fighting activities | Be able to carry and handle fire hoses and fire extinguishers | Is able, without assistance, to pull an uncharged 1.5 inch diameter, 50' fire hose with nozzle to full extension, and to lift a charged 1.5 inch diameter fire hose to fire fighting position |
| Abandon ship | Use survival equipment | Has the agility, strength, and range of motion to put on a personal flotation device and exposure suit without assistance from another individual |

*See, Ochsner Occupational Health – Westbank, Ex. "B"*

Nonetheless, Ben Leblanc, NP, concluded that Ferrier **WAS NOT** fit for employment as a mariner, as his USCG Physical Form CG-719K indicated:

(1) Ferrier was at high risk of having a condition that poses a significant risk of sudden incapacitation or debilitating complication, to include…diabetes mellitus…;

(2) to the best of the provider's knowledge, Ferrier had a medical condition likely to be aggravated by service at sea to render Ferrier unfit for such service or to endanger the health of other persons onboard;

the basis of which was, "Poorly controlled DMI[2] on insulin but last endo[3] notes state his DM[4] is poorly controlled and last 2 recent AIC[5] were greater than 9%[6] ". *See, Ochsner Occupational Health – Westbank, Ex. "B"*. Nevertheless, Natalie Jean Marine disregarded the September 30, 2025 advice of its chosen medical provider and hired Ferrier as a deckhand anyway, with his first day of work on October 3, 2025.

[2] Diabetes Mellitus.
[3] Endocrinologist.
[4] Diabetes Mellitus.
[5] A blood test to determine average blood sugar level over a period of time.
[6] An A1C result in excess of 8% precludes a mariner from being issued a credential authorizing work as a seaman without further review and clearance by a medical provider. See, USCG, NVIC No. 04-08.

Stan Kraly, the Natalie Jean Marine Port Captain and husband of the company's owner, confirmed that he, like Natalie Jean Marine's examining medical provider, did not detect the presence of any medical condition or disability of Ferrier at the time of his hire between September 30 and October 3. Furthermore, Ferrier himself reported to Mr. Kraly that he was medically recovered and capable of working as a deckhand[7].

Kraly testified further that, about one month into Ferrier's employment, Kraly observed Ferrier with a slight limp and a lack of agility in walking on the deck of the vessel to which he was assigned, the M/V GI JOE. However, Kraly was not aware of any new accident of Ferrier during his employment by Natalie Jean Marine. Further, Kraly made no effort to have Ferrier's newly discovered condition evaluated or treated by a medical professional.

Consistent with Kraly's observations "one month" into Ferrier's employment that began on October 3, on November 4, 2025, Ferrier sought medical treatment for right ankle and tibia and fibula discomfort, and for the first time reported right knee symptoms to Dr. Neil Duplantier. *See, Bone & Joint Clinic Records from November 4, 2025, Ex. "C".* Dr. Duplantier relates all of Ferrier's reported medical problems to the April 5 accident, whereas Dr. Michael McNulty, CP Marine/Ten Mile's IME physician, has opined that the right knee symptoms are not related to the accident in suit and Ferrier has recovered from the leg fracture without any treatment needed. *See, Bone & Joint Clinic Records from May 26, 2026, Ex. "C"; see also Dr. Michael McNulty IME Report, Ex. "D".*

Plaintiff demanded payment of maintenance and cure benefits from CP Marine/Ten Mile, based on his medical treatment commencing on November 4, 2025, on March 6, 2026, April 23, , May 28, June 15, and June 29. *See, Plaintiff Maintenance and Cure Demands, Ex. "E".* On July

[7] The transcript of Mr. Kraly's deposition was not yet available at the time of this filing.

2, 2026, CP Marine/Ten Mile sent maintenance payments to Plaintiff, effective February 10, 2026, the date his employment with Natalie Jean Marine ended, which payments have continued through present. *See, Email from Monique Nunez of Condon Claims to Plaintiff's Counsel RE: Initiating Maintenance, Ex. "F".* Further, CP Marine/Ten Mile have agreed to payment of certain past and outstanding medical expenses incurred by Ferrier, and are awaiting records from Ferrier's counsel to accomplish same. *See, Correspondence with Condon Claims and Adam Davis, Ex. "G".*

## II. LAW AND ARGUMENT

Rule 14(a)(1) of the Federal Rules of Civil Procedure states in pertinent part that "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it.

CP Marine/Ten Mile proposed Third Party Complaint falls squarely within the purpose of Rule 14 because the claims that CP Marine/Ten Mile assert against Natalie Jean Marine show that company may be liable for all or part of Ferrier's maintenance and cure claims he has asserted against CP Marine/Ten Mile, and which they have satisfied in part.

The duty of maintenance and cure "obligates [maritime employers] to pay for the lost wages, medical care, food, lodging, and other incidental expenses of a mariner who falls ill or is injured while in the service of the vessel." *Johnson v. Cenac Towing, Inc.*, 599 F. Supp. 2d 721, 726 (E.D. La. 2009) (Vance, J.). "The duty is practically absolute." *Id*. "Unlike an employer's duties under the Jones Act, for example, liability for maintenance and cure is 'in no sense . . . predicated on the fault or negligence of the shipowner." *Id*. (quoting *Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 730, 63 S. Ct. 930, 87 L. Ed. 1107 (1943)).

"Before a seaman can recover maintenance and cure, he must prove (1) that he was employed as a seaman[;] (2) that his injury occurred, was aggravated[,] or manifested itself while

in the ship's service[;] (3) the wages to which he may be entitled[;] and (4) the expenditures or liability that he incurred for medicines, nursing care, board and lodging." *Messer v. Transocean Offshore USA, Inc*., No. CIV.A.03-3287, 2005 U.S. Dist. LEXIS 11571, 2005 WL 1400439, at *2 (E.D. La. June 6, 2005) (Vance, J.).

CP Marine/Ten Mile have established through uncontroverted medical evidence that on September 30, 2025, Ferrier was healthy, recovered from his April 5, 2025 injury, was without a right knee injury, was not limping, and was able to work as a deckhand without any restrictions whatsoever. *See, Ochsner Occupational Health – Westbank, Ex. "B"*; *See, Jefferson Orthopedic August 4, 2025 Records, Ex. "A".*

Further, evidence has established that Ferrier's supervisor at Natalie Jean Marine, Stan Kraly, observed an injury that occurred or manifested itself, while Ferrier was working on the M/V GI JOE as a deckhand for Natalie Jean Marine, about one month into his employment, or between October 25 and November 3, 2025. Finally, it cannot be disputed that Ferrier reported **NEW** symptoms to a medical provider, for the first time, on November 4, 2025, with respect to his right knee. *See, Bone & Joint Clinic Records from November 4, 2025, Ex. "C".*

Thus, in the event that CP Marine/Ten Mile have paid, now or in the future, maintenance and cure benefits to or on behalf of Ferrier, concerning a new injury that manifested or occurred during Ferrier's employment with Natalie Jean Marine, they are entitled to reimbursement from Natalie Jean Marine for same. Further, to the extent that Ferrier sustained a new injury or aggravation of his prior injury, as a result of Natalie Jean Marine's negligence or an unseaworthy condition, CP Marine/Ten Mile would likewise be entitled to contribution, indemnity, or reimbursement. *Poincon v. Offshore Marine Contractors, Inc.*, 9 F. 4th 289, 296 (5th Cir. 2021); *Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1013 (5th Cir. 1994); *Adams v. Texaco, Inc.*,

640 F.2d 618 (5th Cir. Unit A Mar. 1981); *Savoie v. Lafourche Boat Rentals, Inc.*, 627 F.2d 722 (5th Cir. Unit A 1980). Finally, if Ferrier was not injured on April 5, 2025 as a result of the negligence of CP Marine/Ten Mile, and his prior injury was merely aggravated during his employment with Natalie Jean Marine, CP Marine/Ten Mile could be entitled to reimbursement or contribution, as CP Marine/Ten Mile and Natalie Jean Marine would be solidary obligors for the same obligation or would owe contribution in line with their respective interests.

CP Marine/Ten Mile did not possess the information providing the basis for its proposed Third-Party Complaint against Natalie Jean Marine until the August 7, 2026 deposition of Stan Kraly, taken in the consolidated case No. 25-2286. Based upon Mr. Kraly's testimony, CP Marine/Ten Mile learned that Ferrier's new medical condition first documented by Dr. Neil Duplantier on November 4, manifested itself on a Natalie Jean Marine vessel during Ferrier's employment with that company. Thus, it diligently worked to bring these claims upon discovery of the basis thereof, making the claim timely.

WHEREFORE, Claimants, CP Marine, LLC and Ten Mile Exchange, LLC, respectfully request leave of Court to file a Third Party Complaint against Natalie Jean Marine, LLC, for the reasons set forth herein.

Respectfully submitted,

*/s/ Paul D. Hale*
Paul D. Hale (#30539)
Kari M. Rosamond (#34065)
**HALE DEVALL, LLC**
400 Poydras Street, Suite 2107
New Orleans, LA 70130
Telephone: 504-576-0700
phale@haledevall.com
krosamond@haledevall.com

***Attorneys for CP Marine, LLC and Ten Mile Exchange, LLC***