**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **JONATHAN FERRIER** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 25-2286 c/w 26-1694** |
| | * | |
| **CP MARINE SERVICES, LLC, ET AL.** | * | **SECTION: A(4)** |
| | * | |
| **REF: 25-2286** | * | **JUDGE JAY C. ZAINEY**<br>**MAG. JUDGE KAREN WELLS ROBY** |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE AND DAUBERT MOTION TO EXCLUDE AND LIMIT THE OPINIONS AND TESTIMONY OF STACIE A. NUNEZ, CRC**

**MAY IT PLEASE THE COURT:**

Plaintiff Jonathan Ferrier respectfully submits here his Memorandum in Support of his Motion *in Limine* to Exclude the Opinions of Vocational Rehabilitation Counselor, Stacie Nunez–and specifically, the opinions in her August 10, 2026 report:[1] (1) that Mr. Ferrier can return to his pre-injury work as a deckhand "which would result in no wage loss;" and (2) that Mr. Ferrier's pre-injury goal of advancing through the maritime ranks to become a licensed captain was neither realistic nor attainable. Both conclusions are inadmissible under Federal Rule of Evidence 702 and *Daubert*.

## I. FACTUAL BACKGROUND

On April 6, 2025, while working as a Jones Act seaman for CP Marine Services, twenty-two-year-old Jonathan Ferrier had his right leg caught in a mooring line and crushed against the bow H-bitt of the M/V DOUGLAS. He sustained a displaced right tibia/fibula fracture and underwent external-fixator placement and later definitive open reduction and internal fixation procedures; he continues to carry hardware in his lower right leg today.

[1] Exhibit 1 - Vocational Rehabilitation Report of Ms. Stacie Nunez.

Approximately two and half months after the open reduction internal fixation, the orthopedic surgeon, Dr. Wax, who focused on the surgical repair of Ferrier's lower leg/ankle released Ferrier to return to work "as tolerated."[2] But Dr. Wax hedged his return to work determination by saying Ferrier had not yet reached maximum medical improvement (MMI) and by indicating that Ferrier suffered from continued limited range of motion in his ankle and antalgic gait of the right lower extremity (a limp).[3] For the Court's benefit, here are the images of Jonathan Ferrier's leg post-incident and post-ORIF surgery:




*Imaging and colorization of Mr. Ferrier's leg post incident.*

[2] Exhibit 2- Dr. Wax's August 4, 2025 Return to Work Note and Accompanying Office Note.
[3] Id.




*Imaging and colorization of Mr. Ferrier's leg post-ORIF surgery (current state).*

Jonathan Ferrier is not an orthopedic surgeon, and he was facing serious financial struggles in the months that followed his incident. So, when Dr. Wax issued his return to work note on August 4, 2025, Ferrier trusted his medical provider's opinion and returned to an alternate work position offered by CP Marine. That second stint of employment lasted less than 10 days. Significantly, Ferrier's termination letter after that brief period of alternate employment provides in pertinent part that he was being terminated because he had "not demonstrated the physical capability required to effectively carry out the essential duties of the position."[4]

[4] Exhibit 3 - CP Marine Letter of Termination.

Having just been terminated, and still relying on the Return to Work note from Dr. Wax, Jonathan Ferrier reached out to a prior employer, Captain Stan Kraly of Natalie Jean Marine, in hopes that he might be able to secure a job with his company. Ferrier was honest with Captain Kraly from the beginning: he told Captain Kraly that his leg had been crushed earlier in the year; that he had received surgeries; that he had worked to rehab the leg; and that he had a Return to Work determination from his treating physician, Dr. Wax.

Captain Kraly sent Jonathan Ferrier to Ochsner Urgent Care in Marrero, Louisiana on September 30, 2025 to receive a physical that tracked the 719k U.S. Coast Guard Medical Certificate. The evaluation was done solely for the benefit of Natalie Jean Marine; it was not created for purposes of submission to the U.S. Coast Guard.[5] During the examination, the nurse practitioner that evaluated Ferrier expressed little interest in his prior leg injury, especially after Ferrier disclosed the Return to Work letter he had received from Dr. Wax. Instead, his focus was on Ferrier's elevated A1c levels and the management of his Type I diabetes. The nurse practitioner recommended that Jonathan Ferrier not be cleared for marine work based on his elevated A1c.[6] We now know, having deposed Jessica Chu, PA (the provider who regularly sees Ferrier for management of his Type I diabetes), that Ferrier's persistent leg pain contributes in some degree to Jonathan's difficulties managing his A1c. She explained that this is so because pain strains the endocrine system, causing the release of excess stress hormones, like cortisol and adrenaline, which trigger the release of glucose–a serious complication for an individual afflicted with Type I diabetes that cannot produce insulin on their own like a non-diabetic.[7]

---

[5] Exhibit 4 - September 30, 2025 - Ochsner Urgent Care Record.

[6] As the Court would rightly assume, there are diabetics that work in every industry, and the marine environment is no exception. The undersigned includes below a discussion of the medical waiver process for persons afflicted with Type I diabetes–none of which is discussed or otherwise mentioned in Ms. Nunez's report.

[7] Exhibit 5 - Deposition of Jessica Chu, PA - pgs. 16-20; 29-30; 34-35; 45-49.

Captain Kraly testified that he knew Ferrier was a good employee from Ferrier's first stint of employment with Natalie Jean Marine, and he wanted to give him a shot, even knowing that he had sustained a leg injury the prior spring.[8] Ultimately, Jonathan Ferrier was hired back on at Natalie Jean Marine, but in a modified deckhand role. While Ferrier assisted from time to time with traditional deckhand duties, Captain Kraly testified that he made Ferrier primarily responsible for supervising younger, inexperienced deckhands. He was to be a mentor to the new guys.[9] Jonathan started back with Natalie Jean Marine in the first week of October 2025.

Around that same time, the undersigned sent CP Marine their letter of representation demanding the preservation of all evidence and informing CP Marine that Ferrier, who was still dealing with pain (including knee pain) associated with his April 6, 2025 incident,[10] was working to schedule appointments with providers of his choosing.[11] At the time, Jonathan Ferrier had no health insurance and he had been effectively cut off of all medical benefits following his termination from CP Marine.[12]

Unfortunately, in mid-February 2026, Natalie Jean Marine ultimately released him from its employment because his post-incident physical limitations prevented him from performing the duties of a deckhand. Jonathan Ferrier simply was not the same person as he was before his accident. It was around that same time that Ferrier received his MRI results and learned that he had a torn meniscus, a cyst, and microfractures in his right knee. He also continues to experience

---

[8] Exhibit 6 - Rough transcript of the Deposition of Stan Kraly - pgs. 24-26.
[9] Exhibit 6 - Rough transcript of the Deposition of Stan Kraly - pgs. 32-33.

[10] The external A-frame that was installed during Ferrier's initial surgery to keep his bones in place was connected by a bolt to Ferrier's leg just below the knee. Ferrier did not understand that he had additional knee injuries as a consequence of the incident (later confirmed by MRI); instead, he believed that the pain he experienced was associated with the external hardware installation and the related incisions.

[11] Exhibit 7 - October 8, 2025 Letter of Representation and Notice of Continuing Treatment.
[12] Despite Jonathan Ferrier's clear status as a Jones Act seaman, CP Marine paid him indemnity and medical benefits through its workers' compensation insurer until he received the August 4, 2025 Return to Work Note from Dr. Wax.

pain and limitations in his leg and ankle (separate from the knee), which is full of hardware from his second surgery.

Before the injury, Mr. Ferrier was building a maritime career. He worked as a deckhand and, at CP Marine, was mentored by the vessel's captain, Captain Creppel, Sr., who encouraged Ferrier to pursue a career in the wheelhouse.[13] When he was terminated from CP Marine in September 2025, he immediately requested his sea time records, so that he could have a written acknowledgement from CP Marine about the amount of sea time he had accrued while serving aboard their vessels.[14] Ferrier knew that the sea time letter was important to advance his career, which is why he took concrete steps to request it from Gina Taromina of CP Marine after being terminated.

Two licensed mariners have addressed Ferrier's trajectory toward the wheelhouse. Creppel, a licensed captain of fifty years, testified unequivocally at his deposition that Mr. Ferrier would have advanced to the wheelhouse.

Q. And based on everything you saw, he was going to work his way up and -- and -- and it -- and follow his footsteps that -- that you -- you --
A. Yeah, he wanted to.
Q. And -- and -- and what you saw is someone that had the abilities and -- and -- and future to reach that -- that goal; correct?
A. Yes, sir.
Q. And Jonathan -- and you actually had conversations with Jonathan about his desire to get into the wheelhouse; correct?
A. Yes, sir.

[15]

[13] Exhibit 8 - Deposition of Jonathan Ferrier. - pages 164 - 166.
[14] Exhibit 9 - Email and Letter from Gina Taromina with attached Seatime Records. This document reflects that Jonathan had accrued 212 days aboard its vessels, which, in turn, count as time and half.
[15] Exhibit 10 - Deposition of Captain Creppel, Sr. - page 58.

> Q. And if somebody suggested that Jonathan would never have reached that goal, that wouldn't be --
> A. That wouldn't --
> Q. -- that wouldn't be based on anything that you saw; correct?
> A. No.
> Q. And so, you know, if -- if -- if a -- if someone would say Jonathan Ferrier was going to make his way up to the wheelhouse, you would agree with that; correct?
> A. Oh, yeah --
> MR. MARKS:
> Object to the form.
> THE WITNESS:
> -- I'd back him up.

[16]

And Captain Michael Berry—a United States Coast Guard Designated Examiner also provided a report addressing Mr. Ferrier's ability to obtain his credentials and advance.[17]

Unfortunately, Ferrier's treating physicians, Dr. Duplantier and Dr. Lonseth, have both opined that Ferrier is currently unable to work as a consequence of his injuries suffered on April 6, 2025, and Dr. Lonseth has opined that Ferrier will never be able to return to the marine environment given the severity of his leg crush injury, the effects of which he will face long term.

## II. LAW AND MS. NUNEZ'S OPINIONS

### A. Legal Standard

Federal Rule of Evidence 702, as amended effective December 1, 2023, permits expert testimony only if the proponent demonstrates to the court that it is more likely than not that: the expert is qualified; the testimony will help the trier of fact; the testimony is based on sufficient facts or data; it is the product of reliable principles and methods; and the expert has reliably

---

[16] Exhibit 10 - Deposition of Captain Creppel, Sr. - page 59.
[17] Exhibit 11 - Report of Captain Michael Berry.

applied those principles and methods to the facts of the case. Fed. R. Evid. 702(a)–(d). The proponent bears that burden by a preponderance of the evidence.

The trial court is the gatekeeper, and its gatekeeping obligation extends not only to scientific testimony but to all expert testimony grounded in "technical" or "other specialized" knowledge—including vocational testimony. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589–97 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999).

Three principles control this motion.

*Qualification.* An expert must be qualified in the specific field on which she opines; expertise in one discipline does not license opinions in another. "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir. 1999).

*Sufficient facts and data.* An opinion premised on unreliable or incomplete inputs is not admissible, and an expert's say-so cannot substitute for a sound factual foundation. Fed. R. Evid. 702(b); *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."). An expert may rely on otherwise-inadmissible facts or data only if experts in the field would reasonably rely on them. Fed. R. Evid. 703.

*Reliable methodology.* The opinion must be the product of a reliable method reliably applied, not the *ipse dixit* of the expert. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A methodology that disregards the most relevant evidence, or rests on an incomplete review of the

record, is not reliable. See *Paz v. Brush Engineered Materials, Inc*., 555 F.3d 383, 388-89 (5th Cir. 2009).

### B. <u>Ms. Stacie Nunez's Inadmissible Opinions</u>

Defendants retained Ms. Nunez, who holds credentials as a Certified Rehabilitation Counselor, Licensed Rehabilitation Counselor, and Certified Life Care Planner. She interviewed Mr. Ferrier by Zoom on July 24, 2026 for approximately 25 minutes and issued a report dated August 10, 2026. She offers two opinions relevant here.

First, she opines that Mr. Ferrier "is able to return to his previous work as a deckhand which would result in no wage loss," and that he can, in the alternative, perform a set of identified light-duty jobs.[18]

Second, she opines that Mr. Ferrier's pre-injury goal of advancing to captain was unrealistic—that "it did not appear that Mr. Ferrier had a plan to become a captain," that "it does not appear consistency has been demonstrated," and that "the top conditions that delay or deny application for [a] captain's license are cardiac disease, diabetes, psychiatric disorders, and sleep apnea."[19] She thus enlists Mr. Ferrier's diabetes as a reason he would not advance without commenting on the fact that his leg was crushed, his residual pain, or the effect that his pain medications or remaining injuries might have on his vocational outlook.

### C. <u>The undisclosed McNulty Opinions</u>

Ms. Nunez's "no wage loss" opinion does not rest on her own vocational analysis of admissible medical restrictions. It rests on Dr. McNulty. As her report explains, "Dr. McNulty opined he would place no physical restrictions upon Mr. Ferrier in regards to returning to the

---

[18] Exhibit 1 - Vocational Rehabilitation Report of Ms. Stacie Nunez. p.8.
[19] Exhibit 1 - Vocational Rehabilitation Report of Ms. Stacie Nunez, p. 7.

work force," and then concludes: "Based on Dr. McNulty's recommendations, Mr. Ferrier is able to return to his prior work which would result in no wage loss."[20]

Those return-to-work and no-restriction opinions appear nowhere in Dr. McNulty's Rule 26 report.[21] That report is expressly limited to an evaluation of Mr. Ferrier's "right knee" and discloses only opinions on the appropriateness of past care, causation of the meniscus tear, and maximum medical improvement; it offers no opinion on (1) work capacity, (2) restrictions, (3) employability, or (3) disability. Plaintiff has separately moved to limit Dr. McNulty's testimony to the four corners of that report and to preclude precisely the work-capacity opinions that Ms. Nunez has adopted.[22]

### D. The Captains' Testimony Ms. Nunez Failed to Consider

The materials Ms. Nunez lists as reviewed do not include Captain Creppel's deposition. She simply did not consider it. And, although her list of materials does include the report of Captain Berry, her analysis nowhere addresses, credits, or even acknowledges his opinions. Her conclusion that Mr. Ferrier lacked a realistic path to the wheelhouse was therefore reached without considering the testimony of either licensed captain who spoke to that very question—and, as to diabetes and credentialing, without any engagement with the report of the Coast Guard Designated Examiner whose job is to make such determinations.

---

[20] Exhibit 1 - Vocational Rehabilitation Report of Ms. Stacie Nunez. p.6.
[21] Exhibit 12 - Dr. McNulty Report.
[22] See Plaintiff's Motion in Limine to Limit the Testimony of Michael McNulty, M.D., to the Four Corners of His Report Under FRCP 26. (R. Doc. 45)

## III. ARGUMENT

### A. *Ms. Nunez's "no wage loss" opinion is not based on sufficient facts or data, because it rests on undisclosed and inadmissible opinions of Dr. McNulty.*

An expert opinion is only as sound as the facts and data on which it rests. Rule 702(b) requires that the opinion be "based on sufficient facts or data," and Rule 703 permits reliance on otherwise-inadmissible material only where experts in the field would reasonably rely on it. Where the foundation is removed, the opinion falls with it: an opinion "connected to existing data only by the *ipse dixit* of the expert" is inadmissible, *Joiner*, 522 U.S. at 146, and an opinion resting on unreliable or incomplete inputs offers no assistance to the trier of fact, *Viterbo*, 826 F.2d at 424.

Ms. Nunez's no-wage-loss opinion rests on a single load-bearing input: Dr. McNulty's opinion that Mr. Ferrier requires "no physical restrictions" and can return to the workforce. She says so expressly: "[b]ased on Dr. McNulty's recommendations, Mr. Ferrier is able to return to his prior work which would result in no wage loss."[23] That input is defective in two independent ways.

***It is undisclosed.*** Dr. McNulty's return-to-work and no-restriction opinions do not appear within the four corners of his Rule 26 report, which is confined to the right knee and to opinions on past care, causation, and maximum medical improvement. Ms. Nunez did not draw those opinions from the report. Plaintiff has separately moved to confine Dr. McNulty to the four corners of his report and to preclude the very work-capacity opinions Ms. Nunez adopted.

***Ms. Nunez discounts the restrictions placed on Mr. Ferrier by his treating physicians.*** Even setting disclosure aside, a reliable vocational methodology assesses a claimant's work capacity against the medical restrictions of record. Here, the only work-capacity opinions

[23] Exhibit 1 - Vocational Rehabilitation Report of Ms. Stacie Nunez, p. 6.

properly disclosed are those of the treating physicians—specifically, Dr. Lonseth, who found Mr. Ferrier permanently restricted to light-level work, unable to return as a deckhand, and unable to meet the Coast Guard's physical requirements.[24] Ms. Nunez acknowledges these opinions and then sets them aside in favor of a contrary, undisclosed opinion. Selectively crediting an undisclosed opinion over the treating physicians' disclosed restrictions is not a reliable application of vocational methodology; **it is advocacy**. The resulting opinion is not "based on sufficient facts or data" and should be excluded. Fed. R. Evid. 702(b).

***Ms. Nunez completely ignores the termination letter CP Marine issued to Jonathan Ferrier less than 10 days after returning to work in September 2025.*** As explained above, Mr. Ferrier tried to return to work for CP Marine after receiving the August 4, 2025 work release from Dr. Wax. Unfortunately, he was fired just a few days after returning. The termination letter Mr. Ferrier received from CP Marine at the time of his firing is extremely significant. It plainly states that Jonathan had "not demonstrated the physical capability required to effectively carry out the essential duties of the position."[25]

The letter is direct evidence from the employer-defendant, CP Marine, that squarely contradicts Ms. Nunez's "zero wage loss" opinion. Certainly, CP Marine would not have indicated that Jonathan lacked the "physical capability to effectively carry out the essential duties of the job" if it believed he had no physical limitations relating to the April 6, 2026 incident. The truth is, Ferrier was and continues to deal with the complications of his injuries. It was true in September 2025, and it remains true now. The fact that Ms. Nunez was not provided (or did not consider) the CP Marine termination letter is telling and serves as yet another basis for excluding her "no wage loss" opinions.

---

[24] Exhibit 13 - Signed Work Restriction Note from Dr. Eric Lonseth.
[25] Exhibit 3 - CP Marine Letter of Termination.

### B. *Ms. Nunez's opinion that Mr. Ferrier would not have advanced to captain is methodologically unreliable, because she failed to consider key evidence.*

A vocational opinion is reliable only if it accounts for the relevant facts. An expert who ignores the most probative evidence, or who reasons from an incomplete record, does not satisfy Rule 702(c)–(d). See *Paz*, 555 F.3d at 388; *Moore*, 151 F.3d at 276. And the gatekeeper may exclude an opinion where there is "too great an analytical gap between the data and the opinion offered." *Joiner*, 522 U.S. at 146.

Ms. Nunez opines that Mr. Ferrier had no realistic path to captain—that he lacked a "plan," that he had not demonstrated "consistency," and that the "full path from becoming a deckhand to captain can take eight to fifteen years."[26] [27] But she formed that opinion without several pieces of evidence that speak most directly to it.

***She never considered Captain Creppel's deposition.*** Captain Creppel—a licensed captain of fifty years—testified that Mr. Ferrier would have made it to the wheelhouse. That is precisely the question Ms. Nunez purported to answer, addressed by a **defense witness** with a half-century of licensed experience. Ms. Nunez did not consider the deposition testimony, and her report reflects no awareness of it. An opinion about a mariner's career trajectory that omits the sworn testimony of a fifty-year captain, that spent the most time of anyone with Jonathan

[26] Exhibit 1 - Vocational Rehabilitation Report of Ms. Stacie Nunez, p.7.

[27] Ms. Nunez's "eight to fifteen year" comment allegedly comes from information obtained from the Maritime Institute of Technology and Graduate Studies (MITAGS). As an aside, the undersigned has searched diligently through materials put out by MITAGS and cannot find any reference to the alleged eight to fifteen year timeframe relied upon by Ms. Nunez. To the contrary, the MITAGS website suggests the opposite is true and states that structured programs allow students to progress from entry-level training to a Mate's license in just over two years. *See* https://www.mitags.org/maritime-apprenticeship-programs/ ("The duration of the program is approximately 28 months; however, some participants have finished in as few as 24 months. Completion of the program includes finishing all the required coursework, completing the training record book, and accumulating 360 days of sea service."). Indeed, the industry would collapse if the road to the wheelhouse took as long as Ms. Nunez suggests.

Ferrier on the water, and which addresses that exact trajectory is not the product of a reliable review of the record.

***She disregarded Captain Berry's report***. Ms. Nunez did receive the report of Captain Michael B. Berry (a Coast Guard Designated Examiner who makes hiring, promotion, and credentialing decisions for working mariners) yet her analysis never mentions, credits, or engages it. An expert may not simply pass over the record evidence that cuts against her conclusion. Ignoring Captain Berry while reaching the opposite conclusion is the sort of selective, result-driven reasoning that Rule 702 forbids.

In place of that evidence, Ms. Nunez substitutes generic, unattributed "research"—an unnamed conclusion "through the Maritime Institute of Technology and Graduate Studies" about how long the path to captain "can take," and an unsourced list of the "top conditions that delay or deny" a captain's license.[28] *Ipse dixit* of this kind—an expert's assurance, untethered to the case-specific record and unsupported by any identified methodology—is not admissible. *Joiner*, 522 U.S. at 146. Because Ms. Nunez's "would not have become captain" opinion rests on an incomplete record and unverifiable generalities rather than a reliable analysis of the actual evidence, it should be excluded.

***She disregarded the fact that Jonathan had accrued substantial sea time, which he planned to use to advance his license when he requested a record of same from Gina Taromina of CP Marine.*** Ms. Nunez's report makes it seem as though twenty-two year old Jonathan Ferrier took no steps to advance to the wheelhouse, and that is simply not true. Captain Creppel and Jonathan Ferrier both testified that they had discussions about Ferrier's goals of advancing to the wheelhouse. It was through those discussions that Ferrier learned that he would need to accrue certain amounts of sea time to be eligible for a steersman's certificate, then to

[28] Exhibit 1 - Vocational Rehabilitation Report of Ms. Stacie Nunez, p. 7.

continued advancement to pilot and captain. That is why, when he was terminated from CP Marine in September 2025, he immediately requested his sea time records, so that he could have a written acknowledgement from CP Marine about the amount of sea time he had accrued while serving aboard their vessels.[29] Ferrier's decision to work as much as he had and then request that sea time record from Gina Taromina at CP Marine is precisely the type of concrete step towards advancement someone looking to ascend to the wheelhouse would make.

### C. *Ms. Nunez is not qualified to opine that Mr. Ferrier's diabetes would prevent him from advancing to captain.*

An expert may testify only within the bounds of her expertise. "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson*, 163 F.3d at 937. Credentials in one field confer no license to opine in another.

Ms. Nunez opines that diabetes is among "the top conditions that delay or deny application for [a] captain's license," and she deploys Mr. Ferrier's diabetes as a reason he would not have advanced.[30] That opinion lies at the intersection of two fields in neither of which she has any expertise: (1) medicine and (2) Coast Guard credentialing. Whether, and how, a mariner's diabetes affects his ability to obtain or retain a Merchant Mariner Credential (including a steersman endorsement and, ultimately, a master's license) is governed by the Coast Guard's medical-certification framework for merchant mariners.[31] Those standards govern how conditions such as insulin-treated diabetes are evaluated and whether a waiver issues.

Nunez's reports treat Ferrier's diabetes as an effectively dispositive barrier to future licensure. But the Coast Guard's own Merchant Mariner Medical Manual, Commandant

---

[29] Exhibit 9 - Email from Gina Taromina and attached Seatime Records. This document reflects that Jonathan had accrued 212 days aboard its vessels, which, in turn, count as time and half.
[30] Exhibit 1 - Vocational Rehabilitation Report of Ms. Stacie Nunez, p. 7.
[31] https://media.defense.gov/2019/Sep/11/2002181050/-1/-1/0/CIM_16721_48.PDF
PDF - (page 164)

Instruction M16721.48 ("the Manual"), Chapter 14 (Endocrine Conditions), shows that insulin-dependent diabetes is not automatically disqualifying. Manual Ch. 14.D.3(e) provides disqualification is conditioned on failing the medical waiver criteria, not on the diabetes diagnosis itself.[32]

Ms. Nunez's report fails to mention entirely that Ferrier's actual HbA1c range falls in the waiver-eligible band, not the presumptive-denial band. Manual Ch. 14.F.1: an HbA1c below 8% supports a full waiver; an HbA1c of 8% to 10%–the range reflected on both of Ferrier's CG-719K submissions (>9%)–"may be considered for a medical waiver" if the treating physician's evaluation and objective documentation support low risk of sudden incapacitation. Ferrier's A1c sits in the waiver-eligible middle band, not the disfavored one. Ms. Nunez's report fails to engage the actual waiver mechanics the Medical Manual itself invites and therefore must be rejected.

Ms. Nunez is a rehabilitation counselor. She is not a physician, an endocrinologist, a Coast Guard official, or a Designated Examiner, and nothing in her report reflects any training or experience with the Coast Guard's medical-certification or credentialing requirements. She is therefore unqualified to opine on how the Coast Guard would treat Mr. Ferrier's diabetes in credentialing him—a quintessentially medical and regulatory judgment outside a vocational counselor's field. *Wilson*, 163 F.3d at 937.

### D. *The defects go to admissibility, not weight, and warrant exclusion.*

Defendants may respond that these are matters for cross-examination and weight. They are not. Where an opinion is unqualified, unsupported by sufficient facts, or the product of an unreliable methodology, exclusion, not lesser weight, is the gatekeeper's proper response.

[32] https://media.defense.gov/2019/Sep/11/2002181050/-1/-1/0/CIM_16721_48.PDF

*Daubert*, 509 U.S. at 597; *Kumho Tire*, 526 U.S. at 158–59. Vigorous cross-examination is the answer to a shaky but admissible opinion; it is not a cure for an opinion that fails Rule 702's threshold requirements in the first place. Each opinion challenged here fails at that threshold: the no-wage-loss opinion for want of an admissible factual foundation, the no-advancement opinion for want of a reliable methodology, and the diabetes opinion for want of qualification. Each should be excluded.

## IV. CONCLUSION

For the foregoing reasons, plaintiff Jonathan Ferrier respectfully requests that the Court grant this motion and enter an Order excluding and limiting the opinions and testimony of Stacie A. Nunez, CRC, as follows: (1) precluding any opinion that Mr. Ferrier can return to work as a deckhand, or otherwise without wage loss; (2) precluding any opinion that Mr. Ferrier would not have advanced to a licensed captain or reached the wheelhouse, that opinion having been formed without consideration of the deposition testimony of Captain Creppel, Sr. and the report of Captain Berry; and (3) precluding any opinion that Mr. Ferrier's diabetes would delay or deny his ability to obtain a captain's license or otherwise advance, an opinion beyond Ms. Nunez's qualifications.

[SIGNATURES NEXT PAGE]

Respectfully submitted,

**ADAM DAVIS LAW FIRM**

BY: /s/ Taylor M. Bologna________
Adam Neely Davis (Bar No. 35740)
Taylor M. Bologna (Bar No. 37594)
Michelle Paré Ricca (Bar No. 41385)
22398 Hwy. 435
Abita Springs, Louisiana 70420
Telephone: (504) 553-1435
Facsimile: (504) 553-1439
ad@adamdavislawfirm.com
taylor@adamdavislawfirm.com
michelle@adamdavislawfirm.com

**ATTORNEYS FOR JONATHAN FERRIER**