**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JONATHAN FERRIER** | **CIVIL ACTION** |
| **VERSUS** | **NO. 25-2286 C/W 26-1694** |
| **CP MARINE SERVICES, LLC ET AL.** | **SECTION: A(4)** |
| **REF: ALL CASES** | |

**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE, OR ALTERNATIVELY LIMIT OPINION TESTIMONY OF DEFENDANTS' EXPERTS CAPT. MARC A. FAZIOLI, STACIE A. NUNEZ, AND KYLE P. MCAVOY REGARDING JONATHAN FERRIER'S WHEELHOUSE ADVANCEMENT**

Plaintiff Jonathan Ferrier respectfully moves in limine under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), to exclude opinions offered by Defendants' retained experts Captain Marc A. Fazioli, Stacie A. Nunez, and Kyle P. McAvoy concerning Mr. Ferrier's potential advancement from deckhand to a licensed wheelhouse position, including Apprentice Mate/Steersman, Pilot, or Master, absent his April 6, 2025 injury. These opinions fail Rule 702 because the experts lack the necessary qualifications and do not apply any identifiable, reliable methodology. Alternatively, Plaintiff moves under Federal Rule of Evidence 403 to exclude two of the three opinions as needlessly cumulative and unfairly prejudicial.

None of the three experts has specialized training or experience in Coast Guard licensing and credentialing sufficient to support the opinions offered here. Nor does any expert apply an identifiable or testable methodology to the governing Coast Guard requirements or to Mr. Ferrier's individual qualifications and advancement path. Instead, Defendants offer three witnesses who reach variations of the same unsupported conclusion. Presenting those opinions

together would give the jury the appearance of expert consensus without a reliable foundation to support it.

## BACKGROUND

Defendant CP Marine Services, LLC ("CP Marine")[1] employed Jonathan Ferrier as a deckhand. In the early hours of April 6, 2025, Mr. Ferrier was working aboard the M/V DOUGLAS.[2] Captain Creppel, Sr. maneuvered the DOUGLAS away from the dock before confirming that Mr. Ferrier had cleared the mooring line. That premature maneuver caused the line to catch Mr. Ferrier's leg and crush it.

The liability picture ends there, but Mr. Ferrier's damages do not. This motion concerns a separate, forward-looking element of those damages: his lost future earning capacity as a mariner who, but for the injury, was on a documented trajectory toward wheelhouse licensure and command pay. Captain Creppel — Mr. Ferrier's direct supervisor and Capt. of the DOUGLAS at the time of incident— establishes that trajectory through his firsthand testimony and fifty years of experience.[3] Captain Michael B. Berry's retained report corroborates it.

### A. Captain Creppel's Firsthand Testimony: Ferrier Was Going to Make the Wheelhouse

Captain Creppel testified, under oath and without hedging, that Mr. Ferrier was heading to the wheelhouse.[4] He is not a retained expert. He is a non-retained fact witness offering expert testimony under Rule 26(a)(2)(C), based on his own perception as Mr. Ferrier's direct on-the-water supervisor. He has over fifty years of experience on towing vessels and supervised Mr. Ferrier directly for eight to nine months before the injury.[5]

[1] CP Marine is one of three commonly-owned entities — along with Ten Mile Exchange, LLC and Shipwheel, LLC — that operate a fleet of inland towing vessels for the Ten Mile Exchange canal fleet in the Port of New Orleans area.
[2] The M/V DOUGLAS is a towing vessel that was bareboat chartered to CP Marine.
[3] Ex 1, Dep. of Bradford Creppel 23:15–25:8.
[4] Ex 1, Dep. of Bradford Creppel 57:20–61:18.
[5] Ex 1, Dep. of Bradford Creppel 57:20–61:18.

Captain Creppel confirmed that deckhands generally fall into one of three categories: (1) the deckhand who will never make it into the wheelhouse; (2) the deckhand who "maybe, maybe not" will get into the wheelhouse; and (3) the deckhands whom Captain Creppel knows, with confidence, are "getting in the wheelhouse."[6] He testified that Mr. Ferrier fell into that third category.[7] Captain Creppel testified unequivocally that Mr. Ferrier was going to make it to the wheelhouse and that he, personally, would "back him up."[8]

Captain Creppel testified he directly supervised Mr. Ferrier for approximately eight months while serving as captain of the vessel on which Mr. Ferrier worked. His testimony therefore provides firsthand context regarding Mr. Ferrier's work performance and potential for advancement.

**B. Ferrier's Imminent Pay Raise: Real-Time Proof He Was Advancing**

A pay-raise approved on the eve of his injury proves Mr. Ferrier was moving forward, not standing still. The record also contains contemporaneous, documentary evidence independent of Captain Creppel's testimony. CP Marine created this evidence before this litigation existed. That evidence shows Mr. Ferrier's employer viewed him as actively advancing in the days immediately preceding his injury. Less than twenty-four hours before the April 6, 2025 incident, Mr. Ferrier received a text message confirming that he had been approved for a raise.[9]

A raise approved and communicated on the eve of an injury is a real-time snapshot of how the employer paid Mr. Ferrier and assessed his trajectory at that precise moment.

**C. Captain Michael B. Berry's Retained Report Corroborates Captain Creppel**

---

[6] Ex 1, Dep. of Bradford Creppel 57:20–61:18.
[7] *Id.*
[8] *Id.*(Q. "And so, you know, if -- if -- if a -- if someone would say Jonathan Ferrier was going to make his way up to the wheelhouse, you would agree with that; correct?" A. "Oh, yeah -- [objection to form] -- I'd back him up.").
[9] Exhibit 2; Text message between Mr. Ferrier and "BJ" aka Bradford Creppel, Jr., Port Captain at CP Marine.

Plaintiff's retained expert, Captain Michael B. Berry, corroborates and quantifies Captain Creppel's firsthand assessment. Captain Berry is a United States Coast Guard Designated Examiner and an active towboat and port captain with more than twenty years of specialized experience in the inland towing industry.[10] His Designated Examiner credential authorizes him to administer the practical evaluations mariners need to obtain their own towing-vessel credentials.[11] That credential is the precise specialized qualification on point to the wheelhouse-advancement question — and, as discussed below, none of Defendants' three experts holds it.

Captain Berry's report, dated July 8, 2026, relies on Mr. Ferrier's 212 documented sea-service days aboard the M/V ROUGAROU plus 84 additional days (296 total).[12] Based on that record, he opines that Mr. Ferrier had an established path to Apprentice Mate/Steersman by October 2025, Pilot by October 2026 (at $650 or more per day), and Master by October 2028 (at $650 to $827 or more per day).[13] Captain Berry thus corroborates, from the perspective of a Coast Guard-credentialed designated examiner, the same trajectory Captain Creppel described from the perspective of a fifty-year captain who supervised Mr. Ferrier directly.

Defendants offer three experts to say otherwise. They do so against this backdrop: the firsthand, before-and-after testimony of Mr. Ferrier's actual supervisor, corroborated by a Coast Guard Designated Examiner with over two decades of specialized credentialing experience.

**D. The Three Defense Experts and Their Opinions**

Defendants have disclosed three experts who address, in whole or in part, whether Mr. Ferrier would have advanced to the wheelhouse: (1) Captain Marc A. Fazioli of Charted Marine

[10] Ex 9, Expert Report of Michael Berry at 30.
[11] *Id.* at 33.
[12] *Id.* at 19–21.
[13] *Id.* at 21.

Consulting, LLC (report dated August 10, 2026); (2) Stacie A. Nunez, a vocational rehabilitation counselor with Seyler Favaloro, Ltd. (report dated August 6, 2026); and (3) Kyle P. McAvoy of Robson Forensic, Inc. (letter report dated August 10, 2026).

The three do not even agree with one another. Fazioli and Nunez take the categorical position that Mr. Ferrier never had a realistic path to the wheelhouse, independent of the injury. Fazioli states that Mr. Ferrier "had not even taken the first step" toward Apprentice Mate/Steersman or Master.[14] Nunez opines, based on her clinical interview and an unnamed industry study, that Mr. Ferrier had no plan and did no research into the deckhand-to-captain progression.[15] McAvoy takes a materially different position. He does not foreclose the possibility of advancement at all. He argues only that Captain Berry's degree of certainty and timeline are unsupported, while acknowledging that "[o]ptions for the evaluation of Ferrier's physical ability . . . may still allow him to be qualified for requested MMC's."[16] This three-way divergence — two categorical denials and one contrary, hedged rebuttal — is itself part of the reliability and cumulativeness problem addressed below.

**LEGAL STANDARD - EXCLUDING/LIMITING EXPERT TESTIMONY**

Federal Rule of Evidence 702 charges the trial court with a gatekeeping function to ensure that expert testimony is both reliable and relevant before it reaches the jury. *Daubert*, 509 U.S. at 589; *Kumho Tire*, 526 U.S. at 147. In the Fifth Circuit, that inquiry has three independent components: the witness must be qualified by knowledge, skill, experience, training, or education in the specific subject matter of the opinion; the testimony must be reliable, meaning it rests on a sound methodology reliably applied to the facts rather than the expert's unsupported say-so; and the testimony must be relevant, meaning it will assist the trier of fact in

[14] Ex 7, Expert Report of Marc Fazaoli, at 9.
[15] Ex. 5, Expert Report of Stacie Nunez, at 7.
[16] Ex. 6, Expert Report of Kyle P. McAvoy, at 7.

understanding the evidence or determining a fact in issue—the "fit" requirement.[17] The proponent of expert testimony bears the burden of establishing each of these elements by a preponderance of the evidence.[18]

An expert's ipse dixit — a conclusion asserted on the strength of the expert's own say-so, without a reliable methodology connecting the data to the conclusion — is not admissible merely because the witness holds some expert credential in an adjacent field. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Where, as here, the opinion requires specialized knowledge of a discrete regulatory and credentialing scheme—the Coast Guard's merchant mariner licensing, sea-time, and medical-waiver framework—general maritime or vocational credentials in adjacent fields do not qualify a witness to opine on that scheme. And an opinion that fails to apply the governing framework does not reflect a reliable methodology.

Separately, even reliable, relevant, and properly qualified expert testimony may be excluded under Federal Rule of Evidence 403 when its probative value is substantially outweighed by needless cumulative evidence, unfair prejudice, or waste of time. Fed. R. Evid. 403. Multiple experts offering the same ultimate opinion add little incremental probative value and risk causing the jury to credit a proposition because several witnesses said it, rather than because any one opinion is reliable. That risk is especially acute here.

[17] *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668–69 (5th Cir. 1999); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002); *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).
[18] *Moore*, 151 F.3d at 276.

## LEGAL STANDARD – FUTURE LOST WAGES & LOST EARNING CAPACITY

This motion arises from Plaintiff's claim for future lost wages and loss of earning capacity. Plaintiff contends that, absent his injury, Mr. Ferrier was on a probable path to advance from deckhand to the wheelhouse. The law governing that claim shows why these experts' qualifications and methodology matter. The jury should not weigh three unqualified and unreliable opinions against Plaintiff's properly supported evidence.

### A. Future Lost Wages and Lost Earning Capacity

To recover lost wages, a plaintiff must prove by a preponderance of the evidence that he would have earned those wages but for the accident. *Gonzalez v. Laine*, 2025 U.S. Dist. LEXIS 79757, at *12 (E.D. La. Apr. 25, 2025). "To determine lost future earnings in a maritime case, we (1) estimate the plaintiff's loss of work-life or expected remaining work-life; (2) calculate the lost income stream; (3) compute the total damage; and (4) discount that total to present value." *Rivera v. Kirby Offshore Marine, L.L.C.*, 983 F.3d 811, 820 (5th Cir. 2020) (citing *Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir. 1983)). "The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned." *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942, 949 (5th Cir. 2012). "The calculation 'begins with the gross earnings of the injured party at the time of the injury,' including fringe benefits, and subtracts amounts for taxes and work expenses."[19]

Lost earning capacity is a distinct claim from lost wages: "earning capacity refers to a person's potential" and "is not necessarily determined by actual loss."[20] A plaintiff may recover

[19] *Sanders v. Weeks Marine, Inc.*, 2024 U.S. Dist. LEXIS 176748, at *20 (E.D. La. Sept. 30, 2024) (citing *Culver*, 722 F.2d at 117).
[20] *Singleton v. United States*, 2021 U.S. Dist. LEXIS 36210, at *34–34 (E.D. La. Feb. 26, 2021) (citing *Hobgood v. Aucoin*, 574 So. 2d 344 (La. 1990)).

for his lost ability to earn a certain amount "even though he may never have seen fit to take advantage of that capacity," and the court's inquiry is what the plaintiff might have earned but for the injury, measured against what he can earn given his resulting condition — not simply pre-injury income minus post-injury income.[21] Relevant factors include the plaintiff's pre-injury physical condition, his past work history and consistency, what he would have earned absent the injury, and the probability that he would have continued earning over the remainder of his working life.[22]

Because future earning capacity cannot be known with mathematical certainty, the fact finder has substantial discretion in fixing the award.[23] But that discretion is not unbounded: "a projection of loss of future earning capacity must have a factual basis in the record, and an award may not be based upon speculation, possibility, or conjecture."[24]

**B. The "Probable, Not Merely Possible" Standard for Promotion-Based Claims**

Where, as here, the future-wage claim rests on evidence that the plaintiff would have been promoted, the controlling standard is whether the promotion was *probable*, not merely *possible*. "Possibility alone cannot serve as the basis of recovery." *Kennedy v. Magnolia Marine Transp. Co.*, 189 F. Supp. 3d 610, 617–18 (E.D. La. 2016) (denying defendant's motion in limine where plaintiff, at 27 years old, had been consistently promoted, had expressed a desire to become a pilot, and had been encouraged by his employer to apply for the pilot program). The related evidentiary question — whether evidence of a claimed future promotion may go to the jury at all — turns on "whether the factors in play are 'so speculative that they cannot accurately

[21] *Id.*
[22] *Id.* at *28–29.
[23] *Id.* at *29.
[24] *Id.* (citing *Lemings v. Sanasac*, 209 So. 3d 396 (La. App. 1st Cir. 2016)); *see also Martinez*, 481 F. App'x at 949.

be determined.'" *Matter of Callais & Sons, LLC*, 2022 U.S. Dist. LEXIS, at *4 (E.D. La. Mar. 29, 2022) (quoting *Culver*, 722 F.2d at 120).

Courts applying this standard have identified a consistent set of factors bearing on whether a claimed future promotion is probable rather than speculative: work ethic; attitude and being well-liked; superiors' approbation, particularly comments specific to promotion or advancement; acceptance into selective advancement programs; expressed aspiration or intent to advance; extensive experience; a record of consistent and progressive pay increases or promotions; marketability; young age; and family history of advancement in the same industry. *See, e.g., Magee v. Fla. Marine, LLC*, 2026 U.S. Dist. LEXIS 69340, at *64–65 (E.D. La. Mar. 31, 2026); *Singleton*, 2021 U.S. Dist. LEXIS 36210, at *24–35; *Kennedy*, 189 F. Supp. 3d at 617–18; *Matter of Callais*, 2022 U.S. Dist. LEXIS 57818, at *2. The more factors the evidence supports, the more likely a court is to find the claimed promotion probable rather than merely possible.

**C. Cases Finding the Evidence Sufficient**

In *Magee v. Florida Marine, LLC*, 2026 U.S. Dist. LEXIS 69340 (E.D. La. Mar. 31, 2026),[25] the district court credited an expert's promotion timeline that projected the plaintiff would work as a deckmate through 2022, become a pilot in 2023, serve as a relief captain from 2024 through 2028, and become a captain in 2029. The record showed that the plaintiff was "a hard worker, well-liked and respected by his employer" and "diligently working towards his goal of obtaining a position in the wheelhouse." *Id.* at *64. He already held 100-Ton and 200-Ton Pilot's licenses, was under 30 years old, and came from a family of captains. *Id.* The defendant's Vice President of Vessel Operations also testified that the plaintiff "would have been in the wheelhouse by October 2022" and "was the type of person [Defendant] wanted in the

[25] This case is currently on appeal.

wheelhouse." *Id.* at *64–65. Based on that evidence, the court found it "more likely than not" that the plaintiff would have become a captain within the timeline the expert proposed. *Id.*

In *Matter of Callais & Sons, LLC*, the court denied defendant's motion in limine to exclude promotion-based wage evidence even though the plaintiff had completed only a single hitch as a deckhand and had minimal prior work experience, because the employer's own manager testified the plaintiff was a good deckhand who would have made tankerman quickly, that one hitch was enough for such a promotion, and that a captain's simple statement that he has a "good man" is sufficient for promotion to lead deckhand. 2022 U.S. Dist. LEXIS 57818, at *6–7.

In *Singleton v. United States*, the court found the plaintiff had "clearly and reliably established" his future earning capacity based on his experience, steady work history, consistent and progressive earnings increases, marketability, and multiple employer representatives confirming he would have been retained or rehired absent the injury. 2021 WL 765384, at *34–35.

**D. Case Finding the Evidence Too Speculative**

By contrast, courts have excluded or discounted promotion-based future-wage evidence when the record lacked comparable factual support. In *Riha v. Offshore Serv. Vessels, LLC*, the court excluded an economist's future-wage opinion based on the plaintiff's anticipated promotion to master or pilot. The record contained "no evidence or inference" that the plaintiff would achieve that "previously unexpressed" aspiration, no evidence that he had applied for such a position or that his employer had encouraged him to do so, and—critically—no "analysis of the maritime industry" showing the likelihood that the plaintiff would rise through the ranks or the time required to do so. 547 F. Supp. 3d 550, 559 (E.D. La. 2021). The court held "due to [the

expert's] failure to adequately analyze a mariner's career path," his opinion that the plaintiff had a "'fair to good' chance of becoming a master or pilot amounts to inadmissible speculation." *Id.*

**E. Application to This Motion**

*Riha* illustrates the key distinction that matters here. Courts do not exclude promotion-based future-wage opinions simply because advancement is uncertain. They exclude them when the expert fails to apply a meaningful analysis of the maritime industry's credentialing and advancement structure to the plaintiff's actual record. 547 F. Supp. 3d 550, 559. That same defect runs through the Fazioli, Nunez, and McAvoy reports. None applies the specialized Coast Guard credentialing, sea-time, or medical-waiver analysis necessary to move a promotion opinion from speculation to reliable expert testimony.

By contrast, Plaintiff offers the type of evidence courts have found sufficient to submit a promotion-based future-wage claim to the jury: Captain Creppel's firsthand supervisory assessment, Captain Berry's Designated Examiner experience and sea-time-based analysis, and evidence tied to Mr. Ferrier's actual advancement timeline. That evidence is comparable in kind to the employer testimony, credentialed assessment, documented sea time, and promotion-specific evidence relied on in *Magee*, *Matter of Callais*, *Kennedy*, and *Singleton*.

**ANALYSIS**

**I. No Defense Expert Has the Coast Guard Credentialing Expertise This Opinion Requires**

None of Defendants' three experts are qualified to opine on Mr. Ferrier's potential advancement through the Coast Guard's merchant mariner credentialing system. Whether a particular mariner, with a particular sea-service record and medical history, would advance from Deckhand to Apprentice Mate/Steersman to Pilot to Master requires specialized knowledge beyond general maritime or vocational experience. The inquiry requires practical familiarity with how the National Maritime Center and Coast Guard Designated Examiners evaluate sea time,

TOAR (Training, Observation, Assessment, and Recordkeeping) requirements, and medical-waiver applications. Captain Berry's Designated Examiner credential and Captain Creppel's fifty years of hands-on supervisory experience provide that specialized foundation. Defendants have not shown that Fazioli, Nunez, or McAvoy possess comparable training, credentials, or experience.

**1. Fazioli's Own Testimony Confirms He Lacks the Credential He Invokes Against Plaintiff's Witnesses**

Fazioli's qualification defect rests not on inference, but on his own sworn testimony. In a June 20, 2025 deposition taken in an unrelated Jones Act case, *Ayo v. D&S Marine Service, LLC*, No. 2024-CV-5097-DC (24th Dist. Ct., Calhoun County, Tex.), counsel asked Fazioli directly whether he holds the very credential he now relies on to discount Captain Creppel's qualifications:

> Q. Sir, are you a designated examiner by the Coast Guard?
> A. I am not.
> Q. Have you ever been certified by the Coast Guard to be a designated examiner?
> A. I have not.[26]

Fazioli does not base his own advancement opinions on credentialed examiner experience. When asked what qualifies him to determine whether a mariner is progressing toward Pilot or Master, Fazioli admitted that he simply reads the regulations rather than applies any hands-on examiner methodology:

> Q. ". . . [Y]ou're not qualified or certified by the Coast Guard to determine one way or the other whether someone is a - - qualified to be a - - to get their towing enforcement, fair?
> [Objection]
> A. That's untrue. I can read the rules and I know what the rules say and how the rules work.[27]

[26] Ex. 3, Dep. of Marc Fazioli 310:14–19, June 20, 2025.
[27] Ex. 3, Dep. of Marc Fazioli 311:13–23, June 20, 2025.

Fazioli's deposition further confirms that he holds no current Coast Guard license or credential. His last credentials—a 1,600-ton Master's license and a Second Mate Unlimited license, neither with a towing endorsement—expired, and he never renewed them:

> Q. So somewhere before 2015, you let your license lapse and that means you don't have a Coast Guard license at all, fair?
> A. That's correct.[28]

Fazioli's hands-on experience actually working aboard towing vessels—as opposed to advising, surveying, or teaching about the industry from ashore—is minimal and decades stale. He testified that his entire career experience as a towing-vessel *crew member* totals only about 60 days: roughly 30 intermittent days on a small push boat near Port Isabel, Texas, in the late 1990s, and roughly 30 days aboard a converted landing craft fitted with push knees in the Marshall Islands. He further testified that he never held a towing endorsement because the endorsement did not yet exist during the years he briefly worked on towing vessels, and that he has not sailed in any commercial capacity, on any vessel, since 2007.

> Q. But your total towing experience is limited to – working as a crew member aboard a vessel is about 60 days, fair?
> A. Yes, somewhere in there.[29]
> [. . .]
> Q. . . [N]o, more vessel experience after 2007, fair?
> [. . . ]
> A. Not commercially . . . I should say not commercially as a crew member.[30]

Fazioli's own sworn testimony defines the limits of his towing-industry expertise. By his own prior assessment, the wheelhouse-advancement opinion he now offers exceeds those limits and falls outside the area in which he previously considered himself qualified to opine.

Fazioli's report repeats the same structural defect his prior testimony exposes. He discounts Captain Creppel—an experienced Master of Towing with fifty years in the industry

---

[28] *Id.* at 58:5–8*;* see also *id.* at 56:16–57:13 (testifying that his license was last renewed "somewhere around 2010" and was never placed back in continuity).
[29] *Id.* at 52:20–23.
[30] *Id.* at 53:13–18.

who directly supervised Mr. Ferrier—because Creppel does not hold a Designated Examiner credential.[31] Yet Fazioli is not a Designated Examiner either. He also holds no current Coast Guard license, has never held a towing endorsement, and accumulated only about thirty days of towboat crew experience more than two decades ago. Fazioli cannot invoke a credential he does not possess as the basis to discount a firsthand supervisory witness with fifty years of experience, then offer a contrary opinion based only on his own reading of regulations equally available to the jury. The Court should exclude Fazioli's wheelhouse-advancement opinion because he lacks the specialized qualifications necessary to offer it.

**2. Nunez**

Nunez lacks the specialized Coast Guard credentialing expertise necessary to opine on Mr. Ferrier's likely advancement to the wheelhouse. Nunez is a vocational rehabilitation counselor.[32] Her report does not purport to apply any Coast Guard-specific credentialing methodology at all. Instead, for the proposition that the deckhand-to-captain path "typically takes eight to fifteen years," she relies entirely on a secondhand citation to an unnamed "Maritime Institute of Technology" industry study—a source she did not author, has not been shown to have evaluated for methodology or general acceptance, and that says nothing specific to Mr. Ferrier's actual sea time, employer letters, or medical record.[33]

Further, the website of the Maritime Institute of Technology and Graduate Studies contains no materials supporting Ms. Nunez's eight-to-fifteen-year reference. To the contrary, it states that some structured programs allow students to progress from entry-level training to a Mate's license in just over two years.[34] Regardless, this unidentified, and seemingly nonexistent,

---

[31] Ex. 7, Expert Report of Marc Fazaoli, at 9.
[32] Ex. 4, Curriculum Vitae of Stacie Nunez, at 9.
[33] Ex. 5, Expert Report of Stacie Nunez, at 7.
[34] *See* https://www.mitags.org/maritime-apprenticeship-programs/ ("The duration of the program is approximately 28 months; however, some participants have finished in as few as 24 months. Completion of the program includes

study cannot substitute for an expert analysis of Mr. Ferrier's actual qualifications, sea service, and progression through the Coast Guard's credentialing framework. Her opinion therefore does not satisfy Rule 702's qualification or reliability requirements.

**3. McAvoy**

McAvoy likewise lacks the qualifications necessary to offer his rebuttal opinions, and that defect runs through both parts of his analysis. His stated background–vessel inspection, casualty investigation, engineering design review, and MTS/ATON/COTP oversight–includes no medical, psychiatric, or NMC-adjudication experience.[35] McAvoy's own report confirms the problem. At page 2, he expressly states that he will "defer to physician's and medical expert's evaluations and analysis of Ferrier's medical conditions, and any prognosis of those conditions and how they may affect his capacity. . ."[36] Five pages later, he disregards that limitation and offers his own conclusions about the certification consequences of Ferrier's diabetes and childhood bipolar history.[37] Yet, McAvoy faults Captain Berry for being "not qualified to opine with medical certainty on Ferrier's medical condition"[38]-- the very deficiency McAvoy possesses when he offers his own medical-certification opinions.

McAvoy also lacks the specialized credentialing experience needed to challenge Berry's sea-time analysis. His report does not show that he is a Coast Guard Designated Examiner.[39] It does not show that he has administered TOAR evaluations. It does not show any hands-on experience processing mariners through the sea-time and character-review requirements he invokes to dispute Berry's 296-day tally — 212 days plus 84 days — against the 540-day

---

finishing all the required coursework, completing the training record book, and accumulating 360 days of sea service.")

[35] Ex. 6, Expert Report of Kyle P. McAvoy, at 3.

[36] *Id.* at 2.

[37] *Id* at 7.

[38] Ex. 6, Expert Report of Kyle P. McAvoy, at 5.

[39] *Id*; *see also* Ex 10, Curriculum Vitae of Kyle McAvoy.

Steersman/Apprentice Mate threshold.[40] Citing a regulatory manual is not the same as applying the Coast Guard's credentialing framework to an actual mariner's file. McAvoy faults Berry for straying outside his expertise, yet McAvoy does the same thing. He offers medical and credentialing-process opinions without a license, without NMC experience, and without the specialized methodology Rule 702 requires.

In short, none of the three brings expertise comparable to Captain Berry's Designated Examiner credential or Captain Creppel's fifty years of direct supervisory experience on whether *this* mariner (Ferrier) would have advanced. Fazioli's own sworn testimony confirms his lack of qualification, and Nunez's and McAvoy's reports reveal the same defect. The Court should exclude their wheelhouse-advancement opinions under Rule 702 for lack of qualification.

**II. The Opinions Rest on No Reliable, Testable Methodology — They Restate What the Experts Found, Not the Coast Guard's Actual Credentialing and Waiver Framework**

Rule 702 requires more than credentials; it requires the expert to apply a reliable methodology to the facts of the case. Fazioli, Nunez, and McAvoy each recite record notations and general licensing requirements, but none applies the Coast Guard's credentialing and waiver framework to Mr. Ferrier's actual record in a meaningful way. Their opinions cannot be tested, replicated, or falsified. Instead, each reaches a conclusion without showing how the governing framework produces that result. Rule 702 does not permit that kind of results-driven opinion in place of a reliable application of specialized methodology.

**Diabetes disqualifier.** All three reports treat Mr. Ferrier's insulin-dependent diabetes as an effectively dispositive bar to future licensure based on two CG-719K "Not Recommended" notations dated March 27, 2024, and September 30, 2025.[41]Yet none of the three performs any

[40] Ex. 6, Expert Report of Kyle P. McAvoy, at 5.
[41] Ex. 7, Expert Report of Marc Fazaoli, at 10; Ex. 5, Expert Report of Stacie Nunez, at 5–7; Ex. 6, Expert Report of Kyle P. McAvoy, at 4–7.

meaningful waiver analysis under the Coast Guard's own Merchant Mariner Medical Manual, Commandant Instruction M16721.48, Chapter 14. McAvoy cites the Manual, but he does not discuss consideration of the medical waiver.[42] Fazioli acknowledges the waiver process, but only notes that Mr. Ferrier had not yet requested one.[43] Notably absent from either report is any opinion that Mr. Ferrier would have been denied a medical waiver. Nunez does not cite it at all.

That Manual provides that an HbA1c in the 8%-to-10% range "may be considered for a medical waiver,"[44] defines a disqualifying "recent, severe hypoglycemic episode" by a 12-month lookback[45] that does not reach Mr. Ferrier's decades-old adolescent history, and expressly allows consideration of extenuating circumstances in the waiver analysis.[46]

Additionally, Mr. Ferrier's March 27, 2024 and September 30, 2025 Applications for Medical Certificate (Form CG-719K) were never submitted to the United States Coast Guard for review or waiver processing. Natalie Jean Marine[47] used the March 27, 2024[48] form and September 30, 2025[49] form solely for its own internal hiring decisions. Natalie Jean Marine therefore knew of Mr. Ferrier's diabetes, had the "Not Recommended" forms in hand, and nevertheless hired him to work as a deckhand. That conduct undercuts any suggestion that the

---

[42] Ex. 6, Expert Report of Kyle P. McAvoy, at 4–7.
[43] Ex. 7, Expert Report of Marc Fazioli, at 10–11.
[44] U.S. Coast Guard, *Merchant Mariner Medical Manual*, COMDTINST M16721.48, ch. 14, § F.1.c, at 14-7 (Aug. 30, 2019), https://media.defense.gov/2019/Sep/11/2002181050/-1/-1/0/CIM_16721_48.PDF ("Applicants whose HbA1c levels are greater than or equal to 8% but less than 10% may be considered for a medical waiver with a time-limited medical certificate, if the evaluation of the treating physician and objective documentation support extenuating circumstances that indicate low risk for sudden incapacitation or debilitating complication.")
[45] *Id.* at ch. 14, § F.1.b n.1, at 14-7 ("A recent, severe hypoglycemic episode, as defined here, is as an episode of hypoglycemia within the prior 12 months, resulting in seizure, loss of consciousness, or altered consciousness, or requiring assistance from another person for treatment.").
[46] *Id.* at ch. 14, § E.2.b, at 14-5 ("The evaluation will consider whether there are extenuating circumstances that warrant special consideration for issuance of a medical waiver.").
[47] Ferrier worked for Natalie Jean Marine prior to his employment with CP Marine; and after CP Marine terminated him.
[48] Ex 11, March 2024 CG-719K Form - Natalie Jean Marine (redacted)
[49] Ex 12, September 2025 CG-719K Form - Natalie Jean Marine (redacted).

notations themselves constituted an actual bar to vessel employment, future credentialing, or advancement.

An expert does not reliably apply a governing regulatory standard by treating a private employer's pre-placement rejection checkbox as the equivalent of a considered Coast Guard adjudication while never consulting the Manual chapter that actually governs the waiver process the checkbox triggers. At most, that approach reads an isolated form divorced from the framework that gives the form its meaning.

**Employer conduct directly contradicts the disqualifier theory.**[50] Real-world conduct confirms the unreliability of treating the 3/27/24 "Not Recommended" notation as a substantive bar to Mr. Ferrier's fitness for vessel work. Natalie Jean Marine, LLC—the same employer whose examining physician checked "Not Recommended" on the 3/27/24 CG-719K—did not treat that notation as disqualifying in practice. Natalie Jean Marine's own records show that it hired Mr. Ferrier as a deckhand the next day

That contemporaneous decision matters. Natalie Jean Marine hired and continued employing Mr. Ferrier as a deckhand with the benefit of its own examiner's "Not Recommended" checkbox already in hand. Natalie Jean did not see Ferrier's diabetes as an actual bar to safely performing his duties. Likewise, CP Marine's subsequent decision to rehire and employ Mr. Ferrier as a deckhand aboard the M/V ROUGAROU shortly thereafter supports the same conclusion.

Fazioli, Nunez, and McAvoy each ignored this directly contradictory conduct evidence. Yet each reached the same categorical conclusion: that Mr. Ferrier's diabetes was an

[50] Before the incident, CP Marine employed Mr. Ferrier as a deckhand aboard its inland towing vessels. After his April 6, 2025 injury and subsequent medical treatment, Mr. Ferrier returned to work for CP Marine, which then terminated his employment less than 10 days after rehire. In need of work, Mr. Ferrier then obtained a deckhand position with Natalie Jean Marine, LLC. Natalie Jean Marine ultimately released him because his post-incident physical limitations prevented him from performing the duties of a deckhand. Jonathan was not the same person as he was before his accident.

independent, dispositive bar to his advancement. No reliable methodology reaches that conclusion while disregarding contradictory evidence already in the record it claims to have reviewed. A methodology that ignores such evidence cannot reliably apply any analytical framework to the full universe of relevant facts.

The experts' conclusion also conflicts with the real-world record. Mr. Ferrier's employers knew Mr. Ferrier was a diabetic. They hired him anyway. They kept employing him anyway.

Further, if the experts had any applicable experience (they do not), then they would understand that there are many diabetic mariners operating towing vessels in the inland waterways and the U.S. Coast Guard routinely grants medical waivers to those mariners.[51]

**Ferrier's Imminent Raise by CP Marine.** A second, independent body of evidence confirms the categorical no-advancement theory is unreliable. This evidence comes entirely from outside the medical record. Text communications between Ferrier and CP Marine's Port Captain "BJ" show that Mr. Ferrier was actively advancing at the very moment Fazioli, Nunez, and McAvoy claim he had taken "no steps" and had "no plan." Less than twenty-four hours before the April 6, 2025 incident, Mr. Ferrier received a text message confirming his approval for a raise.[52] Meanwhile, Mr. Ferrier's direct supervisor, Captain Creppel, was actively supporting Mr. Ferrier with taking the steps to reach the wheelhouse.

Courts treat a supervisor's favorable assessment—particularly testimony that the employee was suited for, expected to receive, or actively progressing toward promotion—as probative evidence that advancement was probable, not merely possible.[53] This evidence fits

[51] See Ex 13, Dep. of Stan Kraly (Owner of Natalie Jean Marine 38:9–23; Ex 14, Rebuttal Report of Michael Berry, at 4.
[52] Exhibit 2; Text message between Mr. Ferrier and "BJ" aka Bradfor Creppel, Jr., Port Captain at CP Marine.
[53] *Supra* pp. 8–9.

squarely within that category. The employer created it itself, in real time, with no connection to this litigation.

Yet not one of the three reports acknowledges this evidence. None explains how a categorical, no-realistic-path conclusion can coexist with an employer-approved raise communicated to Mr. Ferrier on the eve of his injury.

An expert methodology cannot reliably apply any analytical framework while ignoring unrebutted, contemporaneous, company-generated evidence that squarely contradicts its own conclusion. This is not reasoned analysis. It is a results-driven opinion that simply did not look at everything the record has to offer.

**Sea-time arithmetic.** McAvoy asserts that the Steersman/Apprentice Mate exam requires 540 sea-days. This directly disputes Berry's figure of 296 days (212 + 84). But McAvoy never reconciles his figure with the governing regulation, 46 C.F.R. § 10.107 (2024),[54] or with Mr. Ferrier's own sea-service letter issued by Ten Mile Exchange.[55]

Mr. Ferrier's sea-service letter comes from co-defendant Ten Mile Exchange, LLC's own office manager. The office manager executed it under the 18 U.S.C. § 1001 false-statement warning. It certifies the same 212-day ROUGAROU figure Berry relies on. It also recommends "favorable consideration" of Mr. Ferrier's next license application.[56]

McAvoy departs from his own client's sworn party-admission on the very sea-time figure he disputes.[57] He never explains that departure. This is not a reliable, tested application of the regulation. It is an unverified assertion that happens to favor the client's position.

[54] Under 46 C.F.R. § 10.107 (2024), the Coast Guard generally credits a "day" of sea service as eight hours of watchstanding or day-work. However, when applicable (as is here), a mariner who works a 12-hour day may receive credit for 1½ days of sea service. *Id.*

[55] Ex. 8, Letter from Ten Mile Exchange, LLC to U.S. Coast Guard re Jonathan Ferrier's Sea Service (Oct. 1, 2025) ("Ferrier's Sea-Service Letter").

[56] Ex. 8, Ferrier's Sea-Service Letter.

[57] Ex. 6, Expert Report of Kyle P. McAvoy, at 5.

**Nunez's unidentified industry study.** Nunez's central data point is an 8-to-15-year progression timeline.[58] This figure comes from a single, unnamed industry study. That study has never been produced. No one has tested it. No one has subjected it to any methodology review. Nunez does not otherwise claim specialized, hands-on expertise in Coast Guard credentialing timelines — the very area this study addresses.

Nunez built her opinion on an unidentified secondary source. She has no independent means of validating that source's methodology. This is the paradigm of untestable, unreliable foundation that Rule 702 and *Daubert* are designed to screen out.

**"I Can Read the Rules:" Fazioli's Own Words Confirm He Applies No Methodology.** Fazioli's *Ayo* deposition exposes the same defect. Plaintiff's counsel asked Fazioli a direct question: how does he determine towing-endorsement qualification, given that he holds no Coast Guard certification to do so? Fazioli did not identify any applied examiner methodology. He did not identify any hands-on evaluative process. He did not identify any specialized analytical framework. Instead, he said: "I can read the rules and I know what the rules say and how the rules work."[59]

"Reading the rules" is not a methodology under Rule 702 or *Daubert*. The regulatory text Fazioli read is the same text available to the jury. Fazioli lacks the credentialed, applied experience to know how the National Maritime Center and Designated Examiners actually apply that text to a specific mariner's record.

The same defect runs through Faziol's diabetes, sea-time, and "did not even [take] the first step towards completion of requirements for an Apprentice Mate [ ] of Towing Vessels credential."[60] Each opinion restates a document or a regulation. None applies the specialized,

[58] Ex. 5, Expert Report of Stacie Nunez, at 7.
[59] Ex. 3, Dep. of Marc Fazioli 311:21–23, June 20, 2025
[60] Ex. 7, Expert Report of Marc Fazioli, at 9

tested methodology of an examiner or credentialing professional who has actually worked with real mariners' records.

Taken together, all three reports follow the same pattern: the experts identify record notations and secondary sources that superficially support their conclusions, but none apply the specialized Coast Guard credentialing and medical-waiver framework necessary to test those conclusions against the governing standards. That is not expert methodology reliably applied to the facts. It is a collection of unsupported research-based conclusions dressed as expert opinion, which Rule 702 does not permit merely because the witness holds an expert title.

**III. The Opinions Are Not Helpful to the Jury Because They Lack Specialized Training, Credentials, or Methodology**

Rule 702(a) independently requires expert testimony to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). An expert does not satisfy that requirement by merely reading a government form or generic secondary source to the jury without applying a specialized analytical framework beyond the jury's own capabilities. Such testimony does not assist the jury; it simply substitutes the expert's reading of the evidence for the jury's own fact-finding role.

The jury does not need an expert to explain what a CG-719K form says or to recite an unidentified statistic about typical career-progression timelines. It needs an expert to explain how the mechanics of the Coast Guard's credentialing and medical-waiver system apply to Mr. Ferrier's specific record. None of the three experts performs that analysis because they lack the experience and credentials to do so. Their opinions therefore fail Rule 702's helpfulness and fit requirement because they offer no specialized analysis that would assist the jury beyond its own review of the evidence.

**IV. Alternatively, Rule 403 Requires Excluding or Limiting These Cumulative Opinions**

Rule 403 independently supports excluding or limiting cumulative testimony on Mr. Ferrier's potential wheelhouse advancement. Defendants should not be permitted to present three experts who, in varying terms, offer the same ultimate opinion—that Mr. Ferrier would not have advanced to the wheelhouse. A second and third expert add little, if any, probative value beyond Defendants' best-qualified witness and instead increase the risk of unfair prejudice, jury confusion, and needless consumption of time. Fed. R. Evid. 403.

"It is well established that testimony which is merely repetitious and cumulative of testimony already introduced may be excluded by the trial court in its discretion." *Marquette Transportation Co. Gulf-Inland, LLC v. Navigation Maritime Bulgarea*, No. 19-10927, 2022 U.S. Dist. LEXIS 8327, at *9 (E.D. La. Jan. 17, 2022). "In *Leefe v. Air Logistics, Inc.*, the Fifth Circuit deferred to the district judge's decision to, at trial, exclude testimony by a second expert doctor as cumulative." *Id.* The Fifth Circuit explained that there is "no 'precise limit on the number of experts who can testify in a given area,' although attorneys are "discouraged from paraging additional experts before the court in the hope that the added testimony will improve on some element of the testimony by the principal expert.'" *Id.* (cleaned up).

The inconsistency among the three opinions compounds the prejudice. Fazioli and Nunez take the opine that no path to the wheelhouse ever existed and that Mr. Ferrier took no steps toward one. McAvoy takes a materially different position: a path may still exist, but he disputes Plaintiff's Berry's certainty and timeline. Presenting all three invites an impermissible "weight of numbers" inference. The jury may perceive three experts as corroborating the same ultimate conclusion—that Mr. Ferrier would not reach the wheelhouse—even though their opinions rest on inconsistent and unreconciled premises. That combination of minimal incremental probative value and a substantial risk of an undeserved appearance of consensus is precisely the imbalance

Rule 403 permits the Court to correct. The Court should exclude two of the three witnesses or, at minimum, limit each to distinct, non-overlapping subject matter and prohibit repetitive testimony on the same ultimate issue

**CONCLUSION**

For the foregoing reasons, Plaintiff Jonathan Ferrier respectfully requests that this Court exclude the opinion testimony of Captain Marc A. Fazioli, Stacie A. Nunez, and Kyle P. McAvoy on the question of Mr. Ferrier's wheelhouse advancement, or, in the alternative, exclude or limit that testimony under Federal Rule of Evidence 403 as needlessly cumulative, unfairly prejudicial, and a waste of time, together with such other and further relief as the Court deems just and proper.

Respectfully submitted by:

**ADAM DAVIS LAW FIRM**
*/s/ Adam N. Davis*
Adam Neely Davis (La. Bar No. 35740)
Taylor M. Bologna (La. Bar No. 37594)
Michelle Pare Ricca (La. Bar. No. 41385)
22398 LA 435
Abita Springs, Louisiana 70420
Email: ad@adamdavislawfirm.com
taylor@adamdavislawfirm.com
michelle@adamdavislawfirm.com
Telephone: (504)-553-1435
Facsimile: (504)-553-1439
**ATTORNEYS FOR PLAINTIFF JONATHAN FERRIER**