UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JONATHAN FERRIER<br><br>v.<br><br>CP MARINE SERVICES, LLC and TEN MILE EXCHANGE, LLC | CIVIL ACTION NO. 2:25-cv-02286 consolidated w/ 26-cv-1694<br><br>Ref: 25-2286<br><br>JUDGE JAY C. ZAINEY<br><br>MAGISTRATE JUDGE KAREN WELLS ROBY |

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT:

Defendants, CP Marine Services, LLC ("CP Marine"), and Ten Mile Exchange, LLC ("Ten Mile"), (collectively "Defendants"), submit this Memorandum in Support of their Motion for Partial Summary Judgment on Plaintiff's claim for punitive damages. For those reasons more fully addressed below, Plaintiff's claim seeking punitive damages for Defendants' alleged failure to pay maintenance and cure should be dismissed, with prejudice.

## I. RELEVANT FACTS

Plaintiff, Jonathan Ferrier, filed suit against CP Marine and Ten Mile alleging to have sustained "severe and debilitating" injuries on April 5, 2025[1], while employed by CP Marine as a Jones Act Seaman aboard the M/V DOUGLAS when a "line grabbed [his] leg and crushed it" during mooring operations.[2] After the incident, Plaintiff was taken to West Jefferson Medical

[1] While some records including Plaintiff's Complaints indicate that the accident occurred on April 5, 2025, it is undisputed that Plaintiff's accident actually occurred on April 6, 2025.

[2] Rec. Doc. 1, Paragraphs 2, 4, and 7 and Rec. Doc. 12, Paragraph 5.

Center where he presented with a right tibia and fibula injury/fracture.[3] According to the West Jefferson Medical Center records, Plaintiff complained of an "ankle injury after a crush injury happened while working on a tugboat [sic] he denies any other injury [sic] no other associated symptoms."[4] Plaintiff was diagnosed with a comminuted distal shaft fracture of the tibia and fibula necessitating surgery; specifically, "external fixation right distal tibia and fibula fracture with manipulation" that was performed by Dr. Barton Wax on April 6, 2025.[5]

Once discharged from West Jefferson Medical Center, Plaintiff treated with Dr. Barton Wax at Jefferson Orthopedic Clinic.[6] Plaintiff was prescribed physical therapy 2-3 times per week for 8 weeks, and CP Marine authorized 12 visits. However, Plaintiff only attended five sessions between the roughly six weeks from May 21, 2025 to July 1, 2025.[7] His physical therapist, Fred Eitmann, testified that Plaintiff had a good result from therapy but would likely have done better had he complied with the recommended treatments and attended more regularly.[8]

Eitmann testified that he never detected any problems or symptoms with respect to the right knee from May 21, 2025 to July 1, 2025. By July 1, Eitmann had Plaintiff performing more strenuous exercises, including bosu ball lunges, which Eitmann opined would likely cause pain to someone with a meniscus injury, and which he would not have someone with a meniscus injury perform. Further, Eitmann confirmed that he would be immediately next to the patient watching

---

[3] See Exhibit A, Ferrier Medical 001030 – 001049, West Jefferson Medical Center Records.

[4] See Exhibit A, Ferrier Medical 001030 – 001049, West Jefferson Medical Center

[5] See Exhibit A, Ferrier Medical 001030 – 001049, West Jefferson Medical Center

[6] See Exhibit B, Jefferson Orthopedic Clinic Physical Therapy Records from May 21, 2025-July 1, 2025.

[7] See Exhibit B, Jefferson Orthopedic Clinic Physical Therapy Records from May 21, 2025-July 1, 2025.

[8] Fred Eitmann's deposition transcript is not available yet as the deposition took place on August 10, 2026.

them do the exercises and if they had any trouble or reported any increased symptoms, that information would have been noted in the medical records, which did not contain any such notations.

On August 4, 2025, Dr. Wax noted that Plaintiff's "Pain well controlled, compliant overall. Patient states continued improvement with interval physical therapy. He states markedly improved strength and range of motion."[9] Dr. Wax wrote under Plan: "Patient elects to proceed with continued physical therapy right lower extremity for range motion and strengthening as tolerated. Return to full duty work as tolerated. Return to clinic in 6 weeks with x-rays. Anticipate MMI at follow-up."[10] However, the Work Release document from Dr. Wax indicated, "The patient has no activity restrictions and may continue with FULL DUTY…These limitations are effective for 6 Weeks…".[11]

The planned follow up visit in six weeks after this visit, when MMI would be reached, would have been September 15, 2025. However, Plaintiff did not return for an appointment with this provider, who began practicing in Terrebonne Parish, and Plaintiff did not make any appointment with another provider at the recommended follow-up visit. Likewise, Plaintiff did not make any appointments to attend the physical therapy recommended by Dr. Wax.

From April 5, 2025 through September 15, 2025, the date when Dr. Wax opined MMI would be reached, Plaintiff was paid approximately $66.29 per day on behalf of CP Marine and Ten Mile Exchange (163 days with total payments of $10,805.19). Further, all of Plaintiff's

[9] See Exhibit C, Dr. Barton Wax August 4, 2025 Record.

[10] *Id.*

[11] *Id.*

medical expenses were paid on behalf of CP Marine and Ten Mile Exchange during this time period as well.[12]

Upon his medical release, Plaintiff sought a return to his deckhand position with Defendants. However, there were no available deckhand positions at that time, so, Defendants offered Plaintiff full-time employment performing maintenance on its drydocked vessel.[13] Plaintiff commenced working for Defendants on September 15, 2025, and continued until September 23, 2025. Nonetheless, Plaintiff's employment was terminated following a dispute with his supervisor. Defendants delivered a Letter of Termination that indicated, Plaintiff was terminated "due to repeated instances of poor performance, failure to meet work requirements, and failure to comply with direct orders from [his] supervisors" in violation of company policy as well as his consistent failure "to complete assigned tasks in a timely and satisfactory manner", [his] argumentative and insubordinate conduct, and due to the fact that he had "not demonstrated the physical capability required to effectively carry out the essential duties of the position."[14]

Haleigh Dardar and Jason Schouest, CP Marine employees involved in Plaintiff's termination, testified as to the meaning of the "physical capability" statement within the Termination Letter, explaining that it meant Plaintiff was not physically doing his job, that he was lazy and sitting on his phone when he was supposed to be cleaning the M/V ROUGAROU.[15]

Nevertheless, within a week, Plaintiff sought employment with one of his former employers, Natalie Jean Marine, LLC ("Natalie Jean Marine"), on or about September 30, 2025.

---

[12] See Exhibit N, Ledger of Payments to or on behalf of Plaintiff.

[13] See Exhibit D, Haleigh Dardar July 10, 2026 Deposition, page 231, lines 7-19.

[14] See Exhibit E, Defendants' Letter of Termination.

[15] See Exhibit D, Haleigh Dardar Deposition, pages 327, line 1 – 339, line 1; see also Exhibit F, Jason Schouest July 13, 2026 Deposition, page 240, line 3 – page 241, line 8.

Natalie Jean Marine had Ferrier evaluated by a medical professional on September 30, 2025, at which time Ferrier was asked, in connection with the Physical Exam, among other things:

"Have you ever had, or do you now have any of the following conditions:

| **QUESTION** | **ANSWER** |
| --- | --- |
| Broken Bones: | Yes, 2025 |
| Knee Trouble: | No |
| Dislocate Joints: | No |
| Foot Trouble: | No |
| Swelling of Ankles: | No |
| Any Other Medical Problems: | No |

Ferrier was also asked, and answered the following questions:

Have you ever been a patient in a hospital?
ANSWER: Yes
Have you ever had any surgical operation or been advised to do so?
ANSWER: Yes, Leg Surgery.
Do you have any condition which may require a special work assignment or job accommodation?
ANSWER: No.
Have you ever had an injury or operation to a knee or shoulder?
ANSWER: No.
Have you ever had any job which required heavy physical labor? List year.
ANSWER: Yes, 2020 – 2025.[16]

After considering the history reported by Ferrier, the physical exam, and using his medical training, experience, and application of the sciences, the examining medical provider, Ben Leblanc, NP, concluded in the USCG Physical Form CG-719K that Ferrier, "…has the strength, agility, and flexibility to perform all of the items listed in the physical ability table", which included:

**Section VIII: Demonstration of Physical Ability – To be completed by the Medical Practitioner**

**LISTS OF TASKS CONSIDERED NECESSARY FOR PERFORMING ORDINARY AND EMERGENCY RESPONSE SHIPBOARD FUNCTIONS**

[16] See Exhibit G, Ochsner Occupational Health – Westbank.

| Shipboard Tasks, Function, Event, or Condition | Related Physical Ability | The Examiner Should Be Satisfied That The Applicant: |
|---|---|---|
| Routine movement on slippery, uneven, and unstable surfaces | Maintain balance (equilibrium) | Has no disturbance in sense of balance |
| Routine access between levels | Climb up and down vertical ladders and stairways | Is able, without assistance, to climb up and down vertical ladders and stairways |
| Routine movement between spaces and compartments | Step over high doorsills and coamings, and move through restricted accesses | Is able, without assistance, to step over a doorsill or coaming of 24 inches (600 millimeters) in height. Able to move through a restricted opening of 24 x 24 inches |
| Open and close watertight doors, hand cranking systems, open/close valve | Manipulate mechanical devices using manual and digital dexterity, and strength | Is able, without assistance, to open and close watertight doors that may weigh up to 55 pounds (25 kilograms); should be able to move hands/arms to open and close valve wheels in vertical and horizontal directions; rotate wrists to turn handles; able to reach above shoulder height |
| Handle ship's stores | Lift, pull, push, carry a load | Is able, without assistance, to lift at least a 40 pound (18.1 kilograms) load off the ground, and to carry, push, or pull the same load |
| General vessel maintenance | Crouch (lowering height by bending knees); kneel (placing knees on ground); stoop (lowering height by bending at the waist); use hand tools such as spanners, valve wrenches, hammers, screwdrivers, pliers | Is able, without assistance, to grasp, lift, and manipulate various common shipboard tools |
| Emergency response procedures including escape from smoke-filled spaces | Crawl (ability to move body using hands and knees); feel (ability to handle or touch to examine or determine differences in texture and temperature) | Is able, without assistance, to crouch, kneel, and crawl, and to distinguish differences in texture and temperature by feel |
| Stand a routine watch | Stand a routine watch | Is able, without assistance, to intermittently stand on feet for up to four hours with minimal rest periods |
| React to visual alarms and instructions, emergency response procedures | Distinguish an object or shape at a certain distance | Fulfills the eyesight standards for the merchant mariner credential |
| React to audible alarms and instructions, emergency response procedures | Hear a specified decibel (dB) sound at a specified frequency | Fulfills the hearing standards for the merchant mariner credential |
| Make verbal reports or call attention to suspicious or emergency conditions | Describe immediate surroundings and activities, and pronounce words clearly | Is capable of normal conversation |
| Participate in fire fighting activities | Be able to carry and handle fire hoses and fire extinguishers | Is able, without assistance, to pull an uncharged 1.5 inch diameter, 50' fire hose with nozzle to full extension, and to lift a charged 1.5 inch diameter fire hose to fire fighting position |
| Abandon ship | Use survival equipment | Has the agility, strength, and range of motion to put on a personal flotation device and exposure suit without assistance from another individual |

[17]

Nonetheless, Ben Leblanc, NP, concluded that Ferrier **WAS NOT** fit for employment as a mariner, as his USCG Physical Form CG-719K indicated:

(1) Ferrier was at high risk of having a condition that poses a significant risk of sudden incapacitation or debilitating complication, to include…diabetes mellitus…;

(2) to the best of the provider's knowledge, Ferrier had a medical condition likely to be aggravated by service at sea to render Ferrier unfit for such service or to endanger the health of other persons onboard;

the basis of which was, "Poorly controlled DMI[18] on insulin but last endo[19] notes state his DM[20] is poorly controlled and last 2 recent AIC[21] were greater than 9%[22] ".[23]

Nevertheless, Natalie Jean Marine disregarded the September 30, 2025 advice of its chosen medical provider and hired Ferrier as a deckhand anyway, with his first day of work on October 3, 2025,[24] because it was determined that Ferrier was capable of working as a deckhand from a physical standpoint.[25]

---

[17] *Id*.

[18] Diabetes Mellitus.

[19] Endocrinologist.

[20] Diabetes Mellitus.

[21] A blood test to determine average blood sugar level over a period of time.

[22] An A1C result in excess of 8% precludes a mariner from being issued a credential authorizing work as a seaman without further review and clearance by a medical provider. See, USCG, NVIC No. 04-08.

[23] See Exhibit G, Ochsner Occupational Health – Westbank.

[24] See Exhibit M, Rough Draft of the August 7, 2026 Deposition of Stan Kraley, page 45, lines 21 – 23. Please note that the final deposition transcript was not available at the time of filing this Motion.

[25] *Id*. at page 39, line 24 – page 40, line 7.

Stanley Kraly, the Natalie Jean Marine Port Captain and husband of the company's owner, confirmed that, like Natalie Jean Marine's examining medical provider, he did not detect the presence of any medical condition or disability of Ferrier at the time of his hire between September 30 and October 3. Furthermore, Ferrier himself reported to Mr. Kraly that he was medically recovered and capable of working as a deckhand[26].

Kraly testified further that, about one month into Ferrier's employment, Kraly observed Ferrier with a slight limp and a lack of agility in walking on the deck of the vessel to which he was assigned, the M/V GI JOE.[27] However, Kraly was not aware of any new accident of Ferrier during his employment by Natalie Jean Marine. Further, Kraly made no effort to have Ferrier's newly discovered condition evaluated or treated by a medical professional.[28]

Consistent with Kraly's observations of Plaintiff's new symptoms "one month" after he became employed on October 3, on November 4, 2025, Ferrier sought medical treatment for right ankle and tibia and fibula discomfort, and for the first time reported right knee symptoms to Dr. Neil Duplantier.[29]

Nonetheless, despite Plaintiff's new knee complaints and reporting of symptoms, he continued to work as a deckhand for Natalie Jean Marine, without ever missing work due to pain. other symptoms, or medical appointments, while living aboard the M/V GI JOE, from October 3, 2025 through February 10, 2026, when Natalie Jean Marine terminated him[30].

---

[26] *Id*. at page 24, line 24 – page 25, line 2.

[27] *Id*. at page 43, lines 19 – page 44, lines 6; page 108, line 4 – page 109, line 13.

[28] *Id*. at page 114, lines 10 – 17.

[29] See Exhibit H, Bone & Joint Clinic Records from November 4, 2025.

[30] See Exhibit M, Rough Draft of the August 7, 2026 Deposition of Stan Kraley, 65:18-66:12, and 66:17-22. Please note that the final deposition transcript was not available at the time of filing this Motion.

Dr. Duplantier relates all of Ferrier's reported medical problems to the April 6 accident, as he apparently believes that the leg fracture would have prevented Plaintiff (and Dr. Wax, all of the nurses, anesthesiologists, and other medical providers who treated Plaintiff emergently on April 6 through 8, 2025, and during his two surgeries; Fred Eitmann, PT, Julie Tran, PT, and Ben Leblanc, NP) from being aware that Plaintiff had a significant knee injury, (1) during his treatment at West Jefferson Medical Center; (2) during his treatment with Dr. Wax at Jefferson Orthopedic; (3) during his physical therapy visits in the Jefferson Orthopedic Clinic gym including when he performed bosu ball lunges without difficulty on July 1, 2025; (4) on August 4, 2025 when Dr. Wax gave a full duty work release; (5) from September 15 to 23, 2025 when Plaintiff returned to work for Defendants; (6) on September 30 when Plaintiff denied that he ever had, or now has, Knee Trouble; denied that he ever had a knee injury; and denied that he had any condition which may require a special work assignment or job accommodation; and (7) from October 3, 2025 through November 3, 2025, when he was working as a deckhand on the M/V GI JOE.[31]

Defendants retained an IME physician, Dr. Michael McNulty, who opined that the right knee condition is unrelated to the April 6, 2025 accident, that Plaintiff reached MMI by April 6, 2026, and that Plaintiff requires no further medical treatment for the leg fracture/injury(ies) sustained on April 5, 2025:

> Following surgical treatment and rehabilitation in April 2025, he was ultimately cleared for unrestricted work approximately 5 months after surgery by Dr. Wax. He had no complaints regarding his knee in physical therapy post-op appointment. In his pre-employment physical, he denied any knee symptoms and on exam there was no physical evidence of any knee-related pathology. After being cleared for full/unrestricted duty, he worked on a boat for several months without any recorded difficulties. His job would have required strenuous use of his knee for which a symptomatic meniscus tear would not be compatible. It was not until November

[31] See Exhibit H, Bone & Joint Clinic Records from May 26, 2026.

> 2025, and after several months of strenuous work, that he then first complained of knee symptoms. If he would have sustained a meniscus tear in the work injury he would have complained of knee symptoms and had physical evidence of knee related limitations in the aforementioned medical visits. In addition, given the nature of his job on the boat for which he worked uneventfully for several months after clearance, a symptomatic meniscus tear related to the incident in question would have caused limitations and complaints. Barring surgery he is at MMI. He reached MMI approximately 1 year after the incident.[32]

Plaintiff has never made any complaints or demands with respect to Defendants' payment of maintenance and cure from April 6, 2025 through November 3, 2025, evidencing his satisfaction with Defendants' handling thereof. Thus, because Defendants have shown that they have satisfied those obligations, Defendants should be entitled to summary judgment dismissing his punitive damages claims, with prejudice, alleging failure to pay maintenance and cure to him during this time period.

Plaintiff demanded payment of maintenance and cure benefits from CP Marine/Ten Mile, based on his medical treatment commencing on November 4, 2025, on March 6, 2026, April 23, May 28, June 15, and June 29.[33] On July 2, 2026, CP Marine/Ten Mile sent maintenance payments to Plaintiff, effective February 10, 2026, the date his employment with Natalie Jean Marine ended, which payments have continued through present.[34] Further, CP Marine/Ten Mile have agreed to payment of the past and outstanding medical expenses incurred by Ferrier through June 29 in the

[32] See Exhibit I, Dr. Michael McNulty May 20, 2026 Medical Report.

[33] See Exhibit J, Plaintiff Maintenance and Cure Demands.

[34] See Exhibit K, Email from Monique Nunez of Condon Claims to Plaintiff's Counsel RE: Initiating Maintenance.

sum of $16,056.00 (which includes right knee treatment) as he requested in his maintenance and cure demand letters, and are awaiting records from Ferrier's counsel to accomplish same.[35]

Thus, all potential maintenance obligations to Plaintiff have been satisfied, and all cure obligations have been satisfied, with the exception of (a) any medical charges incurred after June 29, 2026, the last date he demanded payment of benefits; and (b) authorization for the right knee meniscus repair surgery recommended by Dr. Duplantier.

However, Plaintiff has not provided Defendants with any records demonstrating that compensable medical charges have been incurred since June 29, 2026, and there is a reasonable dispute over the relatedness of the right knee symptoms necessitating the meniscus repair surgery, such that Defendants cannot be liable for punitive damages as a result of their refusal to authorize that procedure.

On November 7, 2025, Plaintiff demanded, for the first time, in his Complaint that Defendants pay him additional maintenance and cure for the April 5, 2025 accident, based on the medical treatment commencing on November 4, 2025.[36] Although Defendants had no knowledge of Plaintiff's medical appointment on November 4 or the conclusions of the examining physician, Plaintiff alleged entitlement to punitive and compensatory damages based on Defendants failure to pay maintenance and cure, evidencing the boilerplate nature of this allegation.[37] On March 6, he made his initial formal demand for maintenance and cure treatment supported by medical

[35] See Exhibit L, Email Chain with Paul Hale and Monique Nunez of Condon Claims to Plaintiff Counsel RE: Request for Medical Records.

[36] Rec. Doc. 1, par. 12 and Exhibit J, Plaintiff Maintenance and Cure Demands.

[37] Rec. Doc. 1, par. 12.

records and on March 25, 2026, Plaintiff filed an Amended Complaint, repeating the same allegations.[38]

Here, there is a reasonable dispute as to the veracity, necessity, and/or relatedness of Plaintiff's new medical complaints raised on November 4, 2025 and thereafter. Nonetheless, Defendants have satisfied all maintenance and cure obligations sought by Plaintiff to date, with the exception of authorizing the right knee meniscus surgery, based on the compelling evidence showing it is a new and unrelated injury/condition including: 1) the opinion of Dr. Michael McNulty; 2) the opinion of Dr. Barton Wax - Plaintiff's treating surgeon – that he was released to perform full duty work as of August 4, 2025 and reached MMI as of September 15, 2025 without diagnosis of a knee injury; 3) the opinion of Ben Leblanc, NP who performed a September 30, 2025 United States Coast Guard Physical and concluded that Plaintiff was fully capable of full duty deckhand work and did not have a knee injury; and 4) Plaintiff's own admissions at the time of that physical that he was capable of full duty deckhand work and did not have a knee injury, as well as all other factors outlined below.

Because there is no way that Plaintiff can satisfy the heightened standard necessary to support a claim for punitive damages, Defendants respectfully request that these claims be dismissed, with prejudice.

## II. LAW AND ARGUMENT

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

[38] Rec. Doc. 12, par. 12.

that the movant is entitled to judgment as a matter of law."[39] When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[40] All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions.[41] A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party."[42]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[43] The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable factfinder to return a verdict in favor of the moving party."[44] If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[45] The burden then shifts to the nonmoving party, who must, by submitting or

---

[39] Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[40] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

[41] *Little*, 37 F.3d at 1075.

[42] *Delta & Pine Land Co.*, 530 F.3d 399.

[43] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991) (citation omitted).

[44] *Id.* at 1265.

[45] *See Celotex*, 477 U.S. at 325.

referring to evidence, set out specific facts showing that a genuine issue exists.[46] The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial.[47]

### B. A Claim For Punitive Damages Requires a Higher Burden of Proof Than A Claim For Maintenance and Cure

It is well settled that maintenance and cure is an ancient duty imposed upon a vessel owner whereby it has an "obligation to provide food, lodging, and medical services to a seaman injured while serving the ship."[48] The right to maintenance and cure "terminates only when maximum cure has been obtained."[49]

Punitive damages and attorney's fees are available to an injured seaman[50] for "his employer's willful failure to pay maintenance and cure."[51] According to the Fifth Circuit:

> [T]here is an escalating scale of liability: a shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages. If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well.[52]

---

[46] *See Id.* at 324.

[47] *See, e.g., Id.* at 325; *Little*, 37 F.3d at 1075.

[48] *Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438, 441, 121 S. Ct. 993, 148 L.Ed. 2d 931 (2001).

[49] *Bertram v. Freeport McMoran, Inc*., 35 F.3d 1008, 1012 (5th Cir.1994) (internal quotation and citation omitted).

[50] *Vaughan v. Atkinson*, 369 U.S. 527, 529-30, 82 S. Ct. 997, 8 L. Ed. 2d 88 (1962) (explaining the plaintiff was entitled to attorney's fees after he was forced to hire an attorney to recover maintenance and cure).

[51] *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 407, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009).

[52] *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987), *abrogated on other grounds by, Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496 (5th Cir. 1995), *abrogated on other grounds by, Townsend*, 557 U.S. at 424.

An injured seaman faces a higher burden in establishing entitlement to punitive damages as the employer must have been not only "unreasonable" but also "egregiously at fault."[53] This higher degree of fault has been described in such terms as "callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent.[54] Essentially, the injured seaman must show "an element of bad faith."[55]

However, when an employer receives a claim for maintenance and cure, it is entitled to investigate the claim and require corroboration before tendering any payments[56] — "without subjecting itself to liability for compensatory or punitive damages."[57] After conducting the investigation, **<u>and</u>** upon acting with callousness and indifference to, or willful and wanton disregard for, the seaman's injuries, only then can the employer can be liable for punitive damages and attorney's fees.[58]

**1. Plaintiff Cannot Establish Defendants Acted With Callousness or Indifference With Respect to Conduct Between April 6, 2025 and November 3, 2025**

---

[53] *Morales*, 829 F.2d at 1358.

[54] *Id*. (citations omitted).

[55] *Harper v. Zapata Off-Shore, Co.,* 741 F.2d 87, 90 (5th Cir. 1984).

[56] *MNM Boats, Inc., v. Johnson*, 248 F.3d 1139 (5th Cir. 2001) (citing *Morales v. Garijak, Inc*., 829 F.2d 1355, 1358 (5th Cir. 1995), abrogated on other grounds, *Guevara*, 59 F.3d 1496); *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005) ("A Jones Act employer is entitled to investigate a seaman's claim for maintenance and cu**re** benefits."); *Morales*, 829 F.2d at 1358 ("Upon receiving a claim for maintenance and cure, the shipowner need not immediately commence payments; he is entitled to investigate and require corroboration of the claim."); *McWilliams v. Texaco, Inc.*, 781 F.2d 514, 519 (5th Cir. 1986) ("Where doubt exists—as it reasonably did here—a vessel owner may request reasonable documentation from a seaman before it commences payment of maintenance that may prove both lengthy and expensive.").

[57] *Boudreaux v. Transocean Deepwater, Inc.*, 721 F.3d 723, 728 (5th Cir. 2013).

[58] *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 407, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009).

Here, after Plaintiff's April 6, 2025 incident, it is undisputed that Defendants provided him with, and paid for, all medical care either sought by Plaintiff and/or recommended by his medical providers through November 3, 2025. Likewise, it is not disputed that Plaintiff was paid $10,805.19, which amounts to $66.29 per day from April 6, 2025 until September 15, 2025, the date that Plaintiff's treating surgeon declared he reached Maximum Medical Improvement, and over one month after his release to perform full duty work.

Defendants' reliance on Dr. Wax's medical opinion supplied it with a reasonable basis for it to discontinue payments. *See Averett v. Diamond Offshore Drilling Services, Inc.*, 980 F.Supp. 855, 859 (E.D. La. 1997) (employer's failure to pay maintenance and cure, while erroneous, was not willful, wanton or egregious where employer's decision was based on a treating doctor's report, such that no attorney's fees were compensable). Here, the opinion of Dr. Wax concerning MMI was not contested, as he was the only medical provider opining on this issue, making the reliance totally justified, especially since Plaintiff acquiesced in the decision to return to work and stop medical treatment, considering his failure to attend physical therapy with Fred Eitmann, PT as recommended from May 21 through July 1, 2025, and failure to seek any of the physical therapy recommended by Dr. Wax on August 4, 2025. These facts foreclose any possible finding of arbitrary, recalcitrant or callous conduct necessary for punitive damages, with respect to any conduct through November 3, 2025.

Accordingly, it would be inappropriate for a jury to consider whether Defendants acted with "callousness and indifference to, or willful and wanton disregard for,"[59] the Plaintiff's injuries by its disregard of its maintenance and cure obligation, when the undisputed evidence demonstrates that: 1) Defendants reasonably paid Plaintiff benefits amounting to $66.29 per day

[59] *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 407, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009).

from April 6, 2025 through September 15, 2025[60]; (2) Defendants paid for all medical treatment sought by Plaintiff or recommended by his providers from April 6, 2025 through November 3, 2025 (it did not have prior notice of his November 4 visit); and (3) Defendants terminated benefits upon Plaintiff's physicians determining he reached Maximum Medical Improvement. It is well settled that maintenance and cure terminates when maximum medical improvement has been reached.[61]

Therefore, Defendants respectfully request that the Court grant summary judgment and dismiss Plaintiff's claims seeking punitive and compensatory damages resulting from Defendant's handling of its maintenance and cure obligations to him prior to November 4, 2025.

**2. Plaintiff Cannot Establish Defendants Acted With Callousness or Indifference With Respect to Conduct Between November 3, 2025 and Present**

There is overwhelming evidence demonstrating that Defendants were reasonable in investigating Plaintiff's knee complaints because the evidence demonstrates that Plaintiff did not sustain a right knee injury in the April 6, 2025 accident. Plaintiff was triaged at West Jefferson Medical Center on April 6, 2025, with no mention of any right knee problems, nor were any symptoms detected during his hospital stay through April 8.[62]

Plaintiff did not mention any right knee condition or pain during his treatment with Dr. Barton Wax on April 14, 2025, April 22, May 19, June 23, or August 4, nor did he mention any right knee pain during his physical therapy with Fred Eitmann on May 21, 2025, May 30, June 9,

---

[60] *Armstrong v. Offshore Specialty Fabricators, LLC*, No. 15-4027, 2017 U.S. Dist. LEXIS 58057, at *7 (E.D. La. Apr. 17, 2017) (Judge Milazzo found that $30/day did not warrant an increase and that "other courts in this district have found that $30.00/day is a reasonable maintenance payment." *See Atl. Sounding Co. v. Curette*, No. 05-2810, 2006 U.S. Dist. LEXIS 30282, 2006 WL 1560793, at *3 (E.D. La. May 16, 2006)).

[61] *McBride v. Estis Well Ser., LLC*, 853 F.3d 777, 783 (5th Cir. 2017) (citations omitted).

[62] See Exhibit A, Ferrier Medical 001030 – 001049, West Jefferson Medical Center

June 20, and July 1, 2025. There is absolutely no mention of any knee problems, or other medical condition requiring treatment not provided by Defendants, from April 6 through November 3, 2025. Even more telling is the fact that on September 30, 2025, by his own admission, Plaintiff specifically stated "NO" as to whether he "now" has knee trouble when evaluated by a medical professional in connection with a physical examination for his employment with Natalie Jean Marine, and a medical professional, Ben Leblanc, NP concurred in that assessment.[63]

**ALL EVIDENCE** produced to date unequivocally proves that Plaintiff did not mention a right knee condition for almost seven (7) months after his April 6, 2025 accident, and further, that evidence affirmatively indicates that there is no right knee condition present during that time. Rather, the first mention of right knee pain was made to Dr. Neil Duplantier on November 4, 2025, while Plaintiff was employed with a completely different employer than Defendants for at least one month, when the right knee symptoms presented in service of that employer's vessel. Even more, Defendants' IME physician, a board-certified orthopedic surgeon who reviewed Plaintiff's medical records/case evidence and performed his own physical examination, opined that Plaintiff's new right knee condition is unrelated to the April 6, 2025 accident, and that any injuries sustained in that accident do not require further treatment.

Nevertheless, following Plaintiff's demands for maintenance and cure with respect to his medical treatment commencing on November 4, 2025, Defendants investigated this claim. "Upon receiving a claim for maintenance and cure, the [employer] need not immediately commence payments; [rather] he is entitled to investigate and require corroboration of the claim."[64] On July 2, Defendants instituted maintenance payments to Plaintiff, including back payments effective

[63] See Exhibit G, Ochsner Occupational Health – Westbank.

[64] *Morales*, 829 F.2d at 1358.

February 10, 2026, the date his employment with Natalie Jean Marine ended, which payments have continued through present.[65] Further, except for Plaintiff's recent knee surgery recommendation, CP Marine/Ten Mile have agreed to pay outstanding medical expenses incurred by Ferrier, and are awaiting records from Ferrier's counsel to accomplish same.[66]

Thus, with respect to the period of November 4, 2025 to present, Defendants have discharged all maintenance obligations owed to Plaintiff, who continues to be paid maintenance at an agreed upon rate.[67] Likewise, Defendants have discharged all cure obligations, as they have agreed to pay the outstanding medical bills requested by Plaintiff, except for the request to authorize the right knee meniscus repair surgery recommended by Dr. Duplantier.[68] However, Defendants' IME physician, Dr. Michael McNulty, opined that the right knee condition is wholly unrelated to the April 6, 2025 accident, and nineteen other factors, addressed below, support this conclusion.

Even if this Honorable Court finds that causation of the knee condition is a disputed fact that must be tried, that does not in of itself create a genuine issue concerning Plaintiff's punitive damages claim because all of the foregoing facts clearly establish that Defendants did not act with callousness or indifference with respect to their obligations owed to Plaintiff concerning maintenance and cure between November 4, 2025 and the present.

---

[65] See Exhibit K, Email from Monique Nunez of Condon Claims to Plaintiff's Counsel RE: Initiating Maintenance.

[66] See Exhibit L, Email Chain with Paul Hale and Monique Nunez of Condon Claims to Plaintiff Counsel RE: Request for Medical Records.

[67] See Exhibit K, Email from Monique Nunez of Condon Claims to Plaintiff's Counsel RE: Initiating Maintenance and see Exhibit L, Email Chain with Paul Hale and Monique Nunez of Condon Claims to Plaintiff Counsel RE: Request for Medical Records.

[68] The requested medical bills including treatment solely related to the right knee, which Defendants aver is not owed, and should be paid/reimbursed by Natalie Jean Marine, LLC.

The key to recovering punitive damages and attorney's fees associated with a willful failure to pay maintenance and cure is that the plaintiff must prove that the employer acted arbitrarily, wantonly, or outrageously; some element of bad faith on the employer's part must be established.[69] "[A]n employer," however, "is entitled to investigate a claim for maintenance and cure before tendering any payments to the seaman -- without subjecting itself to liability for compensatory or punitive damages."[70]

In *Morales v. Garijak, Inc*.[71], the Fifth Circuit instructed that egregious conduct supporting an award of punitive damages for arbitrarily failing to pay maintenance and cure had been found where the shipowner: "failed to conduct any investigation into the seaman's claim, withheld payments despite discovering through an investigation that the payments were due, [or] rejected a documented claim because the seaman did not consult the owner before seeking treatment for his injury and because the seaman had filed suit[.]" Judge Feldman previously held, "[t]he Court underscores that punitive damages are available for willful, but not merely negligent, failure to pay or render timely cure."[72]

In *All. Marine Servs., LP v. Youman*, the plaintiff sought maintenance and cure for low back and leg injuries that his doctor, Dr. Dietze, related to his workplace accident and recommended surgery to treat, whereas the IME physician, Dr. Tender, found the injuries not related and that surgery was not necessary. A radiologist retained by Defendants also reviewed imaging of the spine before and after the accident and concluded there were no changes. Plaintiff

---

[69] *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009).

[70] *Boudreaux v. Transocean Deepwater, Inc*., 721 F.3d 723, 728 (5th Cir. 2013).

[71] 829 F.2d 1355, 1360-61 (5th Cir. 1987)

[72] *All. Marine Servs., LP v. Youman*, 2018 U.S. Dist. LEXIS 209455, *21-22 (E.D. La. Dec. 18, 2018).

underwent the recommended back surgery, which Defendants refused to authorize, based on its assessment of a video of the accident, plaintiff's refusal to be interviewed after the accident, plaintiff's history of back pain and lawsuits, and the opinion of its IME physicians. The Court determined that the Defendant did not merely rely on the opinion of its IME physician in declining to pay for the plaintiff's surgery, rather, it investigated his claims and relied on the other evidence too.

Thus, when an employer declines to pay maintenance and cure benefits to a seaman based upon the results of its investigation providing multiple sources of evidence rationally tied to the case, the employer cannot be liable for punitive damages, even if ultimately determined to be a wrong conclusion[73]. This is because in so acting, the employer is not acting arbitrarily or capriciously, since the actions are rooted in evidence and the employer has not merely chosen one physician's subjective opinion over another's without something more[74].

Likewise, here, Defendants investigated Plaintiff's claims for payment of maintenance and cure and have paid all obligations other than authorizing the recommended right knee meniscus repair surgery. In declining to authorize this procedure, Defendants have relied on their investigation, which has shown:

(1) the absence of any right knee symptoms mentioned in the treatment records of West Jefferson Medical Center or Jefferson Orthopedic Clinic from April 6, 2025, through August 4, 2025[75];

---

[73] *All. Marine Servs., LP*, 2018 U.S. Dist. LEXIS 209455, *26-27.

[74] *Id*.

[75] See Exhibit A, Ferrier Medical 001030 – 001049, West Jefferson Medical Center, and see Exhibit B, Jefferson Orthopedic Clinic Physical Therapy Records from May 21, 2025-July 1, 2025

(2) the testimony of Fred Eitmann, PT, that Plaintiff did not have any right knee symptoms from May 21 through July 1, and the treatment/modalities Plaintiff performed during that time would likely have caused same to manifest[76];

(3) the testimony of Fred Eitmann, PT, that Plaintiff did not attend physical therapy as recommended by Dr. Wax and Mr. Eitmann from May 21 through July 1[77];

(4) Dr. Wax's release of Plaintiff to perform full duty deckhand work as of August 4, 2025, with no knee injury present on that date[78];

(5) Plaintiff's failure to attend any of the physical therapy recommended by Dr. Wax on August 4, 2025[79];

(6) Dr. Wax's declaration that Plaintiff would reach MMI as of September 15, 2025 with respect to the injuries sustained in the April 6, 2025 accident[80];

(7) Plaintiff's acquiescence in returning to work for CP Marine in September 2025;

(8) the medical opinion of Ben Leblanc, NP, that Plaintiff was capable of working full duty as a deckhand without any accommodations as of September 30, 2025, pursuant to the standards of United States Coast Guard Form 719-K and U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48 (Aug. 30, 2019)[81];

---

[76] Fred Eitmann's deposition transcript is not available yet as the deposition took place on August 10, 2026.

[77] *Id.*

[78] See Exhibit C, Dr. Barton Wax August 4, 2025 Record

[79] *Id.*

[80] *Id.*

[81] See Exhibit G, Ochsner Occupational Health – Westbank.

(9) the medical opinion of Ben Leblanc, NP, that Plaintiff did not have a right knee injury present as of September 30, 2025[82];

(10) Plaintiff's statements made in connection with the United States Coast Guard Form 719-K Physical that he did not have a right knee injury present on September 30, 2025[83];

(11) Plaintiff's statements made in connection with the United States Coast Guard Form 719-K Physical that he was capable of working as a deckhand without accommodation[84];

(12) the testimony of Stan Kraly of Natalie Jean Marine that he did not detect any right knee or other medical condition on or about September 30, 2025 when Plaintiff sought employment as a deckhand with that company[85];

(13) the testimony of Stan Kraly of Natalie Jean Marine that Plaintiff reported that he was medically recovered from the accident of April 6, 2025 as of September 30, 2025, and did not require further treatment[86];

(14) the testimony of Stan Kraly that Plaintiff did not have any difficulty ingressing or egressing off the M/V GI JOE during October 2025[87];

(15) the testimony of Stan Kraly that Plaintiff developed new symptoms approximately one month into his employment with Natalie Jean Marine[88];

---

[82] *Id*.

[83] *Id.*

[84] *Id.*

[85] See Exhibit M, Rough Draft of the August 7, 2026 Deposition of Stan Kraley, 43:5 – 44:6. Please note that the final deposition transcript was not available at the time of filing this Motion

[86] *Id*. at 24:16 – 25:2.

[87] *Id*. at 107:22 – 108:16.

[88] *Id*. at 113:20 – 114:14.

(16) the testimony of Kraly that he did not have Plaintiff's new symptoms treated or evaluated after they manifested one month into his employment with Natalie Jean Marine[89];

(17) the Plaintiff's lack of seeking any medical care from August 4, 2025 through November 3, 2025;

(18) that Plaintiff's first report of right knee symptoms to a medical provider was on November 4, 2025, after Kraly observed new symptoms not previously present[90];

(19) that Dr. Michael McNulty is of the opinion that Plaintiff's right knee complaints are not related to the April 6, 2025 accident, and no further treatment is required for any injury sustained therein[91].

There is no evidence to indicate that Defendants refused to make maintenance and cure payments with respect to Plaintiff's medical treatment commencing on November 4, 2025, in bad faith or acted outrageously, arbitrarily, or capriciously. Whereas Judge Feldman found that an employer could not be liable for punitive damages when it failed to authorize surgery based on seven factors in *All. Marine Servs., LP v. Youman*, *supra*, Defendants here have relied on at least nineteen factors that support the decision to not authorize the right knee meniscus repair surgery recommended by Dr. Neil Duplantier, whose records make no mention of his consideration of any of these nineteen factors, but instead find causation based on the leg fracture somehow "distracting" Plaintiff from recognizing pain or limitation in his own body, or any of the trained medical personnel from detecting such an injury.

---

[89] *Id*. at, 114:15 – 115:4.

[90] *Id*.; See Exhibit H, Bone & Joint Clinic Records from November 4, 2025.

[91] See Exhibit I, Dr. Michael McNulty May 20, 2026 Medical Report.

The evidence demonstrates that Defendants paid maintenance and cure following Plaintiff's original tibia/fibula fracture and discharged every obligation requested by Plaintiff from April 6, 2025 through November 3, 2025, with termination of benefits made only after his treating physician determined the date of maximum medical improvement of September 15, 2025.

With respect to November 4, 2025 to present, Defendants have paid, or agreed to pay, every maintenance and cure obligation owed to Plaintiff, besides authorizing payment for the right knee surgery recommended by Dr. Duplantier, which is reasonably based on overwhelming evidence outlined in the nineteen factors above.

An employer can refuse to pay for disputed surgery "so long as it had a reasonable factual or legal basis."[92] Punitive damages are only for behavior that is egregious. There is nothing in the foregoing to suggest Defendants acted egregiously. Thus, Defendants respectfully request that the Court dismiss, with prejudice, Plaintiff's claims seeking punitive damages as a result of Defendants' handling of the maintenance and cure obligations arising from his medical treatment commencing on November 4, 2025 through present.

## III. CONCLUSION

For the foregoing reasons and because Plaintiff cannot establish that Defendants acted with callousness or indifference with respect to his plight, but only that Defendants acted reasonably under the circumstances in paying and then terminating benefits as of September 15, 2025, when he reached MMI, and in paying benefits thereafter for his treatment commencing on November 4, 2025, but in declining to authorize payment for a right knee surgery recommended by one doctor, Plaintiff's claim seeking punitive damages for CP Marine Services, LLC/Ten Mile Exchange, LLC's alleged failure to pay maintenance and cure should be dismissed, with prejudice.

---

[92] *In re 4-K Marine, LLC v. Enter. Marine Servs., LLC (Inn re 4-K Marine, LLC),* 914 F.3d 934, 939 (5th Cir. 2019).

Respectfully submitted,

*/s/ Kari M. Rosamond*

Paul D. Hale (#30539)
Kari M. Rosamond (#34065)
**HALE DEVALL, LLC**
400 Poydras Street, Suite 2107
New Orleans, LA 70130
Telephone: 504-576-0700
phale@haledevall.com
krosamond@haledevall.com

***Attorneys for CP Marine, LLC and Ten Mile Exchange, LLC***