**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JONATHAN FERRIER**<br><br>**v.**<br><br>**CP MARINE SERVICES, LLC and TEN MILE EXCHANGE, LLC** | **CIVIL ACTION NO. 2:25-cv-02286 consolidated w/ 26-cv-1694**<br><br>**Ref: 25-2286**<br><br>**JUDGE JAY C. ZAINEY**<br><br>**MAGISTRATE JUDGE KAREN WELLS ROBY** |

# MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE SPECULATIVE EVIDENCE OF PLAINTIFF ACHIEVING PROMOTIONS, WAGE INCREASES, AND LICENSING BY THE UNITED STATES COAST GUARD

MAY IT PLEASE THE COURT:

Defendants, CP Marine, LLC ("CP Marine") and Ten Mile Exchange, LLC ("Ten Mile"), (collectively, "Defendants"), respectfully move this Honorable Court to exclude all evidence that Plaintiff, Jonathan Ferrier ("Plaintiff"), would have achieved promotions and three different licenses from the United States Coast Guard ("USCG"), when 1) he had not demonstrated any propensity for promotion or career progression, 2) he had only one year of experience as a deckhand, 3) he had taken no concrete steps towards obtaining licensure, and 4) he has multiple medical conditions that may disqualify him from obtaining USCG licensure, all of which make presentation to a jury of such a career progression and Plaintiff earning wages more than four times greater than he has to date inherently speculative and subject to exclusion.

## I. FACTS

### a. Pertinent Medical History

Plaintiff was born in October 2002 and has a long-standing diagnosis of Diabetes Mellitus Type 1, which has resulted in his missing school, being hospitalized, and resulting in concern from

the school nurse due to his uncontrolled blood sugar including episodes of hypoglycemia and hyperglycemia. *See, Dr. Gary Birdall Records, June 22, 2018, pg. 72/599, 102-03/599, 116/599, 191-97/599Ex. "A".*

Since he was young, Plaintiff was diagnosed with, "multiple medical problems including attention deficit disorder, diabetes mellitus type 1, depression, bipolar disorder, and hypertension", which required special living accommodations. *See, Dr. Gary Birdall Records, June 22, 2018, pg. 44/599, Ex. "A".*

In 2016, the Police brought him to the hospital after he expressed suicidal ideation. *See, Lady of the Sea Records, DEF 4809, Ex. "B".*

At age 16, he was medically withheld from Physical Education class the entire school year due to chronic low back pain. *See, Dr. Gary Birdall Records, pg. 36-38/599, 221-30, Ex. "A".* In 2019, he was hospitalized in a mental health facility due to self-harm and suicidal ideation. *See, Dr. Gary Birdall Records, June 22, 2018, pg. 181-186/599, Ex. "A".*

From early 2016 through January 2020, plaintiff reported to his doctor, "being unable to complete tasks; procrastinates; tends to start everything and finish nothing", with ADHD present. *See, Dr. Gary Birdall Records, pg. 293; 358-362; 364; 276; 280; 393/599, Ex. "A".*

On September 19, 2018, Plaintiff reported being poorly organized, unable to complete tasks, unable to move on to the next task, procrastinates, with Anxiety/Depression that interfered with sleep, high irritability, anxiety, hypersensitivity, depression, insomnia, restlessness/agitation, sleep disturbances, low self-esteem, social withdrawal, anxiety with excessive sweating, paranoid, and feeling persecuted (at school), with an average A1C reading of 8.75% over the past 10 months. *See, Dr. Gary Birdall Records, pg. 334-339/599, Ex. "A".*

At age 17, Plaintiff's blood sugar continued to be elevated above normal diabetic ranges, and he continued to suffer from ADHD, Depressive Disorder, Hypertensive Disorder, low back pain, Bipolar Disorder, Insomnia, Acid Reflux, and Obesity. *See, Dr. Gary Birdall Records, pg. 295-96/599, Ex. "A".*

Plaintiff's labs consistently indicate that his HbA1C, an average glucose value of a patient's previous three months, was elevated:

- His average HbA1C reading was 9.08% from October 19, 2017 to February 25, 2019. *See, Dr. Gary Birdall Records, pg. 310/599, Ex. "A".*
- HbA1C of 10.4% on February 25, 2019. *See, Dr. Gary Birdall Records, pg. 311/599, Ex. "A".*
- HbA1C of 9.7% on May 6, 2021. *See, Gretna Medical Center Records, DEF 4151 Ex. "C".*
- HbA1C of 10.4% in June 2024, *See West Jefferson Medical Center Endocrinology Clinic Records, Ferrier Medicals 000697-000698, Ex. "F".*

After 10th grade, Plaintiff stopped attending high school and took no steps towards obtaining a GED, did not obtain any certifications from any trade school, and did not seek any other education or training. *See, Deposition of Plaintiff, 23:22 – 24:2 and 25:16 – 26:5, Ex. "E".* Rather, from 2020 through late 2023, he was unemployed, not attending school, and not earning any income. Later records from 2025 indicate that Plaintiff was previously a user of substances, including marijuana and "pills". *See, West Jefferson Medical Center Records, DEF 2133, Ex. "D".*

However, Plaintiff's medical conditions continued into adulthood, including (4/8/22): hypertension, Type 1 diabetes, Obesity, Low back pain, Scoliosis, Hyperlipidemia, Vitamin D deficiency, *See, Gretna Medical Center Records, DEF 4128-29, Ex. "C".* At age 18 (March 1, 2021), he continued to have chronic back pain and scoliosis, among other conditions. *See, Gretna Medical Center Records, DEF 4147, Ex. "C".*

**b. Employment and Earnings History**

Plaintiff was not employed from 2020, when he quit school, through late 2023.

Plaintiff worked for Five and Below as a stocker from November 22, 2023 through January 18, 2024, earning $11 per hour. *See, Five Below Excerpts, Ex. "G".* He next worked for Taco Bell from January 21, 2023 through November 14, 2023, also earning $11 per hour, but abandoned the job when he stopped showing up for his scheduled shifts. *See, B&G Food Enterprises Excerpts, Ex "H".*

Plaintiff was unemployed from November 2023 through the end of March 2024.

In late March 2024, Plaintiff sought employment as a deckhand with Natalie Jean Marine, LLC ("Natalie Jean Marine"), a company where Plaintiff's sister's boyfriend, Joshua McCullough, with whom Plaintiff lived, worked as a deckhand. Deckhand is an entry level mariner position on a vessel crew and can be performed without obtaining a license from the United States Coast Guard, as is required of more senior crew positions.

On March 27, 2024, Natalie Jean Marine had Plaintiff evaluated by Dr. Brian Bourgeois for a physical evaluation pursuant to United States Coast Guard Physical Form 719-K, to determine his fitness to work as a mariner. *See, Natalie Jean Marine 2024 Personnel File Excerpts, Ex. "I".* Plaintiff disclosed his Type 1 Diabetes and the fact that his most recent A1C reading 4-5 months

ago was 8.0%, resulting in Dr. Bourgeois concluding that he was, "Not Recommended" for employment, because diabetes requiring insulin is a condition, "not recommended per USCG guideline – must apply for waiver". *See, Natalie Jean Marine 2024 Personnel File Excerpts, Ex. "I".* The USCG Physical Form CG-719K indicated in Section IX, c. Assessment, 1., that Plaintiff was at "high risk of having a condition that poses a significant risk of sudden incapacitation or debilitating complication, to include…diabetes mellitus…"; *See, Natalie Jean Marine 2024 Personnel File Excerpts, Ex. "I".*

Despite the medical advice, Natalie Jean Marine employed Plaintiff as a deckhand at $125 per day from March 29 through May 28, but when the company accused Plaintiff of infesting its vessel with bed bugs, which he denied, he quit without providing notice. *See, Rough Draft of the August 7, 2026 Deposition of Stan Kraly, Port Captain of Natalie Jean Marine, 12:5 – 13:23, Ex. "J" and see, Deposition of Plaintiff, 56:23 – 57:1, Ex. "E".*

On June 4, 2024, Plaintiff became employed by CP Marine as a deckhand, earning $170 per day, which was increased to $180 per day just before he sustained a leg fracture on April 6, 2026. *See, Deposition of Plaintiff, 49:11-14, 63:21 –64:3, Ex. "E".*

Thus, at the time of his injury, Plaintiff had a total of twelve months' experience working as a deckhand on towing vessels,. *See, Deposition of Plaintiff, 49:11-14, 63:21 –64:3; and 56:23 – 57:1 Ex. "E".* Although he had never worked for twelve months or more for any employer, and the most money he ever earned in a single year was around $30,000 in 2024, the annualized value of his wages at the time of injury would have been $43,802.19[1].

After his employment with CP Marine terminated, Plaintiff requested and was provided a "sea time letter" from CP Marine documenting the number of qualifying days he worked as a

---

[1] $180 per day on 14/7 work schedule.

deckhand for the company, which was 212 days. *See, Deposition of Plaintiff,* 163:19-165:6, *Ex. "E"*. The "sea time" letter can be used to document the number of days that a person has worked in a certain capacity as a vessel crew member, in order to meet <u>one of the requirements</u> necessary to obtain a license from the United States Coast Guard to work as a Captain. *Id.*

Plaintiff testified that he believed he had almost accrued enough sea time as a deckhand, "to start learning about the captain – captain position". *See, Deposition of Plaintiff,* 164:22-165:21, *Ex. "E"*. He explained this further, as, "The process of learning how to operate the boat and getting my steersmanship I think would be the first step and then captain school. I'm not exactly how - -- like in what order it goes in". *See, Deposition of Plaintiff,* 166:3-13, *Ex. "E"*.

Plaintiff's testimony indicated that he acknowledged that he was still learning the ropes of his entry level deckhand position, but, "…[m]y intentional goals were to become a captain after learning everything as a deckhand". *See, Deposition of Plaintiff, 163:19-164:10, Ex. "E"*.

Nonetheless, Plaintiff readily conceded that despite his personal career goals, he did not understand the process of becoming a licensed captain, besides his having to work as a deckhand for an unknown period of time:

> Q. Are you familiar with the process at all?
>
> A. Not fully.

*See, Deposition of Plaintiff*, 165:7-8, Ex. "E".

Plaintiff further noted that his supervisor at CP Marine, Captain Crab, thought that since he was a great deckhand, he would be great in the wheelhouse. *See, Deposition of Plaintiff*, 165:14-24, Ex. "E". In addition to Captain Crab, Plaintiff testified that he was also encouraged to pursue this path by Jason McCullough, the deckhand dating his sister who referred him for his first

job in the industry. *See, Deposition of Plaintiff*, 164:22-167:8, Ex. "E" and see *Rough Draft of Deposition of Stan Kraly, 16:3 – 17:15, Ex. "J".*

**c. Summary of Argument**

Plaintiff, 1) who did not complete high school, 2) whose medical records document his "being unable to complete tasks; procrastinates; tends to start everything and finish nothing", 3) who has diagnoses of bipolar disorder, ADD/ADHD, suicidal ideation, and uncontrolled type 1 diabetes (with multiple HbA1c readings in excess of 10% that render him incompetent to work as a licensed mariner) that has resulted in his being not recommended for employment as a mariner at least twice, and 4) who has admitted to illegal drug use in the past, intends to present evidence at trial suggesting that he would have rapidly completed all hurdles and other variables required to achieve promotions to higher positions with employers, to complete schooling/training, and pass testing and medical clearances necessary to achieve three different licenses from the United States Coast Guard, such that his earnings would have increased from $43,802.19 per year in April 2025, to $157,300 per year in October 2026, and $200,137 per year by October 2028. *See, Report of Michael Berry, Ex. "K"; Report of Todd Capielano, Ex. "L".*

However, as Plaintiff's own expert witness acknowledges, this outcome, "depends on continued sea-time accumulation, company opportunity, successful training/testing, and the ability to maintain Coast Guard medical qualification", factors that the expert has failed to analyze or explain how Plaintiff would navigate them. *See, Report of Michael Berry, Ex. "K"*

It would be inherently speculative to ***assume*** 1) that Plaintiff would successfully complete all the tasks required of him, including: continuing to work as a mariner for another 328 to 1228

days[2] to incrementally advance to three to four higher job positions and obtain licensure from the USCG, 2) that employment would be available to Plaintiff to perform that work, 3) that Plaintiff would research the requirements to achieve the job promotions and licenses necessary to perform those jobs, 4) that Plaintiff would pass the testing required to obtain the licenses to perform those jobs or enroll in approved subject matter training, 5) that Plaintiff would obtain the medical waivers necessary to obtain those licenses despite his having multiple pre-existing conditions requiring same, and for which it appears medical waivers are not available, especially having been Not Recommended for work as a mariner on two prior occasions due to uncontrolled diabetes, and 6) that Plaintiff would take the steps necessary to obtain medical certification necessary to be issued those licenses despite his prior use of marijuana and "pills".

Because it is far from reasonably certain that these numerous variables would break in favor of Plaintiff, and because the evidence adduced to date indicates all of these facts are unlikely to occur, the Court should exclude from trial all evidence suggesting that Plaintiff would have earned wages in the future as a Steersman/Apprentice Candidate, an Apprentice Mate/Steersman MMC, a Mate (Pilot) of Towing Vessels, and/or a Master of Towing Vessels/Captain.

## II. LAW AND ARGUMENT

### a. Legal Standard

The admissibility of expert witness testimony is governed by Federal Rule of Evidence 702 which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;(b) the testimony is based on

[2] 46 CFR § 11.464 – Apprentice Mate requires 540 deck days; 46 CFR § 11.465 – Master of Towing Vessels requires 1440 days of service, including operating a vessel a task never performed by Plaintiff; Expert Report of Captain Kyle McAvoy, p. 5, Ex. "M".

> sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and(d) the expert has reliably applied the principles and methods to the facts of the case.

*Id*. The determination of whether to admit or exclude expert witness testimony falls within the vast discretion of a district court. *Howell v. Avante Services, LLC*, 2013 WL 870525, *1 (E.D. La.). "In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Id*. at *1 (citing *Daubert*, 509 U.S. at 589); see also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony).

Under a *Daubert* inquiry:

> [t]he Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. Second, the Court must determine whether the expert's reasoning or methodology is relevant in that it "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence.

*Howell*, 2013 WL 870525 at *1.

Here, Plaintiff bears the burden of proving that his expert economist's testimony is both reliable and relevant. *Dearman v. Transocean Offshore Deepwater Drilling, Inc*., 2012 WL 441167, * 4-5 (E.D. La.) (citing *Moore v. Ashland Chem., Inc*., 151 F.3d 269 (5th Cir. 1998)). To satisfy his burden, the plaintiff "cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required." *Id*.

"Expert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible." *Moore v. Int'l Paint, L.L.C.,* 547 Fed.Appx. 513, 515 (E.D. La. 2013) (quoting *Hathaway*, 507 F.3d at 319 n. 4)). In addition, "[w]hen an expert's testimony is 'not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's] position,' the trial court should exclude it." *Moore*, 547 Fed.Appx. at 515 (citing *Guillory v. Domtar Indus., Inc*., 95 F.3d 1320, 1331 (5th Cir.1996)).

The Fifth Circuit established the method for calculating future lost wages in maritime cases in *Culver v. Slater Boat Co.,* 722 F.2d 114 (5th Cir. 1983). In *Culver*, the court set forth a four-step process for determining lost wages as follows: (1) estimate the loss of work life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value. Id. at 117. Any award for future lost wages in the maritime context must be based on after-tax earnings. *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. Mar. 30 1988) (stating that in calculating future lost earnings, "the fact-finder should subtract amounts that the wage earner would have been required to pay, such as income tax and work expenses" (quoting *Culver*, 722 F.2d at 117)).

In maritime cases in the U.S. Fifth Circuit, "calculation of the lost income stream begins with the gross earnings of the injured party at the time of the injury." *Culver v. Slater Boat Co.,* 722 F.2d 114 (5th Cir. 1983) (en banc), *cert. denied sub. nom., Heinrich Schmidt Reederei v. Byrd*, 467 U.S. 1252, 104 S. Ct. 3537, 82 L.ed. 2d 842 (1984) (Culver II). "The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned." *Id*. at 120. Thus, a proper calculation of lost wages must be based on what the injured party was making at the time of the injury rather than, for example, an average based on several years of earnings. See, *e.g., Martinez v. Offshore*

*Specialty Fabricators, Inc*., 481 Fed. Appx. 942, 949 (5th Cir. 2012) ("[Defendant] argues that we should vary the calculation method in *Culver* by beginning with an average of [Plaintiff]'s earnings over several years, but the cases it cites in support of its argument do not provide authority for calculating lost wages in this manner."). It is undisputed that Plaintiff earned $180 per day on a 14/7 work schedule at the time of his injury. *See, Deposition of Plaintiff, 49:11-14, 63:21 –64:3, Ex. "E".* Therefore, calculation of lost wages for Plaintiff must begin at this rate. *In the Matter of Callais & Sons, LLC v. Lafont (In re Callais & Sons, LLC),* 2022 U.S. Dist. LEXIS 57818, *5 (E.D. La. March 29, 2022).

As is set forth below, the assumptions and vocational/economic loss assumptions of Plaintiff's experts, Captain Michael Berry, namely that Plaintiff "had an established path to advance from Deckhand to Captain" and would obtain three different Coast Guard licenses despite the many variables impacting their issuance that have not been addressed by Berry, and Todd Capielano, specifically, that as a result of receiving the Coast Guard licenses, Plaintiff's earnings would progressively increase from the approximately $43,802.19 per year in 2025, by 3.5 times that amount to $157,300 by October 2026, by 4.5 times that figure to $200,134 by October 2028, should be excluded at trial as they are unreliable and legally irrelevant.

**b. Any Evidence Suggesting Plaintiff's Progression to a Position Higher than Deckhand is Inherently Speculative and Must be Excluded**

**i. Plaintiff Had Not Taken Any Concrete Steps Towards Licensure**

At the time he was injured, Plaintiff's work history since he quit high school included: Several years of unemployment from 2020 through late 2023; Two months in Retail (*See, Five Below Employment Records, Ex. "G"*); Ten Months in Fast Food (*See, B&G Food Enterprises Records, Ex "H"*); Four Months of Unemployment (November 2023 through the end of March 2024); and Twelve Months of Deckhand experience (April 2024 through April 2025).

His earnings as a deckhand in 2024 amounted to $30,505. *See, Plaintiff 2025 Tax Records, Ex. "N".* His annualized earnings of $180 per day on a 14/7 schedule at the time of the accident was $43,802.19.

The initial Coast Guard mariner license available to Plaintiff would be Apprentice Mate, which requires working 540 days on deck, passing a written exam or completing an approved training course, and meeting character and fitness drug testing, citizenship, and medical requirements. See 46 CFR § 11.466.

If one achieves Apprentice Mate license, the next progression is Mate (Pilot) of Towing Vessels, eligibility for which requires working another 360 days as an Apprentice Mate (Steersman) on towing vessels (900 total days), completing a Towing Officer Assessment Record (TOAR) signed off by a designated examiner, and continued compliance with the character and fitness, drug testing, citizenship, and medical requirements. See 46 CFR § 11.465.

If someone obtains these two licenses, they can progress to be eligible to apply for a Master of Towing Vessels license after working 540 days of service as a Mate (Pilot) of Towing Vessels (1440 days total), completing a TOAR for the specific route if not already completed during the prior phase and continued compliance with the character and fitness, drug testing, citizenship, and medical requirements. See 46 CFR § 11.464.

Plaintiff had performed 212 days of formal sea service on deck at the time he was injured, which is less than half the sea time required for the initial Apprentice Mate License. *See, Oct. 1, 2025 CP Marine Sea time Letter, Ex. "O"*; 46 CFR § 11.466. To the extent that his work performed as a deckhand furthered the process of his being issued an Apprentice Mate license, since part of obtaining a license requires one logging deck time, that was fortuitous. Plaintiff performed the 212 days of deck work shown on the sea time letter to earn money as a deckhand, not to progress

towards issuance of a license, as he was not familiar with the process of obtaining licensure (*See, Deposition of Plaintiff, 165:7-8, Ex*. "E"), he never sought a sea time letter from his initial employer Natalie Jean Marine (*see expert report of Captain Michael Berry, p. 20, Ex. "K"*), he did not know the steps required to obtain his initial license or the order of progression (*See, Deposition of Plaintiff, 166:3-13, Ex. "E"*), and he conceded that he was still learning the deckhand position and was not yet at the level where he could progress towards Captain (*See, Deposition of Plaintiff, 163:15-164:10; 164:22-165:21, Ex. "E"*).

In *Pallis v. United States*, 369 Fed.Appx. 538 (5th Cir. 2010), for example, Plaintiff was a wiper, an entry level merchant mariner, who sustained injury. Pallis sought wages based on a higher job level than he held at the time of the accident, because he only needed forty additional days of sea time, which he argued he would have made on the assignment where he was injured. However, considering his failure to quickly advance to date, and the evidence that accumulating the requisite sea time was not guaranteed, the District Court held that the promotion was too speculative to support the claim for higher wages. The Fifth Circuit affirmed.

In *Lewis v. Seacor Marine, Inc*., 2002 U.S. Dist. LEXIS 29401 (E.D. La. Oct. 23, 2002), a man worked in various jobs for a few years, like Plaintiff's work at Five Below and Taco Bell, before finding work as a deckhand. Whereas Plaintiff here was hurt twelve months into his deckhand job, Lewis was hurt one month into his job. Lewis sought wages based on his being promoted to the rank of Captain in eight years, based upon his attending SEACOR Academy (a training/career progression tract offered by his employer) and his performance of deckhand work during the period that was available to him before injury, a necessary predicate to becoming a licensed Captain. However, District Judge Kurt Englehardt excluded any evidence of the plaintiff's promotion to Captain and ability to earn commensurate wages, as he had not taken any concrete

steps on "the difficult road to becoming a Captain", besides working as a deckhand until becoming injured:

> The plaintiff's economic analysis extrapolating his future lost earnings on the basis of a captain's salary for the greater part of his worklife expectancy is both unreliable and not grounded in the facts of the plaintiff's work history, which presents dabbling in various very different industries, as well as the absence of work from time to time. The analysis is also devoid of any consideration of the fact that the plaintiff had only actually worked as deckhand for approximately one month before the accident. The opinion's assumption — except for the first eight years plaintiff would in fact earn the salary of seafaring captain for remainder of his worklife — is devoid of any basis in fact, and thus unreliable, misleading, and irrelevant.
>
> Although the case law makes it clear that absolute certainty is impossible, considerations of reliability and relevance require that any economic analysis be ensconced with some resemblance to reality. For any trier of fact to assume Lewis would remain gainfully employed in the maritime industry for the rest of his working life with rapid promotion and wage increasing commensurate to captain's salary ignores the reality. The slender reed on which Womack's projection rests warrants no credence from the gatekeeper.

*Lewis*, 2002 U.S. Dist. LEXIS 29401, *4-5 (internal citation omitted).

Plaintiff here is no different than the plaintiff in *Lewis*. Plaintiff herein was a young man who had worked in other fields, was unemployed for several months, and only recently began working in the maritime field in an entry level deckhand position. *See, Five Below Employment Records, Ex. "G"; See, B&G Food Enterprises Records, Ex "H"; See, Rough Draft of the August 7, 2026 Deposition of Stan Kraly, Port Captain of Natalie Jean Marine, 12:5 – 13:23, Ex. "J"; and see, Deposition of Plaintiff, 49:11-14, 63:21 –64:3; and 56:23 – 57:1, Ex. "E".* Within two months of his first job, Natalie Jean Marine, he was accused of infecting a vessel with bed bugs, leading to termination of employment, an undisputably poor job reference by any metric. *See, Rough Draft of the August 7, 2026 Deposition of Stan Kraly, Port Captain of Natalie Jean Marine,*

*12:5 – 13:23, Ex. "J"*. Plaintiff never requested a sea time letter from Natalie Jean Marine, despite working there before and after his employment with CP Marine.

Thereafter, he worked as a deckhand for CP Marine for ten months, where it cannot be contested that he took any concrete steps towards doing anything other than working as a deckhand. *See Deposition of Plaintiff, 163:15-164:10; 164:22-165:21; 165:7-8; 166:3-13, Ex. "E"*. Plaintiff testified that CP Marine did not provide him with any training that would lead to his advancement in the maritime field; he merely followed the orders of his supervisor, and when he was not on duty, he slept. *Id. at 60:11-21, 61:9-13, Ex. "E"*.

It is true that <u>one</u> requirement (of many) to obtain licensure to operate commercial vessels requires a mariner to work on vessels for certain numbers of days, and that Plaintiff had performed 212 of the 540 days necessary to be eligible for consideration of an Apprentice Mate license, or merely 39%. While that sum is far from a clear and conscious progression sufficient to count as a concrete step, there is also no dispute that any progress made towards licensure from his deckhand work was inadvertent, as Plaintiff did not even know what steps were involved in obtaining a license, much less the details thereof. *See Deposition of Plaintiff, 163:15-164:10; 164:22-165:21; 165:7-8; 166:3-13, Ex. "E"*. Further, it is not disputed that Plaintiff had not enrolled in an approved training course that would lead to issuance of an Apprentice Mate license, nor had had obtained any study materials for the examination, much less even identified the areas on which he would be required to become knowledgeable. *See Deposition of Plaintiff, 163:15-164:10; 164:22-165:21; 165:7-8; 166:3-13, Ex. "E"*. Thus, Plaintiff's, "…intentional goals … to become a captain after learning everything as a deckhand.", were just "hopes or dreams", which are not a sufficient factual basis to infer his achieving promotions and being issued three different Coast Guard licenses. *See Deposition of Plaintiff, 163:19-164:10, Ex. "E"*.

Further, in *Lewis, supra*, Judge Englehardt found that an **EIGHT YEAR career progression from deckhand to become a licensed Captain** was, "devoid of any basis in fact, and thus, unreliable, misleading, and irrelevant…[A]nd to assume Lewis would remain gainfully employed in the maritime industry for the rest of his working life with rapid promotion and wage increases commensurate to captain's salary ignores the reality." *Lewis*, 2002 U.S. Dist. LEXIS 29401, *5. Despite this clear and unequivocal holding, Plaintiff here maintains that the Court should accept his proposed career progression from his initial employment with Natalie Jean Marine in April 2024 at $125 per day, or $30,418/year, that ended abruptly with accusations of his causing insect infestation of a vessel, to a Master of Towing vessels, the highest possible license a mariner can hold, in only **FOUR YEARS, by October 2028**. S*ee expert report of Captain Michael Berry, p. 20, Ex. "K".* If a seamless career progression from new deckhand to the most skilled and experienced Captain that exists over eight years "is devoid of any basis in fact, and thus, unreliable, misleading, and irrelevant", and such an assumption, "ignores reality", then the Plaintiff here should not be able to assert a career progression of half that amount, as a matter of law.

If working as a deckhand, without doing anything else, counts as a concrete step towards obtaining licensure, then every single deckhand who is injured can make a claim for future wage loss that assumes they would successfully navigate, "the difficult road to becoming a captain"[3], and achieve multiple promotions with continued positive workplace performance and subsequent issuance of three licenses from the Coast Guard, even if the deckhand has performed only 39% of the sea time necessary to obtain the initial license, 24% of the time needed to obtain the second license, and 15% of the time needed to obtain the final license, with no sea time accrued as an Apprentice or Mate, with no affirmative steps towards passing the examination required for the

[3] *Lewis*, 2002 U.S. Dist. LEXIS 29401, *2.

first license such as obtaining or even identifying the course materials/subjects, studying the course materials/subjects, or enrolling in an approved training course program, or meeting the drug testing and medical clearances required.

In, *Riha v. Offshore Serv. Vessels, LLC*, 2021 U.S. Dist. LEXIS 125086 (E.D. La. July 6, 2021), Riha was a mariner who had achieved the rank of third mate, sought to introduce evidence that he would be promoted to second mate, chief mate, and eventually harbor pilot. He based this claim, like Plaintiff herein, on his high performance in the industry to date and the subjective opinion of his expert that he had a good chance at achieving these career goals.

The Court held, "While the evidence suggests that Riha was a good worker, there is no evidence that Riha had applied to be a master or pilot or that his employer had encouraged him to do so." Cf. *Kennedy v. Magnolia Marine Transp. Co*., 189 F. Supp. 3d 610, 617-18 (E.D. La. 2016) (court unable to conclude that plaintiff becoming a pilot was merely "possible," as opposed to probable, because plaintiff's employer had encouraged him to apply for the pilot program); *Singleton v. United States*, 2021 U.S. Dist. LEXIS 36210, 2021 WL 765384, at *11-12 (E.D. La. Feb. 26, 2021) (court found that plaintiff with 20 years of experience in offshore industry would continue to progress toward high earnings when he had been approved for an exclusive training program).

Like Plaintiff here, Riha's expert relied on Riha's continued accumulation of seatime that could be used to obtain a higher license status, as evidence that he would achieve these licenses and promotions, without explaining how Riha would have risen through the ranks in the time necessary for such an assent. The same is true here, as Captain Berry can point to nothing other than Plaintiff having logged 212 days of deck work in one year as a deckhand, which he extrapolates forward to an assumption that Plaintiff would successfully log 1440 days of deck time

in another three and a half years (including work Plaintiff has never performed such as wheelhouse/captain's work) until October 2028 when he would be issued a Master of Towing Vessels, rising from inexperienced deckhand with a 10th grade education that lost his first maritime job after an accusation of causing an insect infestation on his vessel, to one of the most skilled operators of towing vessels in the industry, in just four years. Berry himself acknowledges that logging seatime is but one of many requirements necessary to achieve licensure. "Advancement depends on continued safe work, company opportunity, mentorship, medical fitness, successful examinations, TOAR completion, route experience, and Coast Guard approval." See, Report of Captain Michael Berry, p. 19/29, Ex. "*K*". Despite this, he offers no explanation or analysis to demonstrate how Plaintiff would have demonstrated the requisite, "continued safe work, company opportunity, mentorship, medical fitness, successful examinations, TOAR completion, route experience, and Coast Guard approval", required to obtain the three different Coast Guard licenses in the ambitious career progression from inexperienced deckhand who lost his first job to Master of Towing Vessels in just four years.

In *Davis v. Jantran, Inc*., 2026 U.S. Dist. LEXIS 179872 (E.D. La. Aug. 12, 2026), the plaintiff was a USCG licensed towing vessel officer earlier in his life and had worked a sufficient number of deck days at the time of his injury to obtain the re-issuance of that mariner's license he previously held. Further, Davis had a plan in place to re-obtain the license he held previously. Because Davis had already achieved the goal of licensure and was actively working towards that goal again, the Court held that his claim for future wage loss based on his being issued the same license he already achieved was not speculative. Whereas, here, Plaintiff has never held a license, has not taken any courses in the subject matter of captain licenses or otherwise tested his

proficiency in this vocation, and did not have a discrete plan of becoming a licensed captain before he was injured; he was merely working as a deckhand.

Subjective opinions of co-workers or others that an individual would make a great Captain, or was a good deckhand, or anything of the like, have no bearing whatsoever on whether such a person is actually issued a license. No portion of the requirements for issuance of a merchant mariner license depend on the opinions of coworkers, expert witnesses, or others, whether those people were issued merchant mariner licenses or not. Coast Guard licensure, deemed a "difficult road" to navigate by Judge Englehardt of the U.S. Fifth Circuit ), is subject to objective standards that one must achieve, and examination thereof reveals that Plaintiff, to date, has merely worked as a deckhand without taking any concrete steps towards achieving his own internal goal of becoming a licensed Captain capable of operating commercial towing vessels. *Lewis*, 2002 U.S. Dist. LEXIS 29401, *4-5.

In *In the Matter of Callais & Sons, LLC v. Lafont (In re Callais & Sons, LLC),* 2022 U.S. Dist. LEXIS 57818, *5 (E.D. La. March 29, 2022), the plaintiff, Triplett, sought future wages based on his receiving two promotions in two years. Triplett was working as a deckhand at the time of the accident but argued that he would have been promoted to Lead Deckhand in one year and Tankerman one year after that. While Triplett was injured on his first hitch, there was evidence that deckhands could be promoted to Lead Deckhand, a non-licensed internal position with his employer, on their first hitch based on the supervisor's whim, and evidence that Triplett would also likely be promoted to Tankerman within the proposed timeframe. *Callais* is distinguishable, as the promotions and licenses upon which Plaintiff's future wage increases rest are not comparable. In *Callais*, the first promotion claimed by Triplett was immediately available based on his current work experience, yet, his assumptions allowed him one year to achieve that position. Further, there

was evidence that the second promotion, which required a license based on 90 days' of sea service, was easily obtained by mariners within the two-year period suggested by Triplett. 46 CFR § 13.203. Meanwhile, the Courts have recognized the difficulties in obtaining a Captain's license to operate commercial vessels, and that to assume a mariner would achieve that status in eight years is unreasonable.

In *Lewis v. Marquette Transp. Co., LL*C, 2019 U.S. Dist. LEXIS 62528 (E.D. La. April 11, 2019), the plaintiff had three years' experience and was employed in a mid-level position as Relief Mate. At the time of his injury, the plaintiff, who had no relevant pre-existing medical conditions impacting his ability to work as a mariner, had discrete plans to attend an approved training course to obtain a Captain's license so his experts assumed he would progress to that position in three to five years. *Lewis*, 2019 U.S. Dist. LEXIS 62528, *10, fn. 23. The Court held that this evidence was sufficient to support his claims of promotion to higher wage-earning positions. This case is distinguishable from the present matter, as the Lewis plaintiff had three times the experience of Plaintiff here, had already achieved promotion within his field to Relief Mate, and had discrete plan to attend Captain's school, all of which together were, "concrete steps on the difficult road to becoming a captain." *Id.; Lewis*, 2002 U.S. Dist. LEXIS 29401, *2-3.

**ii. Plaintiff's Medical Conditions Present Significant Obstacles to His Obtaining Licensure Even if He Completed the Other Requirements**

**1. Medical Certificates Required for Licensed Mariners**

In addition to performing work for the requisite time period and completing an authorized course training program or passing the Coast Guard licensing exam, and other requirements, a mariner must also obtain medical clearance as a pre-requisite for consideration to be issued a license to operate commercial vessels.

The medical certificate, issued by the Coast Guard under 46 CFR part 10, subpart C, serves as proof that a mariner meets the medical and physical standards for merchant mariners. The Coast Guard retains final authority for determining whether a mariner applicant is medically and physically qualified for the medical certificate (See 46 CFR 10.302(a)). U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 2, at 2-1 (Aug. 30, 2019). All credentialed mariners who are required to meet the medical and physical standards for merchant mariners are required to hold a valid medical certificate in order to operate under the authority of their merchant mariner credential (MMC) (See 46 CFR 15.401(c). *Id*.

To qualify for a medical certificate, mariner applicants must provide evidence of meeting the medical and physical standards on the Application for Medical Certificate, Form CG-719K. The Coast Guard retains final authority for determining whether a mariner applicant is medically and physically qualified (See 46 CFR 10.302(a)). *Id*. at ch. 2, 2-4.

Medical conditions may require further review if there is concern that the condition might render the applicant incapable of performing the duties of the credential. The Coast Guard publishes a Manual with a non-exclusive list of conditions subject to further review, but other conditions can be subject to further review if they are likely to pose risk of sudden incapacitation or debilitating complication. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 2, at 2-5 (Aug. 30, 2019).

Medical practitioners who are evaluating mariner applicants for the medical certificate should provide their professional assessment and recommendation with regard to the applicant's risk for sudden incapacitation and the applicant's ability to safely perform the duties of their credential without risk to themselves or others. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 2, at 2-5 (Aug. 30, 2019).

In cases where the applicant does not meet the standards specified by the Coast Guard, it may consider issuing a medical certificate with waivers, limitations, and/or restrictions if it finds that there are extenuating circumstances that warrant special consideration. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 2, at 2-6 (Aug. 30, 2019).

In general, waivers may be considered when objective medical evidence indicates that the medical condition is sufficiently controlled and the effects of medication pose no significant risk to maritime and public safety. (See also 46 CFR 10.303 and Paragraphs F, G, and H of Chapter 3 of this Manual). U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 2, at 2-6 (Aug. 30, 2019). The final determination regarding issuance of the medical certificate lies with the Coast Guard. *Id.*

No medical certificate is required for entry level deckhand work. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 2, at 2-6 (Aug. 30, 2019). However, a medical certificate is required for an Apprentice Mate license, a Mate (Pilot) of Towing license, and a Master of Towing Vessels license.

**2. Medical Review Process**

When individuals submit an application for a medical certificate, the Coast Guard will review the application to determine whether the applicant meets the medical and physical standards for merchant mariner medical certification (See 46 CFR 10.301(a)). U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 3, at 3-2 (Aug. 30, 2019). The National Maritime Center (NMC) will review all information provided and will make one of the determinations below, as indicated in 46 CFR 10.301(a):

> a. The applicant is physically and medically qualified for the medical certificate without any limitations, waivers and/or other conditions;

> b. The applicant is physically and medically qualified for issuance of the medical certificate with appropriate waivers, limitations and/or other conditions as specified by the Coast Guard;
> c. Additional information is necessary to determine if the applicant is physically and/or medically qualified for the medical certificate; or
> d. The applicant is not physically and/or medically qualified for the medical certificate.

U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 3, at 3-2 (Aug. 30, 2019).

If a mariner is not qualified medically to work and is not issues a medical certificate, they are precluded by law from working in the capacity of a licensed mariner. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 3, at 3-10 to 3-12 (Aug. 30, 2019).

### 3. Medical Conditions Precluding Licensing and Subject to Further Review

#### a. Endocrine Conditions

Medical conditions that pose significant risk of sudden incapacitation or debilitating complication, or that are associated with significant functional impairment are subject to further review. Additionally, medical conditions requiring medication that impairs cognitive ability, judgment, or reaction time are subject to further review. Conditions that may be subject to further review include, but are not limited to, Endocrine Conditions, such as Plaintiff's uncontrolled diabetes type 1. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 14, at 14-1 through 14-7 (Aug. 30, 2019).

"Endocrine disorders that are life-threatening or impairing, or that pose risk of sudden incapacitation or debilitating complication are subject to further review and may be determined disqualifying. Examples of conditions that are subject to further review include, but are not limited

to, diabetes…" U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 14, at 14-1 (Aug. 30, 2019).

When an applicant who has diabetes treated with insulin, with a HbA1c level greater than or equal to 8%, have diabetic complications, or have had episodes of symptomatic hypoglycemia, then Coast Guard guidelines state that the applicant SHOULD NOT BE RECOMMENDED OR NEEDS FURTHER REVIEW. *Id*. at 14-4 to 14-5. A mariner with a condition not meeting the standards can seek a medical waiver if objective evidence indicates that the condition is sufficiently controlled to pose no significant risk to maritime and public safety. *Id*. at 14-5.

Here, Plaintiff has type 1 diabetes that has been treated with insulin for many years(*See, Gretna Medical Center Medical Records, DEF 4125, Ex. "C"*.), and has a history of HbA1c level greater than or equal to 8%, has had diabetic complications (*See, Gretna Medical Center Medical Records, DEF 4125, Ex. "C"*.), and has had episodes of symptomatic hypoglycemia (See, Medical Records of Dr. Gary Birdall, p. 409/599, 419/599, 430/599, 454/599, 457-58/599, 289 through 462/599, Ex. "*A*".

For someone with diabetes mellitus treated with insulin or with history of diabetic ketoacidosis (Plaintiff has both), the Coast Guard has a detailed process to obtain a waiver, which requires, among other things, an evaluation from a treating physician that is less than 90 days old, discussing compliance, glucose logs, any hypoglycemic episodes, and explanation of any HbA1c readings of 8% or greater, and they would be required to demonstrate a consistent pattern of Hba1c levels of less than 8% to qualify for a waiver. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 14, at 14-6 to 14-7 (Aug. 30, 2019).

A HbA1c reading over 10% will typically result in denial of a waiver unless it can be shown that it was a temporary irregularity resulting from extenuating circumstances, but that waiver

would be limited in time and temporary. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 14, at 14-6 to 14-7 (Aug. 30, 2019).

Plaintiff has had uncontrolled diabetes for many years, with multiple HbA1c readings in excess of 10%, including the month he first became employed by CP Marine, which automatically disqualify him from working as a licensed mariner under the Coast Guard guidelines. Plaintiff's HbA1C was recorded at 10.4% in June 2024, which renders him unfit for service as a captain. *See West Jefferson Medical Center Endocrinology Clinic Records, Ferrier Medicals 000697-000698, Ex. "F".* His average HbA1C reading was 9.08% from October 19, 2017 to February 25, 2019. *See, Dr. Gary Birdall Records, pg. 310/599, Ex. "A".* See, Dr. Gary Birdall Records, February 25, 2019, pg. 187/599 (10.4% on June 22, 2018), 311/599 (10.4% on Feb. 25, 2019), Ex. "A"; Gretna Medical Center Records, DEF 4151 (9.7% on May 6, 2021), Ex. "C"; U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 14, at 14-6 to 14-7 (Aug. 30, 2019). His average A1C reading was 9.08% from October 19, 2017 to February 25, 2019. See, Dr. Gary Birdall Records, February 25, 2019, pg. 310/599, Ex. "C".

<u>Thus, should Plaintiff seek medical clearance from the Coast Guard in connection with obtaining a captain's license, he will be medically denied and not eligible for a license</u>. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 14, at 14-6 to 14-7 (Aug. 30, 2019). In fact, two different medical providers have concluded that Plaintiff's diabetes was such that he was not recommended for deckhand work due to that condition, on March 27, 2024, and again on September 30, 2025. *See, USCG Form 719-K Physicals with Natalie Jean Marine, Ex. "I".*

**b. Psychiatric Conditions**

Suicidal ideation and/or hospitalization are both conditions that may independently be deemed disqualifying. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 23, at 23-1 (Aug. 30, 2019). General classes of mental conditions that are subject to further review include: Mood disorders, Anxiety Disorders, and ADD/ADHD, all of which Plaintiff has a history of. *Id*.

Conditions with a history of suicidal ideation or hospitalization may be deemed too high risk for medical certification. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 23, at 23-1 (Aug. 30, 2019). Further, the medical provider, in deciding whether a waiver is appropriate, would have to consider a number of factors, review records, and obtain information from the treating provider. *Id*. at 23-2 through 23-4.

**c. Mood Disorders**

In some cases, mood disorders may be deemed too high-risk for medical certification. This would include mood disorders treated with controlled substances or impairing medications, conditions associated with impairing signs and symptoms, as well as conditions with a history of, or at significant risk for psychosis, suicidal ideation, homicidal ideation, or hospitalization. Whether he would be eligible or not for a medical waiver is subject to a qualified medical practitioner(s) consideration of a number of factors and his diagnosis of Mood Disorder could result in the mariner being denied medical clearance, and not issued a license as a result. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 23, at 23-5 through 23-10 (Aug. 30, 2019).

Plaintiff suffers from bipolar disorder, a mood condition that he was diagnosed with as a child and continuing into adulthood. See, St. Bernard Hospital Records, DEF 1033, Ex. "__".

**d. Anxiety Conditions**

In some cases, anxiety disorders may be deemed too high-risk for medical certification. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 23, at 23-11 (Aug. 30, 2019).. Plaintiff has been diagnosed with anxiety issues. *See, Dr. Gary Birdall Records, pg. 334-339/599, Ex. "A".* Whether he would be eligible or not for a medical waiver is subject to a qualified medical practitioner(s) consideration of a number of factors and his diagnosis of Anxiety could result in the mariner being denied medical clearance, and not issued a license as a result. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 23, at 23-11 through 23-16 (Aug. 30, 2019).

**e. ADD/ADHD**

ADD/ADHD treated with controlled substances may be deemed too high risk for medical certification. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 23, at 23-23-17 through 23-22 (Aug. 30, 2019). Plaintiff was prescribed Amphetamine Salts (Adderall) in the past for ADD/ADHD. See, Dr. Birdsall Records, 336, 338, 359, 392, 429, 454, 458, Ex. "*A*". Whether he would be eligible or not for a medical waiver is subject to a qualified medical practitioner(s) consideration of a number of factors and his diagnoses of ADD/ADHD treated with Adderall could result in the mariner being denied medical clearance, and not issued a license as a result. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 23, at 23-23-17 through 23-22 (Aug. 30, 2019).

**iii. Plaintiff's Prior Use of Illegal Drugs Renders Him Unfit for Work as a Licensed Mariner Making His Claims Speculative**

A credential issued by the Coast Guard <u>must</u> be revoked if it is shown that the holder has been a user of dangerous drugs. 46 U.S.C. § 7704(b). There is no question here that plaintiff has

been a user of dangerous drugs, as he readily admits this fact, which is a violation of Department of Transportation ("DOT") policy. See, West Jefferson Medical Center Records, DEF 2133, Ex. "*D*". The only way to avoid revocation of the credential is to prove that the mariner is "cured". 46 U.S.C. § 7704(b).

49 CFR 40.285(a) states, "**As an employee**, when you have violated DOT drug and alcohol regulations, **you cannot again perform any DOT safety-sensitive duties for any employer until and unless you complete the SAP evaluation, referral, and education/treatment process** set forth in this subpart and in applicable DOT agency regulations. The first step in this process is a SAP evaluation" (emphasis added). An SAP evaluation is a time-consuming five step process. 49 CFR 40.291. These regulations are strict and rigid; if a mariner uses illegal drugs he cannot work aboard a vessel until and unless he demonstrates that he is drug free and unlikely to continue the use of drugs, or "cured".

In Coast Guard suspension and revocation proceedings, the burden of establishing "cure" is on the Respondent. *See* Appeal Decisions 2638 (PASQUARELLA) and 2526 (WILCOX). Prior Commandant Decisions on Appeal make clear that to establish cure under 46 U.S.C. § 7704(b), a mariner must: (1) successfully complete a bona fide drug abuse rehabilitation program, and (2) demonstrate a complete non-association with drugs for a minimum of one year following the successful completion of the drug abuse program. *See* Appeal Decisions 2638 (PASQUARELLA) and 2546 (SWEENEY). Finally, because a mariner is not authorized to sail under the authority of his or her credential until all of the requirements of cure are satisfied, the Coast Guard must retain a mariner's credential during the cure process. *See* Appeal Decisions 2638 (PASQUARELLA) and 2634 (BARETTA): Commandant Decision on Review #18 (CLAY).

Here, Plaintiff would not be qualified to work as a licensed boat captain under applicable United States Coast Guard and DOT regulations because of his use of marijuana and pills in the past. See, West Jefferson Medical Center Records, DEF 2133, Ex. "*D*".

There is no evidence that Plaintiff has undergone the requisite SAP evaluation process, drug rehabilitation, and remained drug free for one year following such rehabilitation. Thus, whether he would ever be qualified to perform work as a licensed captain is speculative until he meets these benchmarks. Under the circumstances, Plaintiff was and is not eligible to work as a licensed mariner.

WHEREFORE, for the reasons set forth above, Defendants, CP Marine, LLC and Ten Mile Exchange, LLC, respectfully move the Court to dismiss the speculative evidence put forth by Plaintiff, and exclude any evidence from the jury trial, that he would have achieved any USCG licensure or earned money commensurate with such positions, from the trial of this matter.

Respectfully submitted,

*/s/ Paul D. Hale*

Paul D. Hale (#30539)
Kari M. Rosamond (#34065)
**HALE DEVALL, LLC**
400 Poydras Street, Suite 2107
New Orleans, LA 70130
Telephone: 504-576-0700
phale@haledevall.com
krosamond@haledevall.com

***Attorneys for CP Marine, LLC and Ten Mile Exchange, LLC***