**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JONATHAN FERRIER** | **CIVIL ACTION** |
| **VERSUS** | **NO. 25-2286 C/W 26-1694** |
| **CP MARINE SERVICES, LLC ET AL.** | **SECTION: A(4)** |
| **REF: 25-2286** | |

**OPPOSITION TO MOTION TO CONTINUE**

Now comes Jonathan Ferrier, through undersigned counsel, who files his opposition to the *Motion to Continue Trial* (Rec. Doc. 40). Defendants fail to show good cause to continue the trial.

Defendants cannot meet the good cause standard for three reasons. First, the parties have been diligent, and the remaining deadlines can reasonably be met without disrupting the trial date. Second, any prejudice that results from continuing the trial falls on Ferrier, not Defendants. Ferrier filed his complaint on November 7, 2025, and has diligently pursued his claims since. Further delay compounds the harm he has already suffered from Defendants' delayed maintenance and cure payments.

Third, the "recently discovered" evidence Defendants cite is neither new, nor recent. Defendants argue that Stan Kraly's August 7, 2026 deposition is "recently developed evidence" that Ferrier's torn meniscus may have originated at Natalie Jean Marine, not from the April 5, 2025 accident. However, Defendants have known about Ferrier's knee issues and subsequent employment at Natalie Jean Marine for months. On February 20, 2026, Plaintiff listed Stan Kraly, owner of Natalie Jean Marine, in his initial disclosures. Further, Ferrier also disclosed Natalie Jean Marine in his responses to written discovery months ago, including document

production of Ferrier's medical records. On March 13, 2026, Ferrier testified about his knee issues as well as his subsequent employment at Natalie Jean Marine. And Defendants' own principal, Joseph Dardar, testified about the causation-issue of Ferrier's knee on May 19, 2026. Defendants cannot manufacture good cause out of facts they already had, but failed to further investigate.

Additionally, T&M's Limitation Action is nothing more than gamesmanship to delay this trial and sidestep the scheduling order. Every potential claimant in that action was already a party before this Court. There is no unknown claimant Defendants need to wait for, and no reason the Limitation Action requires the trial date to move.The Court should maintain the current trial date and scheduling order.

**BACKGROUND**

On April 6, 2025, Ferrier's leg was crushed by a mooring line when the captain of the M/V DOUGLAS negligently maneuvered the vessel during a mooring operation. Ferrier underwent two surgeries to treat his shattered leg. On August 4, 2025, his surgeon, Dr. Wax, released Ferrier to "[r]eturn to full duty work as tolerated."[1] In that same note, Dr. Wax documented an "antalgic gait," tying Ferrier's limp to his leg and ankle injury months before he ever worked for Natalie Jean Marine.[2] Ferrier returned to work for CP Marine shortly thereafter. Fewer than 10 days working CP Marine, CP Marine terminated Ferrier, noting in the termination letter that he had "not demonstrated the physical capability required to effectively carry out the essential duties of the position."[3]

---

[1] Ex 6, Quick Note of Barton L. Wax, M.D. (Aug. 4, 2025), Ferrier Medicals 000362.
[2] *Id.* This confirms that any later-observed limp, including the limp Stan Kraly described in his deposition, was accident-related and an issue in this case from the outset — one Defendants simply failed to investigate.
[3] Ex 7, Ferrier's Termination Letter.

On October 3, 2025, Ferrier returned to work for his prior employer, Natalie Jean Marine, in a light-duty capacity. In early February 2026, Natalie Jean Marine terminated Ferrier's employment because he was no longer physically fit to perform his duties as a deckhand.

On November 7, 2025, Ferrier filed his Original Seaman's Complaint against CP Marine Services, LLC and Ten Mile Exchange, LLC.

The Court set trial for October 26, 2026 and final pretrial conference for October 8, 2026.[4] It set these deadlines: amended pleadings by March 23, 2026; Ferrier's expert reports by July 10, 2026; Defendants' expert reports by August 10, 2026; witness and exhibit lists by August 10, 2026; dispositive motions and Daubert motions file by August 18, 2026; and discovery and depositions by September 8, 2026.

Defendants deposed Ferrier on March 13, 2026.

Ferrier filed his First Amended Complaint on March 23, 2026, the amended-pleadings deadline. He added T&M Holdings, LLC as a defendant.[5]

Ferrier deposed Joseph Dardar on May 19, 2026.

On July 8, 2026, Ferrier declined a request to continue trial.[6] Ferrier timely provided deposition dates for all witnesses requested by the Defendants and T&M.

Then, T&M filed a Complaint for Exoneration From or Limitation of Liability on August 3, 2026 (No. 26-1694). The Court consolidated it with the instant case as a related matter.[7]

Defendants waited until **August 7, 2026** to depose Stan Kraly of Natalie Jean Marine.

The Court stayed all claims against T&M on August 12, 2026. The stay runs until October 31, 2026, which is after the current trial date.

[4] Also, a settlement conference is scheduled for September 22, 2026 before Judge Roby.
[5] Rec. Doc. 12. Defendants answered the Amended Complaint on June 9, 2026. T&M answered on June 15, 2026.
[6] *See* Ex 3; *see also* Ex 4.
[7] Rec. Doc. 32.

On August 13, 2026, the Court granted in part and denied in part Ferrier's summary judgment motion, holding that Ferrier is a Jones Act seaman; and that CP Marine is owner *pro hac vice* of the DOUGLAS.[8] The Court denied Ferrier's request to dismiss T&M without prejudice.

Recently, Defendants sought leave to file a Third Party Complaint against Natalie Jean Marine, a subsequent employer of Ferrier, arguing that the same "recent discovery" has revealed "a ***potential claim*** against Natalie Jean Marine for tort indemnity, contribution, and/or equitable subrogation, concerning payment of maintenance and cure obligations to or on behalf of Mr. Ferrier that have been, or could be, satisfied by CP Marine/Ten Mile."[9][10] Plaintiff wholeheartedly opposes this motion.

Defendants filed this instant motion seeking to continue the October 26, 2026 trial date. Defendants argue good cause exists because (1) this case has been pending for less than one year and has never previously been continued; (2) T&M's Limitation Action arises from the same incident, has been consolidated with this case, and the Court has stayed all claims against T&M through October 31, 2026—after the currently scheduled trial date; (3) Defendants contend Natalie Jean Marine is a necessary party and that facts supporting claims against it were only discovered during Stan Kraly's August 7, 2026 deposition, requiring additional time for joinder and related discovery; (4) additional discovery remains outstanding, including depositions of experts, medical providers, and other witnesses; (5) Ferrier remains under active medical treatment, has not reached MMI, has recommended knee surgery, and his treating surgeon has deferred opinions concerning prognosis, permanent disability, and future work capacity until after surgery and recovery; (6) the monition period in the Limitation Action has not expired,

[8] Rec. Doc. 37.
[9] Rec. Doc. 42, at 1.
[10] This motion has been referred to Judge Roby for submission on September 2, 2026.

Natalie Jean Marine has not yet appeared, and additional claimants may still come forward; and (7) proceeding with the October 26 trial would allegedly result in piecemeal and duplicative litigation, risk inconsistent findings, and waste judicial and party resources, whereas a continuance would allow all related claims and parties to be addressed in a single trial.

Plaintiff addresses each argument, below, in turn.

**LEGAL STANDARD**

The Fifth Circuit has recognized that continuing a trial is "never ideal." *Red Dot Bldgs. v. Jacobs Tech., Inc.*, No. 11-1142, 2012 U.S. Dist. LEXIS 78957, at *4 (E.D. La. June 7, 2012) (Barbier, J.). Federal Rule of Civil Procedure 16(b)(4) applies specifically to requests to modify a court's scheduling order. Pursuant to that rule, a court's scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). In this context, to show good cause, the party seeking to modify the scheduling order must show "that the deadlines cannot reasonably be met despite the diligence of the party needing the extension." *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., N.A.*, 315 F.3d 533, 535 (5th Cir. 2003) (quoting 6A Charles Alan Wright et al., Federal Practice and Procedure § 1522.1 (2d ed. 1990)).

In considering such requests, courts in the Fifth Circuit examine four factors: "(1) the explanation for the failure to timely comply with the scheduling order; (2) the importance of the modification; (3) potential prejudice in allowing the modification; and (4) the availability of a continuance to cure such prejudice." *Squyres v. Heico Cos.*, 782 F.3d 224, 237 (5th Cir. 2015) (cleanned up). A district court's discretion to modify a scheduling order "is exceedingly wide" and the "court must consider not only the facts of the particular case but also all of the demands on counsel's time and the court's." *Streber v. Hunter*, 221 F.3d 701, 736 (5th Cir. 2000) (citation and quotation marks omitted).

## ANALYSIS OF DEFENDANTS' ARGUMENTS

Ferrier will address each of Defendants' arguments sequentially, while providing the necessary context that supports why a continuance of the present trial date is not warranted.

**The case's short pendency and lack of a prior continuance do not establish good cause.**

Defendants cannot show good cause based on the case's posture. The parties have exchanged extensive discovery, including expert reports from both sides. Plaintiff has been diligent in providing dates for expert depositions. This shows a case that is trial-ready, not one that needs more time. CP Marine even acknowledges the extensive discovery that has taken place in its opposition to Ferrier's earlier-filed motion for partial summary judgment on the issues of seaman status and vessel ownership.

**The Limitation Action's stay through October 31, 2026 does not establish good cause to continue trial.**

Defendants cannot rely on the stay in the Limitation Action to justify a continuance. T&M's Limitation Action arises from the same incident and has already been consolidated with this case. Ferrier has moved to lift the stay, and that motion remains pending. T&M has identified only two potential claimants: Ferrier and CP Marine.[11] When asked to identify any other potential claimant, T&M could not name one. Defendants cannot use a stay over claimants who do not exist to delay a trial-ready case from proceeding as scheduled.

**Defendants' claimed need to join Natalie Jean Marine is not good cause – they have known the underlying facts/issues since Ferrier's initial disclosures and depositions months before Kraly testified.**

Defendants' "recently discovered" evidence is neither new nor recent. Ferrier disclosed Stan Kraly[12] as a witness in his February 20, 2026 initial disclosures. On March 9, 2026, Ferrier identified Natalie Jean Marine by name as a subsequent employer in his written discovery

---

[11] Civil Action 26-1694, Rec. Doc. 1, at 3.
[12] Port Captain at Natalie Jean Marine and husband to the owner of Natalie Jean Marine.

responses and produced medical records documenting his knee condition, including Dr. Duplantier's noted opinion that the injury stemmed from the April 5, 2025 accident.[13] On March 13, 2026, Ferrier testified at his deposition that Stanley Kraly hired him, that Stanely Kraly terminated him because he could no longer physically perform his job, and that his injuries limited what he could lift and carry. (See below).

Moreover, Ferrier testified about his knee issues as well. Ferrier testified that his first surgery included external fixation hardware — two bolts placed just below his knee to stabilize his leg while his shattered tibia and fibula healed.[14] Doctors later removed that hardware and installed plates and screws during his second surgery, and Ferrier testified that a future surgery may be needed simply to remove the remaining hardware from his leg.[15] Beyond the hardware, Ferrier testified that Dr. Duplantier identified a separate, underlying injury in his knee — a torn meniscus and damaged cartilage — for which Ferrier has been receiving PRP injections in an effort to avoid a third surgery.[16] Ferrier described ongoing symptoms from that knee injury: his knee locks up and goes numb when driving, he cannot fully bend or squat, and kneeling feels "like someone put a sword through my knee."[17]

---

[13] Pl.'s Resps. to Def.'s First Set of Written Disc. Reqs. to Pl. (March 9, 2026) Interrogatory No. 9 (asking for employers over the last ten years; Plaintiff responding: "Natalie Jean Marine and CP Marine / Ten Mile Exchange."); *id.* at Interrog No. 13 (asking for all sources of money received since the accident; Plaintiff responding: "None other than Plaintiff's brief employment with Natalie Jean Marine that post-dated the incident."); *id.* at Interrog. No. 14 (asking about training and qualifications; Plaintiff responding: "Plaintiff also received limited familiarization with vessels on which he worked for Natalie Jean Marine and CP Marine/Ten Mile Exchange.").
See Ex 1, Bone & Joint Clinic Record of Neil L. Duplantier, M.D. (Nov. 4, 2025), Ferrier Medicals 000001–03 (Dr. Duplantier was already flagging suspected meniscus pathology and tying it to the accident).
[14] Ex 2, Ferrier Dep. 132:12–18; 133:7–25, 134:1–10.
[15] *Id.* at 138:8–23, 139:1–15.
[16] *Id.* at 138:15–139:15.
[17] *Id.* at 170:24–171:12.

Q Okay. Any accidents or injuries during that stint?
A No, sir.
Q All right. What was your reason for leaving employment with Natalie Jean on the GI JOE?
A I was fired because I was performing like worse than what I used to because of my injuries. In my boss's terms, I lost a step.
Q Who was it that actually said you lost a step?
A Stanley Kraly.
Q He told you that you -- they had to terminate you because you were not able to physically do your job?
A Yes, sir.
Q Did they give you any examples of what you're not able to do or not able to do as well?
A I couldn't lift up on a lot of things that were super heavy that would normally need to be lifted.
Q Anything else because of inability to lift heavy things?

Page 161

A My walking was really bad.

Q Can you give me an example, Mr. Ferrier, of what you could lift before but you couldn't lift when you went back to the GI JOE?

MR. DAVIS:

Objection. Form. Before the incident or before the --

MR. MARKS:

I'm sorry, yes.

BY MR. MARKS:

Q What you could -- what you could lift before the incident but what you couldn't lift when you went back to the GI JOE?

A Basically I could lift anything before the incident with no problem.

Q What were the items that you were having trouble with when you went back?

A Cables, so like face wires and certain ropes. I was having trouble with the -- some people call them ratchets or pelican hooks and I think that's about it when it comes to carrying things mostly.

Q Did -- did Stan Kraly, did he give you any written discharge papers or termination papers?

A No, sir. He sent it in the mail, and I have yet to receive it.

Moreover, Plaintiff's counsel deposed Joseph Dardar (CP Marine, T&M, Ten Mile's managing member and who has ownership interest in all three entities) and questioned him directly about Ferrier's post-employment medical treatment, his knee issues, his time at Natalie Jean Marine, and Defendants' maintenance and cure obligations.[18] Defendants had this

[18] Ex 5, Dep. of Joseph Dardar 188:12–195.

information and knew of the Ferrier's knee issues months before Kraly's August 7, 2026 deposition. Defendants cannot manufacture good cause out of facts they already had.

Page 188

BY MR. DAVIS:
Q. This is your deposition, Mr. Dardar. So if you don't know the answer, you say, I don't know. But I -- we're --
A. I honestly thought he was getting medical treatment. I mean, did he not get medical treatment?
MR. MARKS: He received medical treatment.
A. Did he -- I mean, he told me --
MR. MARKS: He got a full release.
A. He was full release. He never once told me, I'm not getting my medical treatment, I'm not getting my medicine, nothing.
BY MR. DAVIS:
Q. When he got off -- when he couldn't make it at NATALIE JEAN MARIE because of his leg, he goes and gets checked out, his knee's messed up, he's had procedures on his knee.
You're not aware of any of that?
A. I mean --
MR. MARKS: Object to the form.
A. -- no. He could've hurt himself on the NATALIE JEAN for his knee.
BY MR. DAVIS:

Q. If he did --
A. I don't know.
Q. Well, but you agree that --
A. Did they not do an MRI on him when they did all that work on his leg and they did not -- did they miss that?
Q. I just want to ask one question.
Are you aware that Jonathan Ferrier's requesting medical treatment, post your employment, post NATALIE JEAN MARIE --
A. No.
Q. -- and you're not aware of any of that ever being made?
A. Not after -- not after he was fired from us, no, I don't.
Q. Okay. Well, who -- how does that maintenance and cure get dealt with? Do you -- you agree that that's a duty that you have?
MR. MARKS: Object to the form.
Don't answer that.
You're asking for a legal conclusion from a lay witness.
BY MR. DAVIS:
Q. But if -- if a seaman is injured while working on the vessel and the doctor's saying that

Page 190

this was related to the incident, right, like, and that's all said and done, you agree that that treatment has to be paid?

MR. MARKS: Object to the form. You're asking for a legal conclusion. Do not answer that.

BY MR. DAVIS:

Q. Do you have a --

A. I'm not answering.

MR. MARKS: He's not answering.

BY MR. DAVIS:

Q. Okay. Well, as you sit here today, do you have -- what is your understanding of Jonathan Ferrier's medical picture, that he just hasn't gone to the doctor again?

A. I don't know what Jonathan's doing. All I know is he got medical treatment, he went through treatment, he went through his surgeries, he got Workers' Comp from us. I mean, I'm thinking he is totally taken care of. If he's not, that's news to me. So I don't know anything about that. If he's got a new injury that just popped up, again, that's news to me.

Defendants' "recently discovered" argument is belied by Joseph Dardar's own testimony when he suggested it was a possibility Jonathan Ferrier's knee injury arose at Natalie Jean Marine. Defendants cannot manufacture good cause out of facts they already had and standing issues in the case. Likewise, Defendants should not benefit from its decision not to follow up on any Natalie Jean discovery until August 7, 2026, when it took Stan Kraly's deposition.

**Defendants had ample opportunity to complete discovery — any remaining gaps are Defendants' own doing, not good cause for delay.**

Defendants cannot show good cause based on outstanding depositions. On July 8, 2026, T&M's counsel first asked Ferrier to agree to a continuance based on outstanding depositions.[19] Ferrier declined that request.[20] Ferrier immediately turned around and offered deposition dates for the witnesses T&M identified.[21] Within twenty-four hours of receiving T&M's email, Ferrier's counsel began providing available dates for many of the witnesses on T&M's list and sent them to T&M the next day.[22] Ferrier's counsel was diligent in securing available dates for all requested witnesses.[23] Defendants did not follow up on half of the dates Ferrier offered. Ferrier has been diligent in setting deposition dates for experts, medical providers, and other witnesses. He continues to offer dates to Defendants. Ferrier told Defendants then what remains true now: the discovery deadline was not set to expire, and deposing nine fact witnesses, most of them medical providers whose depositions run no more than a few hours, is a manageable task with cooperation between counsel. Remaining depositions reflect the normal course of discovery. They are not a reason to delay trial. Defendants cannot rely on discovery they have had every opportunity to schedule as good cause for a continuance.

**Ferrier's ongoing treatment and pending knee surgery are not good cause — Defendants cannot deny him cure for that surgery and then use its absence as a reason to delay trial.**

The knee surgery Defendants point to does not change the central damages issue in this case. Ferrier's crush injury to his leg and ankle, and his continuing complaints from that injury, remain central to this case regardless of the knee. Dr. Lonseth's permanent work restriction stands on that injury alone, independent of any knee condition or future knee surgery. And

---

[19] Ex. 3, July 8, 2026 Email from A. Rufty to A. Davis, at 6.
[20] *Id.* at 5; Ex. 4, July 9, 2026 Ltr. to Defendants.
[21] Ex. 3, July 9, 2026 Email from A. Davis to Defense Counsel, at 3; Ex. 4, July 9, 2026 Ltr. to Defendants.
[22] *Id.*; Ex. 4, July 9, 2026 Ltr. to Defendants.
[23] *See* Ex. 3, Email string between parties' counsel, and Proposed Deposition Date charts, at 7–8.

Defendants ignore why Ferrier has not yet had his knee surgery: CP Marine is denying him cure. CP Marine cannot have it both ways. It cannot refuse to pay for the surgery it is legally obligated to fund, then turn around and use the absence of that surgery as a reason to delay the very trial where its maintenance and cure obligations will be decided. Defendants' hope that discovery against Natalie Jean Marine will let them point the finger elsewhere and it does not justify further delay.

Further, the law does not require a plaintiff to reach MMI before trial. Ferrier's treating physicians can testify to his prognosis, permanent disability, and future work capacity to a reasonable degree of medical probability, even before he completes his recommended knee surgery and recovery. Dr. Lonseth has already permanently restricted Ferrier from returning to work, and he based that restriction on Ferrier's leg and ankle crush injury. Waiting for MMI would let Defendants delay trial indefinitely, since Ferrier's recovery timeline is not fixed and further complications could always postpone that benchmark. Defendants cannot use Ferrier's ongoing injury, itself a consequence of the incident, as a reason to delay his day in court.

**The monition period is not good cause — every known claimant is already before the Court, and Defendants cannot conjure a phantom claimant to justify delay.**

Defendants cannot rely on the monition period to justify a continuance. T&M has identified only two potential claimants: Ferrier and CP Marine.[24] When asked to identify any other potential claimant, T&M could not name one, because every necessary party to this litigation is already present and diligently litigating this case. Defendants cannot use the mere possibility of an unnamed claimant, one they cannot identify, to delay a trial ready to proceed.

[24] Civil Action 26-1694, Rec. Doc. 1, at 3.

**There is no risk of piecemeal litigation — one consolidated trial, with proper stipulations, resolves every claim before this Court.**

Defendants are using the Limitation Action as a procedural mechanism to delay trial. Joseph Dardar has ownership in, and manages, CP Marine, Ten Mile Exchange, and T&M Holdings alike. T&M filed the Limitation Action as a workaround to avoid the Scheduling Order. All known potential claimants are already before this Court. There is no other potential claimant. This is delay, plain and simple, and the Court should not permit this kind of gamesmanship.

Proceeding to trial will not cause piecemeal or duplicative litigation. Ferrier's civil action and T&M's Limitation Action are already consolidated before this Court. All known claimants, Ferrier and CP Marine, are present and litigating this case now. There is no other potential claimant. In his *Motion to Lift Stay* (Rec. Doc. 38), Ferrier has offered the stipulations the Fifth Circuit requires to protect T&M's limitation rights, including that this Court retains exclusive jurisdiction over exoneration and limitation, and that Ferrier will not enforce any judgment beyond the limitation fund until the Court resolves that issue. Ferrier proposes a single trial on October 26, 2026: the jury decides Ferrier's Jones Act and unseaworthiness claims and assesses his damages, and the Court/Bench alone decides whether T&M had privity or knowledge and can limit its liability. Courts in this district routinely try Jones Act and limitation claims this way in one proceeding. This structure eliminates the risk of inconsistent findings Defendants claim to fear, and it protects both Ferrier's right to a jury and Defendants' right to litigate limitation.

## CONCLUSION

For the foregoing reasons, Ferrier respectfully requests that this Court deny Defendants' Motion to Continue Trial. Defendants cannot show good cause, and the case is ready for trial on October 26, 2026.

In the alternative, should the Court grant a continuance, Ferrier asks that the Court preserve all deadlines that have already passed, including the August 18, 2026 dispositive motion and Daubert deadline, and rule on the motions already pending before it. Oppositions to these motions are due on August 25, 2026. Re-briefing them would waste the time and resources. A ruling on the pending motions now will narrow the issues for trial and move this matter toward resolution.

Respectfully submitted by:

**ADAM DAVIS LAW FIRM**
*/s/ Taylor M. Bologna*
Adam Neely Davis (La. Bar No. 35740)
Taylor M. Bologna (La. Bar No. 37594)
Michelle Pare Ricca (La. Bar No. 41385)
22398 LA 435
Abita Springs, Louisiana 70420
Email: ad@adamdavislawfirm.com
taylor@adamdavislawfirm.com
michelle@adamdavislawfirm.com
Telephone: (504)-553-1435
Facsimile: (504)-553-1439
**ATTORNEYS FOR PLAINTIFF JONATHAN FERRIER**