**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JONATHAN FERRIER**<br><br>**v.**<br><br>**CP MARINE SERVICES, LLC and TEN MILE EXCHANGE, LLC** | **CIVIL ACTION NO. 2:25-cv-02286**<br>**consolidated w/ 26-cv-1694**<br><br>**Ref: ALL CASES**<br><br>**JUDGE JAY C. ZAINEY**<br><br>**MAGISTRATE JUDGE KAREN WELLS ROBY** |

**MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE OR LIMIT**
**TESTIMONY OF DEFENDANTS' EXPERTS REGARDING JONATHAN FERRIER'S**
**WHEELHOUSE ADVANCEMENT**

MAY IT PLEASE THE COURT:

CP Marine Services, LLC ("CP Marine") and Ten Mile Exchange, LLC ("Ten Mile Exchange") (collectively, "Defendants"), file this Memorandum in Opposition to Plaintiff's Motion in Limine Seeking to Limit or Exclude the Testimony of Expert Witnesses, Capt. Marc Fazioli, Stacie Nunez, and Kyle McAvoy, Captain USCG (Retired), *Rec. Doc. 47*.

Plaintiff argues that the experts are not qualified to render their opinions about his potential, or lack thereof, to obtain several job promotions, and then advance through at least three different licenses from the United States Coast Guard that would allow him to increase his annual income by nearly five times his highest wages and be considered among the elite towboat Captains on the Gulf Coast in only four years, despite his inexperience, poor history of consistency, lack of demonstrable progress towards that goal, potential physical limitations as a result of the injury received on or about April 5th, 2025, and pre-existing medical conditions.

These arguments go to the weight of the Defendants' experts' opinions or rest on Plaintiff's belief that his experts are correct and have adequately considered Plaintiff's one year of deckhand work, pre-existing medical conditions, and other variables in reaching their opinions.

Plaintiff further argues that Defendants' experts' opinions are cumulative and that Defendants should be limited to a single expert on the licensing issue. However, while there may be some limited overlap in the subject matter of the opinions of vocational expert, Stacie Nunez, Coast Guard licensing expert, Kyle McAvoy, and maritime industry expert, Captain Marc Fazioli, their testimony will not be cumulative and Nunez, McAvoy, and Fazioli should each be allowed to provide testimony within their expertise and from the perspective of their discipline on this subject[1].

## I. BACKGROUND AND SUMMARY OF ARGUMENTS

Nunez will provide testimony within her expertise of a vocational counselor/vocational expert, and the process by which a vocational counselor determines a candidate's potential for success in a given occupation, and whether they possess the skills, training, and experience required for various jobs. She will apply that methodology to Plaintiff and explain to the jury why she does not believe that Plaintiff is a candidate for employment in wheelhouse jobs requiring a United States Coast Guard license and explain why he would be a candidate for other jobs.

Captain Fazioli has worked as a mariner in many capacities, including deckhand and Captain and has held a Master's license issued by the Coast Guard. *See, Curriculum Vitae of Captain Marc A. Fazioli, Ex. "A"*. He holds a college degree and a Merchant Marine Officer License from the Texas Maritime Academy at Texas A&M University. *Id.* He has worked on a

[1] If the Court grants Defendants' Motion in Limine, Rec. Doc. 49, and excludes all evidence of Plaintiff's promotions to wheelhouse positions and future wage loss based on his obtaining a licensing credential from the U.S. Coast Guard, Defendants do not intend to present expert testimony on these issues.

wide variety of vessels including Tankers, Geared Bulk Carriers, Ro/Ro, Towing Vessels and Passenger Ferries. Captain Fazioli has taught maritime issues at Texas A&M University as a Lecturer and worked in many marine roles in the U.S. and abroad. *Id.* Captain Fazioli will provide testimony within his expertise that Plaintiff did not have an established path towards licensing as a Merchant Marine Officer who would ultimately receive a Master of Towing Vessels license, which is a designation reserved for the most qualified and experienced towboat captains. Captain Fazioli will provide testimony from the perspective of a mariner who has transitioned from deckhand to Master, with respect to the legal requirements to achieve licensing and their application in the workforce to mariners seeking to work their way up the ranks and what steps are required to achieve measurable progress towards this goal in a workplace setting, and the potential pitfalls and shortcuts encountered along the way.

Finally, Kyle McAvoy was a Captain in the United States Coast Guard when he retired after more than 26 years of service. *See, Curriculum Vitae of Kyle McAvoy, Ex. "B".* His career spanned nearly all facets of the United States Coast Guard including Marine Safety, starting from field work as an inspector to Senior Executive positions responsible for establishing national policy of the Coast Guard. *Id*. To suggest that McAvoy lacks the experience to render his opinion is laughable, as he worked in Coast Guard Headquarters for four years, with responsibilities that included developments of policies relative to credentialing professional merchant mariners. *Id*. at p. 2. In fact, McAvoy had final authority on behalf of the Commandant to resolve mariner appeals and developed and maintained policy determinations as a result of appeals challenging Merchant Mariner Credential (License) issuance decisions. *Id*. McAvoy oversaw the development of strategies for compliance with the requirements of the Standards of Training, Certification, and Watchkeeping (STCW) and all domestic credential (license) developments. *Id*. at p. 3. Thus,

McAvoy participated in and had authority in (1) the development of the rules and regulations pertaining to issuance of Coast Guard license credentials, and, (2) the adjudication of those issues to mariners appealing their application at Coast Guard hearings. McAvoy, within his role as the Office Chief of the Coast Guard's Office of Commercial Vessel Compliance (CVC) was also the Dedicated Federal Officer to the Coast Guard's Federal Advisory Committee, entitled Merchant Mariner Medical Advisory Committee, and, helped oversee the Coast Guard's implementation of international STCW standards into domestic national standards of care. McAvoy will provide testimony from the perspective of a Coast Guard Senior Executive as to the regulations applying to licensing and their real time application to mariners seeking licensing, including the medical waiver process. McAvoy will be able to provide the Court with testimony explaining the process of a mariner seeking a license credential, the legal requirements, and the impediments to issuance of a license when a mariner has certain medical conditions, and how the Coast Guard responds to those issues.

Plaintiff's motion in limine largely focuses on why his expert's summary conclusions about Plaintiff becoming a licensed mariner are correct. In particular, the focus of his motion is the fact that his expert, Captain Michael Berry, is a Designated Examiner for the Coast Guard, without ever explaining how meaningless this designation is in the overall licensing process that Plaintiff claims he would successfully navigate despite not having even researched the steps required in the process.

Plaintiff argues that determining whether a mariner advances and obtains licensing from the Coast Guard, "…requires specialized knowledge beyond general maritime or vocational experience." He then claims his experts are better qualified without explanation, which he argues should result in the exclusion of Defendants' experts.

While this "better qualified" argument goes to the weight of the experts' opinions, Plaintiff has overstated the importance of a Designated Examiner designation and that person's role in a mariner navigating the path from entry level deckhand to licensed captain with a Coast Guard credential.

A Designated Examiner does not determine the merits of any license application to the Coast Guard, does not make the rules for the licensing process, cannot change the facts associated with any license application, and cannot take concrete steps towards licensing on behalf of any deckhand. They simply, and as per the regulatory definition (*See 46CFR10.107*), "…evaluate whether an applicant has achieved the level of proficiency required to hold a towing vessel endorsement on an [Merchant Mariner Credential] MMC." They do not offer information on other critical evaluations essential to the issuance of a MMC to a commercial mariner such as the final evaluations of a mariner's character and final medical approvals.

In fact, <u>a Designated Examiner has no role in the initial step in the process that has not been taken by Plaintiff here</u>, which is issuance of an Apprentice (Mate) Steersman license. Rather, a mariner must first obtain sufficient promotions and job experience to become eligible for an Apprentice (Mate) Steersman license, and then clear medical screening and character fitness, and then be issued such a license. *See 46 CFR § 11.466*. All experts, including those hired by Plaintiff, agree that Plaintiff was not even at the stage of his career to be eligible to seek this initial low-level license.

If one achieves Apprentice Mate license, the next progression is Mate (Pilot) of Towing Vessels, eligibility for which requires working another 360 days as an Apprentice Mate (Steersman) on towing vessels (900 total days), completing a Towing Officer Assessment Record

(TOAR) signed off by a designated examiner, and continued compliance with the character and fitness, drug testing, citizenship, and medical requirements. *See 46 CFR § 11.465*.

46 CFR 10.404(c) provides the information a Designated Examiner (DE) furnishes to the Coast Guard in a TOAR, which generally requires that the DE show that they have examined the skills of the mariner and determined that they are competent. Beyond this very limited scope in one of the licenses Plaintiff claims he would have achieved, the DE has no role in the issuance of any license and their positive assessment in a TOAR can be rejected by the National Maritime Center, the body that determines eligibility for licensure.

Thus, the fact that Captain Berry is a DE is meaningless here. Berry has not completed a TOAR of Plaintiff because Plaintiff unquestionably lacks the skills and other requirements to even undergo this evaluation. After all, Plaintiff is so inexperienced as a mariner that he is several rungs down the ladder from the point where a TOAR is performed, as Plaintiff holds no credentials that would allow him to serve in the wheelhouse of vessel, including the entry level Apprentice (Mate) Steersman license. Furthermore, Berry never even explains what a TOAR is or how Plaintiff would more likely than not successfully complete that required step in being issued his second Coast Guard license.

In any event, although Plaintiff's motion has not made any showing that the experts should be limited or excluded, as is demonstrated below, all three experts offered by Defendants are more than qualified to provide the testimony at issue, and each witness presents a unique perspective from their respective disciplines, which will be helpful to the jury in understanding the issues in dispute.

## II. LAW AND ANALYSIS

### A. Admissibility of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. *See Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012); *Daubert v. Merrell Dow. Pharms., Inc.*, 509 U.S. 579 (1993). Rule 702 is intended "to protect juries from unreliable and irrelevant expert testimony." *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022). Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods; and" (4) "the expert has reliably applied the principles and methods to the facts of the case." *Fed. R. Evid. 702*.

In *Daubert*, the Supreme Court established a two-part test designed to determine the admissibility of expert testimony. 509 U.S. at 588; *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006). First, the court must determine the quality of the expert's testimony by examining whether the testimony reflects scientific knowledge, is derived by the scientific method, and is supported by appropriate validation. *Daubert*, 509 U.S. at 590. "Testimony that is not scientific in nature is better judged by examining whether the expert has sufficient personal knowledge, work experience, or training to support the opinions offered." *Redding Linden Burr, Inc. v. King*, 2009 U.S. Dist. LEXIS 8248 (S.D. Tex. Feb. 4, 2009) (citing Fed. R. Evid 702 and *Kumho Tire. Co. v. Carmichael*, 526 U.S. 137, 150-51, (1999)).

Second, the court must determine whether the testimony will assist or help the trier of fact to understand the evidence. *Daubert*, 509 U.S. at 591. The Fifth Circuit has repeatedly observed:

"Assisting the trier of fact means 'the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.'" *Puga v. RCX Sols., Inc*., 922 F.3d 285, 293-94 (5th Cir. 2019) (quoting *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992)).

> There is no more certain test for determining when experts may be used than the commonsense inquiry [of] whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*Vogler v. Blackmore*, 352 F.3d 150, 155 n.5 (5th Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules). "In other words, expert testimony is unnecessary where a jury can 'adeptly assess [the] situation using only their common experience and knowledge.'" *Beech v. Adriatic Marine, L.L.C*., 2021 U.S. Dist. LEXIS 32886 (E.D. La. Jan. 12, 2021) (quoting *Peters v. Five Star Marine Serv*., 898 F.2d 448, 450 (5th Cir. 1990). While Rule 702 does not require that an expert be "highly qualified" in order to testify about a given issue, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009);

When expert testimony is challenged under Rule 702, the burden of proof as to the expert's qualifications and the testimony's admissibility rests with the party seeking to present the testimony. See *Moore v. Ashland Chem., Inc*., 151 F.3d 269, 276 (5th Cir. 1998).

**1. CAPTAIN MARC FAZIOLI**

Fazioli is an imminently qualified maritime expert, as shown above. *See, Curriculum Vitae of Captain Marc Fazioli, Ex. "A"*. The fact that his work has transitioned from the vessel to the classroom/office as he aged and gained experience, and that he no longer maintains a Merchant Mariner Credential/captain license is not grounds to exclude his opinion. *Rapides Station Land*

*Co. LLC v. Markel Am. Ins. Co*., 21-376, 2024 U.S. Dist. LEXIS 236671, *12-13 (M.D. La. Dec. 2, 2024) (internal citations omitted). In fact, the evidence put forth by Plaintiff proves Captain Fazioli's qualifications, as it shows that he has held a 1,600-ton Master's license and a Second Mate Unlimited license from the United States Coast Guard, and has served as a crew member on towing vessels. *Rec. Doc. 47-2, p. 13*.

Captain Fazioli's point about Captain Creppel's lack of DE status is not to show that Captain Creppel's positive opinion about Plaintiff is incorrect. Rather, it is to demonstrate the lack of potential for advancement within the company he worked for, CP Marine, such as the employer programs in *Kennedy v. Magnolia Marine Transp. Co*., 189 F. Supp. 3d 610, 617-18 (E.D. La. 2016) or *Singleton v. United States*, 2021 U.S. Dist. LEXIS 36210, 2021 WL 765384, at *11-12 (E.D. La. Feb. 26, 2021). If a mariner was employed at a company with a program that assisted mariner's in obtaining licensing, he had enrolled in the program and taken demonstrable steps progressing him towards licensure such as issuance of the initial Apprentice/Mate Steersman license, and that company employed Captains with DE status who could assist in obtaining one requirements (TOAR) of the next rung of licensing as a Mate (Pilot) of Towing, then such a mariner could argue that he was taking concrete steps towards becoming a licensed Captain through his work as a deckhand for the company. However, Captain Fazioli points out that at CP Marine, no such pathway exists, as there is no program and the Captain supervising Plaintiff, Captain Creppel, has never gone through the United States Coast Guard licensing process due to his age and he could not sign off on a TOAR if an employee worked their way to the point of eligibility for consideration of a Mate (Pilot) of Towing Vessels license.

Thus, Captain Fazioli, based on his training, education, and experiences, is obviously qualified to offer an opinion about the workplace realities of a mariner working as a deckhand who

desires to obtain licensure from the Coast Guard and to transition to wheelhouse work as a captain. His testimony about the means, methods, and procedures available to mariners to achieve this goal, and the deleterious effects resulting when they are not, will be helpful to the jury in determining whether Plaintiff would have been more likely than not to achieve these multiple promotions and three different Coast Guard licenses.

**2. STACIE NUNEZ**

Plaintiff's argument that Stacie Nunez, a vocational expert, is unqualified to offer opinions about Plaintiff's vocational opportunities, is seriously misplaced.

Vocational Experts are utilized to "assess whether jobs exist for a person with the claimant's precise abilities." *Romine v. Barnhart*, 454 F. Supp. 2d 623, 635, fn. 2 (E.D. Tex. July 27, 2006), citing, *Gilliam v. Califano*, 620 F.2d 691, 694 n. 1 (8th Cir. 1980). A vocational rehabilitation counselor considers age, academic achievement, and skill level involved in the training, ultimate career goal, and physical ability to do that type of job. *D'Ambrosia v. Lang*, 985 So. 2d 800, 807 (5th Cir. 2008).

Plaintiff claims that Nunez reaches her conclusion that Plaintiff has not demonstrated consistency, or the skills, knowledge, or dedication required to be promoted to wheelhouse positions and become a licensed captain, based solely on a study from the Maritime Institute of Technology and Graduate Studies in Louisiana Small Vessel Industry. *See Rec. Doc. 47-2, p. 14*.

While it is true that Nunez cites evidence from that source that shows the typical timeline of <u>QUALIFIED</u> mariners progressing from deckhand to captain is eight to fifteen years[2], this is far from the sole basis of her opinion. Further, the fact that Plaintiff, who has not deposed Nunez,

---

[2] Defendants point further to *Lewis*, *v. Seacor Marine, Inc*., 2002 U.S. Dist. LEXIS 29401, *5 (E.D. La. Oct. 23, 2002), wherein Judge Engelhardt found an eight year timeline to progress from deckhand to captain as speculative, while noting Captain Berry suggests a four year timeline for Plaintiff to progress from unlicensed entry level deckhand to his third license, Master of Towing Vessels.

is unable to achieve the same research results in a field in which he is not an expert, is not surprising and not a reason to exclude an expert who is very familiar with the information she cites and relies on in her field.

Nunez acknowledged Plaintiff's statement that he wanted to work as a mariner, "…and eventually move up to become a tow boat master.", and that, "…he was being mentored by the captain." *See, Report of Stacie Nunez, p. 7, Rec. Doc. 46-2.* However, she also discussed directly with Plaintiff his "plan of moving forward" and in her opinion as a vocational expert found it was significantly lacking. *Id*. Her conclusion was well supported, as Plaintiff,

> …did not know the steps that would be required for him to obtain this license. He told me has not performed research of his own. He told me that he is aware that he is required to perform a certain number of days on a boat to get a license. Mr. Ferrier also discussed his diabetes. He told me that when he was younger it was hard for him to get his diabetes under control and told me now he is trying his best to control his diabetes.
>
> Based on my evaluation with Mr. Ferrier, it did not appear that Mr. Ferrier had a plan to become a captain nor had he researched into progressing from his position of a deckhand to a captain. According to research from the Maritime Institute of Technology and Graduate Studies in Louisiana Small Vessel Industry, the full path from becoming a deckhand to captain can take eight to fifteen years depending upon opportunities and dedication. Based on Mr. Ferrier's work history, records reviewed and my discussion with him in our evaluation, it does not appear consistency has been demonstrated. He has not demonstrated skills, knowledge or dedication required to become a licensed captain. It is important to note, according to research, the top conditions that delay or deny applications for captain's license are cardiac disease, diabetes, psychiatric disorders, and sleep apnea.

*Id*.

Nunez's expert vocational opinion that Plaintiff was not a candidate for advancement to a wheelhouse position requiring Coast Guard licensure is no different than her opinion that Plaintiff was not a candidate for the NFL Draft or medical school.

Because Nunez reliably applies the methodology of her area of expertise, vocational issues, as acknowledged by the *Romine* and *D'Ambrosia* courts, she is qualified to render her opinion that Plaintiff, "…has not demonstrated skills, knowledge or dedication required to become a licensed captain." *Id*.

**3. KYLE MCAVOY, CAPTAIN USCG (RETIRED)**

Plaintiff complains that McAvoy lacks medical, psychiatric, or National Maritime Center adjudication experience, so he should be precluded from opining on how the Coast Guard determines eligibility of a mariner to hold a licensing credential and the process of seeking a license and the government agency's response thereto.

However, McAvoy is not rendering a medical opinion, nor is he considering the merits of an application submitted as a mariner seeking a license. Rather, McAvoy offers an opinion providing, "additional information and insight into the Coast Guard credentialing process for professional mariners." *See, Report of Kyle McAvoy, p. 2, Ex. "C".* Captain Michael Berry, a boat captain that Plaintiff relies on as an expert in the licensing process apparently because he was issued a license in the past, summarily concludes that Plaintiff had a "future ability to continue advancing in the towboat maritime industry". *See, Report of Captain Michael Berry, p. 19, Ex. "D".*

Berry acknowledges that the issuance of a license depends on the outcome of eight to eleven different variables: "Advancement depends on continued safe work, company opportunity, mentorship, medical fitness, successful examinations, TOAR completion, route experience, and Coast Guard approval."[3] Despite his opinion that these variables bear directly on whether a mariner

---

[3] See also, sea-time accumulation, successful training/testing, and the ability to maintain Coast Guard medical qualification. *See, Report of Captain Michael Berry, p. 19 – Opinion 12, p. 20 - Chart Notes, Ex "D"*

would be issued, and maintain a license, Berry's report provides an analysis of sea-time only, and perhaps mentorship, without any analysis of explanation of the other factors.

For example, Berry gives no explanation of the "company opportunities" available to Plaintiff at CP Marine, which does not employ a DE to supervise Plaintiff and did not have a formal apprentice program designed to advance deck personnel to the wheelhouse.

Likewise, Berry acknowledges that issuance of a license depends on, "successful training/testing", but he provides no explanation/analysis of the study obligations, course studies and materials, location of the training, admission standards for the training, costs of the training courses, or details of the examinations required of a mariner to obtain any of the three licenses he contends Plaintiff would have been awarded in a brief three year period, or how Plaintiff who did not complete even half of his high school studies before dropping out, would suddenly become studious with the ability to rapidly advance and excel in studies and testing, despite his history of the opposite. *See, Report of Stacie Nunez, p. 7, Rec. Doc. 46-2*; *See, Report of Captain Michael Berry, p. 19 – Opinion 12, p. 20 - Chart Notes, Ex "D".*

Besides mentioning the word once and admitting that issuance of a license depends on its completion, Berry makes no effort to explain what a TOAR is, how a TOAR is completed, when a mariner is eligible for a TOAR, what happens after a TOAR, and how the outcome of a TOAR impacts the issuance of a license. Most importantly, Berry does not analyze how and why Plaintiff, would have more likely than not successfully completed all obligations of this TOAR requirement, 46 CFR 10.404, despite his focus on Berry as DE, whose only role would be completing the TOAR.

Further, Berry does not provide analysis of the "route experience" that would be required of Plaintiff to obtain licensure, how he would obtain the requisite experience, what route he would

have worked on, and/or why the Plaintiff would have been a good candidate to successfully achieve that route experience.

Most importantly, Berry acknowledges that "medical fitness" is a pre-requisite for a mariner to be eligible to be issued a license credential. And while Berry is certain that Plaintiff's alleged physical injuries sustained in the accident impact, "his ability to…satisfy the physical demand associated with the U.S. Coast Guard medical-review process," he merely agrees that Plaintiff's advancement to wheelhouse job positions requiring a Coast Guard license would depend on Plaintiff's ability to meet and maintain medical qualification in line with the Coast Guard's rules[4]. *See, Report of Captain Michael Berry, p. 19, Opinion 12, p. 20, Chart Notes, Ex. "D".*

McAvoy, who had oversight and responsibility for various licensing issues in his role at the Coast Guard, provides actual knowledge, experience, and expertise from the Coast Guard side of the licensing process, with real analysis of some of the variables Berry fails to explain, and which McAvoy demonstrates make Plaintiff's future wage loss claim incredibly speculative.

For example, McAvoy notes that the Coast Guard's Merchant Mariner Credentialing process, is designed, "to issue licenses to applicants found qualified as to age, experience, professional qualifications, physical fitness, character and habits of life", which includes review of the candidate's professional skills, medical sufficiency, and an evaluation of their character. *See, Report of Kyle McAvoy, p. 2, Ex. "C".*

[4] Berry makes no effort to explain how Plaintiff's diabetic condition resulting in HbA1c readings of 10.4% on the month he became employed by CP Marine, June 2024, and of 10.9% in August 2025, would not have resulted in his disqualification from being a issued a Merchant Mariner credential, due to ineligibility for a medical waiver, which would preclude him from wheelhouse work. U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, ch. 14, at 14-6 to 14-7 (Aug. 30, 2019); Rec. Doc. 49-3, Ex. F. He further fails to explain how Plaintiff's other disqualifying medical condition could qualify for a medical waiver, and the likelihood that a medical provider, and the National Maritime Center staff, would all agree that a waiver was appropriate.

McAvoy demonstrates how Berry failed to address how the Coast Guard assesses many facets of a mariner's life and record as part of its character fitness analysis, including motor vehicle driving records, criminal convictions, and evidence of drug use, including marijuana. *Id*. at p. 5. Further, McAvoy is of the opinion that the evidence of Plaintiff's admitted prior illegal use of marijuana and prescription pills, and his history of suicidal ideation/self-injurious behavior, present a significant obstacle to his licensing as it would require further evaluation by the National Maritime Center. *Id*. McAvoy's opinion is well-supported by the law, as Defendants refer the Court to the legal consequences of any prior drug use by a mariner seeking/holding a license credential and the revocation thereof, with a requirement of drug rehabilitation program and proof of a complete non-association with drug for at least one year to be eligible to request the license be reinstated, as set forth in Rec. Doc. 49-3, p. 27-29, iii. Plaintiff's Prior Use of Illegal Drugs Renders Him Unfit for Work as a Licensed Mariner Making His Claims Speculative. McAvoy also has direct experience of how the Coast Guard suspended or revoked a mariner's license associated with drug use, and the steps those mariners had to complete in order to demonstrate "cure" to the administration law judge in an effort to regain their credential in the early 1990's. *See Curriculum Vitae of Kyle McAvoy and his experience described from 1990 to 1994, Ex. "B."*

McAvoy also demonstrates how the Coast Guard uses Physical Evaluation of mariners by medical professionals pursuant to Form CG 719-K, the United States Coast Guard Physical Form, and the guidelines of U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, (Aug. 30, 2019), to determine whether a mariner has the "medical fitness" that Berry acknowledges is required to be issued a license, but which he fails to even tangentially address in his report. McAvoy explains that a medical professional will exam the mariner and complete the Form 719-K Physical, but that medical staff employed by the National Maritime Center performs

their own independent review of that provider's conclusions, in order to determine a number of factors McAvoy sets forth. *See, Report of Kyle McAvoy, p. 5-6, Ex. "C".*

McAvoy explains how the Form 719-K Physical includes a table listing a host of duties and tasks that the examining provider must determine whether a medical condition impairs the applicant's ability to fully perform, as well as any specific duties required of a license credential, and that alternative analyses are available for mariner with physical limitations. *See, Report of Kyle McAvoy, p. 6-7, Ex. "C".* Thus, McAvoy shows that despite Berry's opinion that Plaintiff's physical injuries prevent his becoming licensed, this is not necessarily true.

McAvoy further shows that if mariners do not meet the medical requirements for issuance of a license, they may be eligible to seek a medical waiver in certain specified circumstances. *Id*. at 7. However, McAvoy opines that Plaintiff's two prior Form 719-K Physicals resulting in two different medical providers determining he was "Not Recommended" for a medical certificate, due to his diabetic condition being disqualifying under Coast Guard guidelines, would present a significant hurdle to his ever being approved, from a medical standpoint, to be issued a licensing credential. *Id*. Similarly, McAvoy opines that Plaintiff's bipolar disorder diagnoses is another condition that the Coast Guard guidelines have specifically identified as one that may be disqualifying for issuance of a license. McAvoy provides no medical evaluation of Plaintiff but rather points out that certain medical issues of which the Plaintiff has already been diagnosed can be potentially disqualifying. *Id*.

McAvoy's opinion is based on his review of the case evidence and application of his knowledge, training, and experiences as a Coast Guard Officer with oversight and responsibilities for licensing issues, as well as the laws and regulations pertaining thereto, including U.S. Coast Guard, Merchant Mariner Medical Manual, COMDTINST M16721.48, (Aug. 30, 2019). His

testimony will assist the trier of fact in understanding the roles of the National Maritime Center employees in considering a mariner's license application, the steps taken by the National Maritime Center in response to an application, how the National Maritime Center responds to mariner applications, and the rules, regulations, and standards applicable to the National Maritime Center's decisions on mariner applications and the related issues, including medical and character issues.

**A. Presenting Different Experts in Different Expertises**

"It is within the power of the district court to exclude testimony that is repetitious and cumulative of testimony already before the court." *Leefe v. Air Logistics, Inc.*, 876 F.2d 409, 410 (5th Cir. 1989) (citing *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir.), *cert. denied* 471 U.S. 1126, 105 S. Ct. 2659, 86 L. Ed. 2d 276 (1985); Fed. R. Evid. 403). However, "the Fifth Circuit instructs that '[t]he exclusion of evidence under Rule 403 should occur only sparingly.'" *Thomas v. W&T Offshore, Inc.*, No. CV 16-14694, 2018 U.S. Dist. LEXIS 145844, 2018 WL 4095099, at *3 (E.D. La. Aug. 27, 2018) (quoting *United States v. Pace*, 10 F.3d 1106, 1115 (5th Cir. 1993)).

The Fifth Circuit has made clear that experts from different disciplines can testify about the same subject so long as each has sufficient expertise within his field to allow each to give reliable expert testimony on that subject. *Carlson v. Bioremedi Therapeutic System, Inc.*, 822 F.3d 194, 200 (5th Cir. 2016)("A medical degree is not a prerequisite for expert testimony relating to medicine. For example, we have held that scientists with PhDs were qualified to testify about fields of medicine ancillary to their field of research. *See, e.g., Dawsey v. Olin Corp.*, 782 F.2d 1254, 1262-63 (5th Cir. 1986)(holding a biochemist who studied the effects of phosgene on animals was 'well qualified . . . to extrapolate his research to humans'")).

More importantly, the fact that two experts may hold the same conclusion does not by itself render the opinions cumulative so long as the experts' opinions are reached through different

disciplines. *Sanchez v. Swift Transp. Co. of Ariz., LLC*, No. 4:15CV15-LG, 2017 U.S. Dist. LEXIS 204892, 2017 WL 5643554, at *3 (W.D. Tex. July 19, 2017) ("Even though the conclusions are the same, the two doctors approached their analysis of Plaintiffs' medical conditions from different vantage points.").

> Additionally, the Fifth Circuit has not put a precise limit on the number of experts that can testify regarding a particular issue. *Leefe*, 876 F.2d at 411. Multiple experts may testify to the same conclusion if they approached their individual analyses from separate "vantage points." *See Sanchez*, 2017 U.S. Dist. LEXIS 204892, 2017 WL 5643554; *Thomas*, 2018 U.S. Dist. LEXIS 145844, 2018 WL 4095099, at *3. Because "[i]t is difficult . . . to determine the necessity and cumulative effect of testimony by several experts," the Court has wide discretion in allowing experts to testify. See *Leefe*, 876 F.2d at 411.

*Parker v. John W. Stone Oil Distribs., L.L.C.,* No. CV 18-3666, 2019 U.S. Dist. LEXIS 139820, 2019 WL 3891574, at *3 (E.D. La. Aug. 19, 2019); *see also Farris v. Jefferson*, No. 6:19-CV-00108 LEAD, 2021 U.S. Dist. LEXIS 206258, 2021 WL 4978693, at *1 (W.D. La. Oct. 25, 2021); *Matter of Savage Inland Marine LLC*, No. 1:19-CV-536, 2021 U.S. Dist. LEXIS 132328, 2021 WL 2935300, at *5 (E.D. Tex. Jan. 22, 2021).

In *Stewart v. Fam. Dollar, Inc*., 23-314, 2025 U.S. Dist. LEXIS 195035, *43-45 (M.D. La. Sept. 11, 2025), the Plaintiff called two experts, a safety consultant and an architect, to provide testimony that "the bolt protruded too high from the pavement and that the pavement was not wide enough," with both referring to the same standards, in connection with a personal injury case. Defendants argued that the opinions were identical, making the evidence cumulative and a waste of time. However, the Court properly allowed both witnesses to testify, as although their conclusions were the same and they relied on the same standards, they each approached the issue from a different discipline and reached those conclusions in their own respective fields of expertise. *Stewart*, 2025 U.S. Dist. LEXIS 195035, *45.

The same is true here, as Defendants will call Fazioli, Nunez, and McAvoy to provide expert testimony about the Coast Guard licensing process and Plaintiff's inability to qualify for wheelhouse positions or Coast Guard licensure, within their individual disciplines: (1) Captain Fazioli – maritime industry/mariner perspective; (2) Nunez – vocational counselor perspective; and (3) McAvoy – Coast Guard/National Maritime Center perspective.

Captain Fazioli, will offer testimony about the licensing process from the perspective of a mariner and the potential obstacles, hurdles, and/or assistance that a mariner could encounter in seeking licensure; Stacie Nunez, who will offer testimony about Plaintiff's aptitude and qualifications to work in various jobs, and jobs for which he is not qualified such as wheelhouse work requiring a license, based upon his abilities, age, academic achievements, skills in the field of wheelhouse work, and his medical qualifications for wheelhouse work; and McAvoy will provide testimony about the licensing process from the perspective of the United States Coast Guard and the potential obstacles, hurdles, and/or assistance that a mariner could encounter in seeking licensure.

The fact that these witnesses' conclusions are aligned does not make their opinions cumulative; it means that the evidence consistently leads to those conclusions in any discipline that performs an adequate examination of the licensing issue in dispute. Because these three witnesses each testify in different areas of expertise, their testimony should be allowed.

**WHEREFORE** Defendants, CP Marine Services, LLC and Ten Mile Exchange, LLC respectfully pray that Plaintiffs' Motion in Limine, Rec. Doc. 47, be denied.

Respectfully submitted,

/s/ *Kari M. Rosamond*_______________________

**PAUL D. HALE (Bar No. 30539)**
**KARI M. ROSAMOND (Bar No. 34065)**
**HALE DEVALL, LLC.**
400 Poydras Street, Suite 2107
New Orleans, LA 70130
Telephone: (504) 576-0700
Facsimile: (504) 383-0932
phale@haledevall.com
krosamond@haledevall.com

**Attorneys for CP Marine, LLC and Ten Mile Exchange, LLC**