UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JONATHAN FERRIER<br><br>v.<br><br>CP MARINE SERVICES, LLC and TEN MILE EXCHANGE, LLC | CIVIL ACTION NO. 2:25-cv-02286 consolidated w/ 26-cv-1694<br><br>Ref: 25-2286<br><br>JUDGE JAY C. ZAINEY<br><br>MAGISTRATE JUDGE KAREN WELLS ROBY |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE AND DAUBERT MOTION TO EXCLUDE AND LIMIT THE OPINIONS AND TESTIMONY OF STACIE A. NUNEZ, CRC**

**MAY IT PLEASE THE COURT:**

Defendants, CP Marine Services, LLC ("CP Marine"), and Ten Mile Exchange, LLC ("Ten Mile"), (collectively "Defendants"), submit this Memorandum in Opposition to Plaintiff's Motion in Limine and *Daubert* Motion to Exclude and Limit the Opinions and Testimony of Stacie A. Nunez, CRC (Rec. Doc. 46).

For those reasons more fully addressed below, Plaintiff's grievances about Ms. Nunez's opinions are more appropriately handled by cross-examination rather than excluding and/or limiting her testimony, because Plaintiff's argument that the evidence does not support her opinion, "goes to the weight of evidence and not to its admissibility under *Daubert*." *Kent v. Int'l Paper Co.*, 17-350, 2018 U.S. Dist. LEXIS 2430945 (Miss. S.D. Sept. 14, 2018), citing, *Carter v. Hornbeck Offshore Transp., LLC*, 2014 U.S. Dist. LEXIS 87099, 2014 WL 2898458, at *1-2 (E.D. La. June 26, 2014)("[T]he reliability of data underlying an expert's opinion goes to the weight of this evidence, but should not serve as a basis for its exclusion.")(quoting *St. Joseph Abbey v. Castille*, 2011 U.S. Dist. LEXIS 59511, 2011 WL 2182046, at *5 (E.D. La. June 3, 2011)(citing

*Tyler v. Union Oil Co. of Cal*., 304 F.3d 379, 392-93 (5th Cir. 2002)); *General Elec. Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd*., 2004 U.S. Dist. LEXIS 30714, 2004 WL 5495590, at *4 (W.D. Tex. Oct. 21, 2004)("Courts should not be lured by arguments disguised as *Daubert* challenges that actually attack the weight of the expert testimony, not its admissibility. As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.")(alterations in original)(internal citations omitted); 2004 U.S. Dist. LEXIS 30714, [WL] at * 4 ("Therefore, challenges to the factual bases or underpinnings of an expert opinion usually go only to weight and credibility of the evidence, not admissibility.")(citing *Moss v. Ole South Real Estate, Inc*., 933 F.2d 1300, 1307 (5th Cir. 1991) and *Matador Drilling Co. v. Post*, 662 F.2d 1190, 1199 (5th Cir. 1981)).

## I. RELEVANT FACTS

Plaintiff, Jonathan Ferrier, filed suit against CP Marine and Ten Mile alleging to have sustained "severe and debilitating" injuries on April 5, 2025[1], while employed by CP Marine as a Jones Act Seaman aboard the M/V DOUGLAS when a "line grabbed [his] leg and crushed it" during mooring operations,[2] causing him to seek various damages from Defendants as well as maintenance and cure.[3]

[1] While some records including Plaintiff's Complaints indicate that the accident occurred on April 5, 2025, it is undisputed that Plaintiff's accident actually occurred on April 6, 2025.

[2] Rec. Doc. 1, Paragraphs 2, 4, and 7 and Rec. Doc. 12, Paragraph 5.

[3] Rec. Doc. 1, par. 12.

After Plaintiff's incident, he was taken to West Jefferson Medical Center where he presented with a right tibia and fibula injury/fracture necessitating surgery that was performed by Dr. Barton Wax on April 6, 2025.[4]

Once discharged from West Jefferson Medical Center, Plaintiff treated with Dr. Barton Wax at Jefferson Orthopedic Clinic.[5] On August 4, 2025, Dr. Wax noted that Plaintiff "…. has no activity restrictions and may continue with FULL DUTY…These limitations are effective for 6 Weeks…".[6]

Upon his medical release, Plaintiff sought a return to his deckhand position with Defendants. However, there were no available deckhand positions at that time, so, Defendants offered Plaintiff full-time employment performing maintenance on its drydocked vessel.[7] Plaintiff commenced working for Defendants on September 15, 2025, and continued until September 23, 2025. Nonetheless, Plaintiff's employment was terminated following a dispute with his supervisor. Defendants delivered a Letter of Termination that indicated, Plaintiff was terminated "due to repeated instances of poor performance, failure to meet work requirements, and failure to comply with direct orders from [his] supervisors" in violation of company policy as well as his consistent failure "to complete assigned tasks in a timely and satisfactory manner", [his] argumentative and insubordinate conduct, and due to the fact that he had "not demonstrated the physical capability required to effectively carry out the essential duties of the position."[8]

---

[4] See Exhibit A, Ferrier Medical 001030 – 001049, West Jefferson Medical Center.

[5] See Exhibit B, Jefferson Orthopedic Clinic Physical Therapy Records from May 21, 2025-July 1, 2025.

[6] See Exhibit C, Dr. Barton Wax August 4, 2025 Record.

[7] See Exhibit D, Haleigh Dardar July 10, 2026 Deposition, page 231, lines 7-19.

[8] See Exhibit E, Defendants' Letter of Termination.

Haleigh Dardar and Jason Schouest, CP Marine employees involved in Plaintiff's termination, testified as to the meaning of the "physical capability" statement within the Termination Letter, explaining that it meant Plaintiff was not physically doing his job, that he was lazy and sitting on his phone when he was supposed to be cleaning the M/V ROUGAROU.[9]

Nevertheless, within a week, Plaintiff sought employment with one of his former employers, Natalie Jean Marine, LLC ("Natalie Jean Marine"). Natalie Jean Marine had Ferrier evaluated by a medical professional on September 30, 2025, at which time Ferrier was asked, in connection with the Physical Exam, among other things whether he had or has knee trouble whereby Ferrier stated "no."[10]

The examining medical provider, Ben Leblanc, NP, concluded in the USCG Physical Form CG-719K that Ferrier, "…has the strength, agility, and flexibility to perform all of the items listed in the physical ability table,"[11] but concluded that Ferrier **<u>WAS NOT</u>** fit for employment as a mariner, because:

(1) Ferrier was at high risk of having a condition that poses a significant risk of sudden incapacitation or debilitating complication, to include…diabetes mellitus…;

(2) to the best of the provider's knowledge, Ferrier had a medical condition likely to be aggravated by service at sea to render Ferrier unfit for such service or to endanger the health of other persons onboard;

---

[9] See Exhibit D, Haleigh Dardar Deposition, pages 327, line 1 – 339, line 1; see also Exhibit F, Jason Schouest July 13, 2026 Deposition, page 240, line 3 – page 241, line 8.

[10] See Exhibit G, Ochsner Occupational Health – Westbank.

[11] *Id*.

the basis of which was, “Poorly controlled DMI[12] on insulin but last endo[13] notes state his DM[14] is poorly controlled and last 2 recent AIC[15] were greater than 9%[16] ”.[17]

Nevertheless, Natalie Jean Marine hired Ferrier as a deckhand, with his first day of work on October 3, 2025,[18] because it was determined that Ferrier was capable of working as a deckhand from a physical standpoint.[19]

Stanley Kraly, the Natalie Jean Marine Port Captain, did not detect the presence of any medical condition or disability of Ferrier at the time of his hire between September 30 and October 3. Furthermore, Ferrier himself reported to Mr. Kraly that he was medically recovered and capable of working as a deckhand[20].

Kraly testified further that, about one month into Ferrier’s employment, Kraly observed Ferrier with a slight limp and a lack of agility in walking on the deck of the vessel to which he was assigned, the M/V GI JOE.[21]

[12] Diabetes Mellitus.

[13] Endocrinologist.

[14] Diabetes Mellitus.

[15] A blood test to determine average blood sugar level over a period of time.

[16] An A1C result in excess of 8% precludes a mariner from being issued a credential authorizing work as a seaman without further review and clearance by a medical provider. See, USCG, NVIC No. 04-08.

[17] See Exhibit G, Ochsner Occupational Health – Westbank.

[18] See Exhibit H, Rough Draft of the August 7, 2026 Deposition of Stan Kraley, page 45, lines 21 – 23. Please note that the final deposition transcript was not available at the time of filing this Motion.

[19] *Id*. at page 39, line 24 – page 40, line 7.

[20] *Id*. at page 24, line 24 – page 25, line 2.

[21] *Id*. at page 43, lines 19 – page 44, lines 6; page 108, line 4 – page 109, line 13.

Consistent with Kraly's observations of Plaintiff's new symptoms "one month" after he became employed on October 3, on November 4, 2025, Ferrier sought medical treatment for right ankle and tibia and fibula discomfort, and for the first time reported right knee symptoms to Dr. Neil Duplantier.[22]

Nonetheless, despite Plaintiff's new knee complaints and reporting of symptoms, he continued to work as a deckhand for Natalie Jean Marine, without ever missing work due to pain. other symptoms, or medical appointments, while living aboard the M/V GI JOE, from October 3, 2025 through February 10, 2026, when Natalie Jean Marine terminated him[23].

Defendants retained IME physician Dr. Michael McNulty who opined that the right knee condition is unrelated to the April 6, 2025 accident, that Plaintiff reached MMI by April 6, 2026, and that Plaintiff requires no further medical treatment for the leg fracture/injury(ies) sustained on April 5, 2025:

> Following surgical treatment and rehabilitation in April 2025, he was ultimately cleared for unrestricted work approximately 5 months after surgery by Dr. Wax. He had no complaints regarding his knee in physical therapy post-op appointment. In his pre-employment physical, he denied any knee symptoms and on exam there was no physical evidence of any knee-related pathology. After being cleared for full/unrestricted duty, he worked on a boat for several months without any recorded difficulties. His job would have required strenuous use of his knee for which a symptomatic meniscus tear would not be compatible. It was not until November 2025, and after several months of strenuous work, that he then first complained of knee symptoms. If he would have sustained a meniscus tear in the work injury he would have complained of knee symptoms and had physical evidence of knee related limitations in the aforementioned medical visits. In addition, given the nature of his job on the boat for which he worked uneventfully for several months after clearance, a symptomatic meniscus tear related to the

---

[22] See Exhibit I, Bone & Joint Clinic Records from November 4, 2025.

[23] See Exhibit H, Rough Draft of the August 7, 2026 Deposition of Stan Kraley, 65:18-66:12, and 66:17-22. Please note that the final deposition transcript was not available at the time of filing this Motion.

> incident in question would have caused limitations and complaints. Barring surgery he is at MMI. He reached MMI approximately 1 year after the incident.[24]

Defendants also retained licensed rehabilitation counselor, Stacie Nunez, to complete a vocational rehabilitation evaluation assessing the employability and expected earnings range of Plaintiff.[25] Ms. Nunez, in addition to her vocational interview of Plaintiff, an analysis of transferable skills and work abilities, specifically stated that she received and reviewed at least thirty (30) different records in forming her opinions.[26] Further, Ms. Nunez discussed the case with Dr. McNulty, and within her report, reiterated several of Dr. McNulty's opinions regarding Plaintiff: 1) his opinion on future care, 2) the unrelatedness of Plaintiff's right knee condition, 3) the only medical condition present at the time of his evaluation was right knee pain resulting from a medical meniscus tear, but that he does not relate that condition to the accident in suit, 4) that Plaintiff could require medical treatment in the future, including knee arthroscopy, meniscus repair vs. partial meniscectomy, and hardware removal, but he did not relate this treatment to the accident in suit, and 5) did not recommend any medication, diagnostic studies, physical therapy, acupuncture, or surgeries/injections due to injuries sustained in the accident, and 6) that Plaintiff has no physical work restrictions related to injuries sustained in the accident.[27]

## II. LAW AND ARGUMENT

The principles that govern the admissibility of expert testimony are found in Federal Rule of Evidence 702, which states:

---

[24] See Exhibit J, Dr. Michael McNulty May 20, 2026 Medical Report.

[25] See Exhibit K, Stacie Nunez August 10, 2026 Vocational Report.

[26] *Id*.

[27] *Id*. at page 5.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

District Courts have broad discretion in determining the qualifications of an expert witness and the admissibility of expert testimony.[28] In admitting expert testimony, Rule 702 requires the Court to make two preliminary determinations. First, the proffered expert witness must be qualified as an expert by knowledge, skill, experience, training, or education.[29] Second, the proffered expert's opinion, inference, or other testimony must be based on scientific, technical, or other specialized knowledge that will assist the trier of fact to understand evidence or determine a fact in issue.[30]

To guide lower courts in determining whether an expert's reasoning or methodology is reliable, the *Daubert* court offered some "general observations, in the form of four factors. These include: (1) whether the theory or technique can be (and has been) tested according to the scientific methods; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the opinion is generally accepted within the relevant

---

[28] *Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co.*, 954 F.2d 19, 21 (1st Cir. 1992); *Black v. Ryder/Pie Nationwide, Inc.*, 930 F.2d 505 (5th Cir. 1991).

[29] *Moore v. Ashland Chemical, Inc.*, 126 F.3d 679, 684 (5th Cir. 1998), aff'd *en banc*, 151 F.3d 269 (5th Cir. 1998).

[30] *Id.*; *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

scientific or technical community."[31] The Court further held that the Rule 702 inquiry is a "flexible one" and that a trial court's focus should be solely on the principles and methodology, and not on the conclusions that they generate.[32] Although Rule 702 does not require absolute certainty, it does require expert testimony be based on good grounds.[33]

Further, as a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact.[34] Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[35] The Court is not concerned with whether the opinion is correct, but whether the preponderance of the evidence establishes that the opinion is reliable.[36]

**A. Stacie Nunez's Opinions Concerning No Wage Loss and, Alternative Light-Duty Jobs, Are Based On Sufficient Facts and Data**

Plaintiff's allegation that Ms. Nunez's opinions are solely based upon Dr. McNulty's Rule 26 expert report and that she discounts the restrictions placed on Plaintiff by his treating physicians is baseless and mischaracterizes the evidence. In her report, Ms. Nunez, in addition to her vocational interview of Plaintiff, an analysis of transferable skills and work abilities, specifically states that she received and reviewed at least thirty (30) different records in forming her opinions.

---

[31] *Daubert* at 593-94.

[32] *Id*. at 595.

[33] *Poly-America, Inc. v. Serrot Int'l, Inc.*, 2002 WL 1996561, p. 12 (N.D. Tex. 2002) (citing *U.S. v. Posado*, 57 F.3d 428, 433 (5th Cir. 1995)).

[34] *Primrose Operating Co, v. National Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).

[35] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 596).

[36] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).

Within her report, Ms. Nunez specifically states Dr. McNulty's opinion on these issues:

> Dr. McNulty opined he would place no physical restrictions upon Mr. Ferrier in regards to returning to the work force related to the April 5, 2025 incident. Based on Dr. McNulty's recommendations, Mr. Ferrier is able to return to his prior work which would result in no wage loss.

Contrary to Plaintiff's allegation, Ms. Nunez's opinion concerning Plaintiff's ability to return to his prior employment is not rested upon an unsupported factual assumption; rather, she did what experts, especially vocational rehabilitation experts, routinely do: relied upon another expert, a physician's assessment of physical restrictions, and applied that assessment vocationally. Dr. McNulty's report documents that:

- Plaintiff sustained a right tibia/fibula fracture in the April 2025 incident, requiring surgery;
- After surgery and treatment, Dr. Wax released Plaintiff to unrestricted work 5 months after surgery;
- Plaintiff reported no knee complaints during post-operative physical therapy;
- Plaintiff denied knee problems at the September 30, Natalie Jean Marine pre-employment examination;
- The September 30 examination demonstrated no physical evidence of knee-related pathology;
- Plaintiff worked on a boat for several months without any recorded difficulties after his April 5 2025 incident;
- Knee complaints did not arise until several months of strenuous work while working for Natalie Jean Marine[37]

Dr. McNulty ultimately opined that Plaintiff's right knee, i.e. his meniscal tear, was unrelated to the April 5, 2025 accident and that Plaintiff had reached maximum medical improvement from the accident. Based upon the foregoing medical and factual information, Dr. McNulty confirmed, in writing, to Ms. Nunez that he did not relate Plaintiff's right knee complaints to the April 5, 2025 incident, recommended no future medical treatment as it related to the April 5, 2025 incident, and

[37] See Exhibit J, Dr. Michael McNulty May 20, 2026 Medical Report.

would place no physical restrictions upon Plaintiff in regards to returning to the work force as related to the April 5, 2025 incident.[38]

These conclusions are further supported by the testimony of Plaintiff's treating surgeon from April 5, 2025 through August 4, 2025, Dr. Barton Wax, who testified on August 20 (transcript not yet available) that Plaintiff was capable of returning to work as of August 4, 2025, and that Plaintiff agreed with that recommendation.

Federal Rule of Evidence 703 provides for the admissibility of an expert's opinion if the sources underlying that opinion are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[39] Vocational rehabilitation experts routinely rely upon physician conferences, written medical opinions, and written medical records in evaluating employability and earning capacity and in forming their ultimate opinions.

Furthermore, Ms. Nunez did not "discount" Dr. Lonseth's restrictions and then set them aside; her report expressly addressed his opinion that Plaintiff was restricted to light-level work and specifically cited Dr. Lonseth's restrictions:

> According to the records, Dr. Lonseth opined that Mr. Ferrier has permanent restrictions including inability to maintain balance, climbing up and down, crouching, crawling and no pushing/pulling more than five pounds.[40]

Ms. Nunez then identified alternative occupations falling within Dr. Lonseth's restrictions, thus, she has obviously considered and accounted for his opinion. Her vocational methodology did not depend upon selectively crediting an undisclosed opinion over a treating physician's

---

[38] See Exhibit, Stacie Nunez August 10, 2026 Vocational Report.

[39] FED. R. EVID. 703.

[40] See Exhibit ?,

opinion[41]; rather, she evaluated Plaintiff's vocational circumstances against competing medical assessments. Just because Plaintiff does not agree with Ms. Nunez's opinion, does not make her vocational opinions unreliable or inadmissible. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration;"[42] as "[i]t is the role of the adversarial system, not the court"[43] to prove evidence that may be deemed weak. Plaintiff can cross-examine Ms. Nunez concerning her reliance upon Dr. McNulty's conclusions concerning her no wage loss opinion.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion in Limine and *Daubert* Motion to Exclude and Limit the Opinions and Testimony of Stacie A. Nunez, CRC, Rec. Doc. 46, should be denied because Plaintiff's motion requests this Honorable Court to resolve disputed evidence and competing expert opinions under the guise of Rule 702, and because her opinion is grounded to the evidence in the case and within her area of expertise.

Respectfully submitted,

*/s/ Kari M. Rosamond*

Paul D. Hale (#30539)
Kari M. Rosamond (#34065)
**HALE DEVALL, LLC**
400 Poydras Street, Suite 2107
New Orleans, LA 70130
Telephone: 504-576-0700
phale@haledevall.com

[41] Her opinion is supported by the testimony and opinion of treating physician, Dr. Barton Wax.

[42] *Primrose*, 382 F.3d at 562.

[43] *Id*.

krosamond@haledevall.com

***Attorneys for CP Marine, LLC and Ten Mile Exchange, LLC***