ROUGH DRAFT

DEPOSITION OF STANLEY KRALY

EXHIBIT A

REPORTER'S NOTE AND WARNING

***************

This transcript is unedited work product and must be regarded as such until corrected certified, and signed by the Court Reporter The Reporter reserves all rights to make whatever editing she deems necessary in order to produce an accurate, verbatim record.

***************

EXAMINATION BY MR. HALE:

Q. Good morning, Mr. Kraly. My name is Paul Hale. We met before the deposition. Today, I represent CP Marine and Ten Mile Exchange in a lawsuit brought by Jonathan Ferrier.

Okay? You understand that?

A. Yes.

Q. Go ahead and state your full name for the record today?

A. My plan was to keep Jonathan on in the supervisory condition just to watch him and assess if there's any issues, and once I assessed that there may be issues, we would have to terminate his position.

Q. Well, on 10/3/25, he's got a full-and-complete medical release from a medical professional with respect to his leg and any other physical parts of his body, right?

A. Correct.

Q. He's not limping on 10/3/25 when he's coming to work for you. True?

MR. BOLOGNA:

Object to the form.

THE WITNESS:

I can't recall. I may have -- I probably did watch him, but I can't if there was a detectable limp.

BY MR. HALE:

Q. As we sit here today, you have no information that Mr. Ferrier was limping on the first day he went to work for you?

MR. BOLOGNA:

Object to the form.

THE WITNESS:

I can't recall seeing him limp.

BY MR. HALE:

Q. Okay. There was no reason to restrict his employment to light-duty, at that time, other than that was the only job available. True?

A. I only needed him as a supervisor. I had two full-time employees. We keep two employees -- deckhands on the vessel at all times. So I just wanted him to be a supervisor and to help him out financially. He said he wasn't -- hasn't received money in a while; was paying for his own medication and doctor bills, so I decided to bring him on as a supervisor.

Q. Sure. And what I'm trying to understand --

A. Light-duty.

Q. What I'm trying to understand is, was there a medical reason that he only worked in light-duty, or was that simply the job that was open?

A. The job, quote/unquote, wasn't open. We made a position because I felt sorry for Jonathan, No. 1. No. 2, I had two inexperienced deckhands that needed guidance from a deckhand with experience. So subsequently, we hired

Q. Okay. And did that concern you as his employer, that this guy is walking around the boat with 8-out-of-10 pain in his body?

A. Yes and no. I have a high tolerance to pain, so instinctively, I think everybody exaggerates their pain level where I would probably call it a lower pain level.

Q. Uh-huh.

A. That's how I react to pain.

Q. Yeah. Again, we know you're not a medical guy and you're just observing him as a person. But what you observed and the limitations and problems that he had -- were you able, in your mind, to perceive what you thought his pain level was?

MR. BOLOGNA:

Object to the form.

THE WITNESS:

I can't ascertain, you know, exactly what someone's pain level is. I would just ask him what his pain level is at that moment and just reiterate "you're on a light duty." And I would tell him from time to time to just go lay down on the bed or on

the recliner in the galley.

BY MR. HALE:

Q. Is what you observed -- did it just, sort of, look to you like a guy that broke his leg the year before but was now able to do his job but could you tell he had broke his leg?

MR. BOLOGNA:

Object to the form.

THE WITNESS:

I wouldn't be able to ascertain or discern what physical ailment he has, you know, unless told.

BY MR. HALE:

Q. Whatever the problems were that you observed, you didn't think they interfered with his ability to work for you, right?

A. In a light-duty status, I don't believe it interfered. I believe had he been at full-duty status, I believe the outcome would be different where he wouldn't be able to maintain the same level of proficiency and agility as the other deckhands.

Q. Okay. When you did talk to him after you observed this, did Mr. Ferrier reiterate to you that he felt fine and that he could continue

working for you?

A. He may have told me something to that effect because he was on light-duty status, and I gave him ample time to stay in bed longer if he needs to. Basically just kind of work through this light-duty status until we -- the vessel goes to work, and then we'll make an assessment then.

Q. Did you ask him, "Are you having any problems with your particular parts of your body"? In other words, did you find out what was wrong with the guy, or did you not care?

A. Of course, I cared, but I never asked him, "Can you pinpoint where the injury or where the pain is emitting from?" I probably just asked, "What is your overall pain level?" And he just lumped it all in together, I believe, and so that's what -- I just based off of face value what he told me.

Q. Yeah. I guess, what -- you were not aware of any sort of limp or problems before. He's at work, you observe him limping, and sort of having trouble getting around, right?

A. Probably about maybe a month after we were at the shipyard, that's when I started

his employment and you became aware of it, you would have made sure he got to a doctor to address that condition. True?

MR. BOLOGNA:

Object to the form.

THE WITNESS:

True to a point; however, I can't determine, you know, what pain he has coming from where, if it's related to his injury or not. And if he would have had an injury while on the vessel and reported it to me and said that it's unrelated to his previous accident, surely, I would have sent him to the doctor to be evaluated.

BY MR. HALE:

Q. Did you ever ask Mr. Ferrier, point blank, "Did you become injured while you were working for me"?

A. I don't recall asking him that.

Q. When you told Mr. -- did you terminate Mr. Ferrier in person?

A. Yes.

Q. Where were you?

A. It was probably here at the yard.

Q. And was this -- so I think what we have here is -- I think his last day is -- February 12th was the payday. It's through February 10th.
Does that help orient you in time as to when the GI JOE came back here?
A. I think the GI JOE came back January -- early February.
Q. Okay. So do you -- it's your recollection that the boat came back and you terminated him shortly thereafter?
A. Yes.
Q. And did Mr. Ferrier tell you, at any point, "My attorney told me I can no longer work"?
A. I don't recall him ever saying that.
Q. Did Mr. Ferrier ever tell you, "My attorney has recommended that I no longer work"?
A. I don't recall Jonathan telling me that. The only thing I remember telling Jonathan is, "With your injuries, the likelihood of you ever working on the deck again is slim to none. You're going to get probably a sedentary job or become a captain where the job is much easier than being a deckhand.
Q. And what is the basis for that belief?

a good attribute of a deckhand or a bad attribute of a deckhand?

MR. BOLOGNA:

Object to the form.

THE WITNESS:

That's -- it's so broad why we let go of deckhands and terminate their positions, but I can -- I can discern a good deckhand from a bad deckhand sometimes within ten minutes of, you know, the job interview.

BY MR. HALE:

Q. When you have good deckhands in your employment, do you fire them, or do you keep them employed?

A. Well, good deckhands we would definitely want to keep them employed.

Q. Yeah. If you have a deckhand that you think is going to become a captain, he's that good, are you going to fire him? Or you're going to keep him employed?

MR. BOLOGNA:

Object to the form.

THE WITNESS:

I would -- I would probably -- just